# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BENJAMIN MICHAEL MERRYMAN, AMY WHITAKER MERRYMAN TRUST, AND B MERRYMAN AND A MERRYMAN 4TH GENERATION REMAINDER TRUST, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>                  Defendant. | **CIVIL ACTION NO.**<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     JURISDICTION AND VENUE ......................................................................... 5

III.    PARTIES .............................................................................................................. 6

IV.     FACTUAL ALLEGATIONS ............................................................................. 12

        A.      JPMorgan's Role as a Depositary Bank for ADRs ............................... 12

        B.      The Contract Documents Govern the Conversion, Fees and
                Expenses for Cash Distributions to ADR Holders ................................ 13

        C.      JPMorgan Assigned an Unauthorized Spread Resulting in
                Unfavorable FX Rates in Violation of the Contract Documents ......... 15

        D.      JPMorgan Actively Concealed its Practices ......................................... 19

        E.      JPMorgan Continues to Charge ADR Holders Impermissible FX
                Fees ....................................................................................................... 20

V.      CLASS ACTION ALLEGATIONS ................................................................... 21

VI.     COUNTS .............................................................................................................. 24

        COUNT I BREACH OF CONTRACT ........................................................... 24

        COUNT II BREACH OF IMPLIED COVENANT OF GOOD FAITH
        AND FAIR DEALING ...................................................................................... 26

        COUNT III CONVERSION ............................................................................. 27

VII.    PRAYER FOR RELIEF ...................................................................................... 28

VIII.   JURY TRIAL DEMANDED .............................................................................. 29

Plaintiffs Benjamin Michael Merryman, Amy Whitaker Merryman Trust, and B Merryman and A Merryman 4th Generation Remainder Trust, individually and on behalf of all others similarly situated, allege the following against JPMorgan Chase Bank, N.A. ("Defendant," "JPMorgan," or the "Bank") based upon information and belief[1] except as to the allegations pertaining specifically to Plaintiffs that are based on personal knowledge:

## I.    INTRODUCTION

1.      JPMorgan is one of the world's leading investment and depositary banks. The Bank serves as a depositary bank for the issuance of American Depositary Receipts ("ADRs") and in that capacity is charged with certain contractual and implied obligations to the holders of the ADRs, for which it acts as depositary ("ADR Holders").   JPMorgan created the first Depositary Receipt in 1927 and claims the company is guided by the core principle of "first class business in a first class way."

2.      This is an action for injunctive relief and to recover damages on behalf of Plaintiffs and proposed Class members (as defined below) for harm suffered as a result of JPMorgan's practice of systematically deducting impermissible fees from dividends and/or cash distributions (collectively, "Cash Distributions") issued by foreign companies, and rightfully owed to ADR Holders.

3.      Throughout the Class Period (as defined below), JPMorgan was a party to agreements with Plaintiffs and Class Members which required it to convert Cash Distributions issued by foreign companies in foreign currency denominations into U.S. Dollars. For these

---

[1] Plaintiffs' information and belief is based on an investigation (by and through their counsel) that included review and analysis of: (i) JPMorgan's public documents and announcements; (ii) newspaper articles and other publications concerning Defendant and/or practices relating to foreign exchange currency trading; (iii) foreign companies' public documents, wire and press releases, and United States Securities and Exchange Commission ("SEC") filings; (iv) the pricing of ADR foreign exchange ("FX") transactions by JPMorgan; and (v) the underlying governing documents relating to JPMorgan's provision of ADR services to Plaintiffs.

services, among others required under the agreements, JPMorgan received certain contractual fees and expenses. Yet, JPMorgan breached these contractual duties to Plaintiffs and Class members by charging Plaintiffs and the Class additional fees over and above those specified in the applicable contracts. It did this by assigning unfavorable foreign exchange ("FX") rates applied to the conversion of non-U.S. dollar ("USD")-based Cash Distributions by foreign companies prior to issuing those payments to ADR Holders. These rates reflected a spread between the exchange rate the Bank actually received at the time of the conversion and the rate JPMorgan assigned its clients. As a result of its assignment of unfavorable FX rates and unbeknownst to ADR Holders, JPMorgan unlawfully skimmed millions of dollars from Cash Distributions owed and payable to Plaintiffs and Class members.

4.    JPMorgan's conduct of extracting additional fees from ADR Holders by assigning disadvantageous FX rates, which reflect the addition of a spread, is evidenced by Plaintiffs' analysis of 400 Cash Distributions made to the holders of 59 unique ADRs for which JPMorgan served as the depositary bank between 2002 and 2014.[2]  Comparing the FX conversion rate that JPMorgan assigned to Cash Distribution conversions to the range of the interbank market on the day that the Cash Distributions were converted shows that ADR Holders received unfavorable FX conversion rates *below the midpoint* of the day's trading in *86% of conversions (362 of 419 transactions)*. In *almost one-third of the FX conversions* in the sample examined *(136 of 419 transactions)*, the FX conversion rate JPMorgan charged ADR Holders was *at or near the very worst rate* of the day's trading range.

5.    On information and belief, the FX rates JPMorgan assigned Plaintiffs and Class members reflected a spread over the prevailing interbank market rate at the time the trades were

---

[2] JPMorgan acted as a depositary bank for 119 companies during the period analyzed.

executed or the rate JPMorgan actually received so as to generate additional, unauthorized profits at the expense of ADR Holders.

6.     A normal distribution of the rates achieved by JPMorgan on currency conversions—not subject to the addition of spreads by the Bank—would have predicted a majority of rates falling *at or around the midpoint* of the day's trading range for the currency. Instead, the rates that JPMorgan charged its ADR Holders were skewed disproportionally towards the worst rates of the day.  The below graph illustrates a sample of the foreign currency rates for Cash Distribution conversions that JPMorgan assigned to ADR Holders:



7.     As illustrated in the above graph, over a twelve year period from 2002 through 2014, the FX rates JPMorgan charged ADR Holders for dividend conversions were skewed towards the worst rates available during the trading day (-100% of the day's median rate in the interbank market).  Such a pattern evidences an intentional effort by JPMorgan to assign spreads, resulting in disadvantageous FX rates, to ADR Holders in order to earn additional unauthorized fees.

8.     On information and belief, JPMorgan's retained millions of dollars in Cash Distributions owed to Plaintiffs and Class members by extracting fees in excess of those permitted under the applicable agreements governing their services.

9.     In 2012, JPMorgan partially revealed that it charged ADR Holders a spread on the FX rates it assigned to them by disclosing, for the first time, on its website—*www.ADR.com*— that ADR dividends are "converted to U.S. dollars through a foreign exchange transaction with JPMorgan Chase Bank, N.A. or an affiliate ('JPMorgan')" and that "[t]he Final Foreign Exchange Rate will be net of any gain or loss incurred by JPMorgan on the transaction and a fee of up to 20 basis points in connection with the conversion of the dividend into U.S. dollars." This "fee of up to 20 basis points" is not permitted under the Contract Documents as defined below.

10.     JPMorgan continues to charge Plaintiffs and Class members an unauthorized fee on its FX conversions for Cash Distributions to ADR Holders.  Moreover, this fee bears no relation to any reasonable expenses that JPMorgan might incur for its services.  The industry standard fee in the interbank market for converting marketable sized transactions (such as the aggregate dividend payments at issue in this action) from foreign currency to USD does not exceed 1-2 basis points, and this fee is intended to cover both expenses and a reasonable profit,

JPMorgan's fee of "up to 20 basis points" is commercially unreasonable, and moreover, a charge that is beyond the enumerated fees and expenses for foreign exchange services set forth in the applicable agreements.

11.     JPMorgan's conduct of assigning a spread to the FX rates it achieves, which it has admitted since 2012, breached and continues to breach JPMorgan's contractual obligations, which enumerate the fees, expenses and charges that the Bank is permitted to charge and requires the Bank to act in good faith.

## II.   JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because this is a class action in which: (1) there are hundreds (if not thousands) of proposed Class members; (2) more than two-thirds of the proposed Class are believed to be citizens of States other than that of JPMorgan; and (3) the claims of the proposed Class exceed $5,000,000 in the aggregate.

13.     This Court has personal jurisdiction over JPMorgan. JPMorgan maintains its principal place of business in New York, New York.

14.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because (1) pursuant to 28 U.S.C. § 1391(c)(2), JPMorgan is deemed to reside in this District which has personal jurisdiction over JPMorgan with respect to this action; and (2) a substantial part of the events and/or omissions giving rise to the claims alleged herein occurred in this District.

## III.   PARTIES

15.     Plaintiff Benjamin Michael Merryman is a resident of the state of Arkansas.  Mr. Merryman was an ADR Holder in the following entities for which JPMorgan served as the

depository: Banco Santander SA; Chunghwa Telecom Co., Ltd.; CNOOC Ltd.; ENEL SpA; Novartis A.G.; Novo Nordisk A/S; and Sanofi.

16.     Mr. Merryman is Power of Attorney for the Amy Whitaker Merryman Trust (the "Whitaker Merryman Trust").   The Whitaker Merryman Trust was an ADR Holder in the following entities for which JPMorgan served as the depositary: Banco Santander SA; Chunghwa Telecom Co., Ltd.; CNOOC Ltd.; ENEL SpA; Novartis A.G.; Novo Nordisk A/S; Prudential PLC; Rio Tinto PLC; and Vale SA.

17.     Mr. Merryman is Trustee of the B Merryman and A Merryman 4th Generation Remainder Trust (the "4th Generation Remainder Trust").  The 4th Generation Remainder Trust was an ADR Holder in the following entities for which JPMorgan served as the depositary: CNOOC Ltd.; Guangshen Railway; Nippon Telegraph & Telephone Corp.; Novartis A.G.; Novo Nordisk A/S; and Rio Tinto PLC.

18.     During the Class Period, JPMorgan converted foreign currencies into USD for ADRs owned by Plaintiffs and Plaintiffs were damaged by the Bank's misconduct as alleged herein.  The following table demonstrates the ADRs held by Plaintiffs and the Cash Distributions Plaintiffs received, in relation to those ADR holdings:

| Plaintiff | Depositary Receipt Held | Dividend Payable Date |
|---|---|---|
| Benjamin Michael Merryman & Amy Whitaker Merryman TEN/COM | BANCO SANTANDER SA | 2/8/2008 |
| Amy Whitaker Merryman Trust | BANCO SANTANDER SA | 2/8/2008 |
| Benjamin Michael Merryman & Amy Whitaker Merryman TEN/COM | BANCO SANTANDER SA | 5/9/2008 |

| Plaintiff | Depositary Receipt Held | Dividend Payable Date |
|---|---|---|
| Amy Whitaker Merryman Trust | BANCO SANTANDER SA | 5/9/2008 |
| Benjamin Michael Merryman & Amy Whitaker Merryman TEN/COM | BANCO SANTANDER SA | 8/8/2008 |
| Amy Whitaker Merryman Trust | BANCO SANTANDER SA | 8/8/2008 |
| Benjamin Michael Merryman & Amy Whitaker Merryman TEN/COM | BANCO SANTANDER SA | 11/10/2008 |
| Amy Whitaker Merryman Trust | BANCO SANTANDER SA | 11/10/2008 |
| Benjamin Michael Merryman & Amy Whitaker Merryman TEN/COM | CHUNGHWA TELECOM CO. LTD. | 8/23/2007 |
| Amy Whitaker Merryman Trust | CHUNGHWA TELECOM CO. LTD. | 9/2/2009 |
| Amy Whitaker Merryman Trust | CHUNGHWA TELECOM CO. LTD. | 9/10/2010 |
| Amy Whitaker Merryman Trust | CNOOC LTD. | 6/25/2009 |
| Amy Whitaker Merryman Trust | CNOOC LTD. | 10/7/2009 |
| Amy Whitaker Merryman Trust | CNOOC LTD. | 6/16/2011 |
| Amy Whitaker Merryman Trust | CNOOC LTD. | 10/7/2011 |
| Benjamin Michael Merryman & Amy Whitaker Merryman TEN/COM | CNOOC LTD. | 7/6/2012 |

7

| Plaintiff | Depositary Receipt Held | Dividend Payable Date |
|---|---|---|
| Amy Whitaker Merryman Trust | CNOOC LTD. | 7/6/2012 |
| Benjamin Michael Merryman & Amy Whitaker Merryman TEN/COM | CNOOC LTD. | 10/17/2012 |
| Amy Whitaker Merryman Trust | CNOOC LTD. | 10/17/2012 |
| The B Merryman and A Merryman 4th Generation Remainder Trust | CNOOC LTD. | 7/11/2013 |
| Benjamin Michael Merryman & Amy Whitaker Merryman TEN/COM | CNOOC LTD. | 7/11/2013 |
| The B Merryman and A Merryman 4th Generation Remainder Trust | CNOOC LTD. | 10/17/2013 |
| Benjamin Michael Merryman & Amy Whitaker Merryman TEN/COM | CNOOC LTD. | 10/17/2013 |
| Amy Whitaker Merryman Trust | ENEL SPA | 6/28/2007 |
| Benjamin Michael Merryman & Amy Whitaker Merryman TEN/COM | ENEL SPA | 6/28/2007 |
| Amy Whitaker Merryman Trust | ENEL SPA | 11/30/2007 |
| Benjamin Michael Merryman & Amy Whitaker Merryman TEN/COM | ENEL SPA | 11/30/2007 |
| The B Merryman and A Merryman 4th Generation Remainder Trust | GUANGSHEN RAILWAY | 7/8/2011 |
| The B Merryman and A Merryman 4th Generation Remainder Trust | NIPPON TELEGRAPH & TELEPHONE CORP. | 7/3/2013 |

| Plaintiff | Depositary Receipt Held | Dividend Payable Date |
|---|---|---|
| The B Merryman and A Merryman 4th Generation Remainder Trust | NIPPON TELEGRAPH & TELEPHONE CORP. | 12/16/2013 |
| The B Merryman and A Merryman 4th Generation Remainder Trust | NIPPON TELEGRAPH & TELEPHONE CORP. | 12/15/2014 |
| Amy Whitaker Merryman Trust | NOVARTIS A.G. | 4/10/2007 |
| Benjamin Michael Merryman & Amy Whitaker Merryman TEN/COM | NOVARTIS A.G. | 4/11/2008 |
| Benjamin Michael Merryman & Amy Whitaker Merryman TEN/COM | NOVARTIS A.G. | 4/6/2009 |
| The B Merryman and A Merryman 4th Generation Remainder Trust | NOVARTIS A.G. | 4/8/2011 |
| Amy Whitaker Merryman Trust | NOVARTIS A.G. | 4/8/2011 |
| Benjamin Michael Merryman & Amy Whitaker Merryman TEN/COM | NOVARTIS A.G. | 4/8/2011 |
| The B Merryman and A Merryman 4th Generation Remainder Trust | NOVARTIS A.G. | 4/5/2012 |
| Amy Whitaker Merryman Trust | NOVARTIS A.G. | 4/5/2012 |
| Benjamin Michael Merryman & Amy Whitaker Merryman TEN/COM | NOVARTIS A.G. | 4/5/2012 |
| Amy Whitaker Merryman Trust | NOVARTIS A.G. | 4/5/2013 |
| Amy Whitaker Merryman Trust | NOVARTIS A.G. | 4/10/2014 |

| Plaintiff | Depositary Receipt Held | Dividend Payable Date |
|---|---|---|
| The B Merryman and A Merryman 4th Generation Remainder Trust | NOVO NORDISK A/S | 4/2/2014 |
| Benjamin Michael Merryman & Amy Whitaker Merryman TEN/COM | NOVO NORDISK A/S | 4/2/2014 |
| Amy Whitaker Merryman Trust | NOVO NORDISK A/S | 3/31/2009 |
| Amy Whitaker Merryman Trust | NOVO NORDISK A/S | 4/2/2013 |
| The B Merryman and A Merryman 4th Generation Remainder Trust | NOVO NORDISK A/S | 4/2/2013 |
| Benjamin Michael Merryman & Amy Whitaker Merryman TEN/COM | NOVO NORDISK A/S | 4/2/2013 |
| Amy Whitaker Merryman Trust | PRUDENTIAL PLC | 6/3/2011 |
| Amy Whitaker Merryman Trust | PRUDENTIAL PLC | 9/29/2011 |
| The B Merryman and A Merryman 4th Generation Remainder Trust | RIO TINTO PLC | 3/31/2011 |
| The B Merryman and A Merryman 4th Generation Remainder Trust | RIO TINTO PLC | 9/9/2011 |
| Amy Whitaker Merryman Trust | RIO TINTO PLC | 4/10/2014 |
| Amy Whitaker Merryman Trust | RIO TINTO PLC | 9/11/2014 |
| Benjamin Michael Merryman & Amy Whitaker Merryman TEN/COM | SANOFI | 6/5/2013 |

| Plaintiff | Depositary Receipt Held | Dividend Payable Date |
|---|---|---|
| Benjamin Michael Merryman & Amy Whitaker Merryman TEN/COM | SANOFI | 6/5/2014 |
| Amy Whitaker Merryman Trust | VALE SA | 5/7/2009 |
| Amy Whitaker Merryman Trust | VALE SA | 11/6/2009 |
| Amy Whitaker Merryman Trust | VALE SA | 1/31/2011 |
| Amy Whitaker Merryman Trust | VALE SA | 5/6/2011 |
| Amy Whitaker Merryman Trust | VALE SA | 9/2/2011 |
| Amy Whitaker Merryman Trust | VALE SA | 11/7/2011 |
| Amy Whitaker Merryman Trust | VALE SA | 5/7/2012 |
| Amy Whitaker Merryman Trust | VALE SA | 11/7/2012 |

19.     Defendant JPMorgan Chase Bank, N.A. is a national bank that maintains its headquarters at 1111 Polaris Parkway, Columbus, Ohio 43240.   JPMorgan's American Depositary Receipt Department maintains its offices at 4 New York Plaza, 12th Floor, New York, New York 10004.   As alleged herein, JPMorgan's conduct has unlawfully deprived ADR Holders of the full amounts owed upon foreign-company dividend payments during the Class Period by applying unreasonable FX rates to conversions of foreign currency into U.S. Dollars ("USD").   JPMorgan is the successor entity of JPMorgan Chase Bank (a New York corporation),

The Chase Manhattan Bank, and Morgan Guaranty Trust Company of New York.  As a result, any deposit agreements that were entered into by these entities—or any other predecessor entity to JPMorgan—and were not otherwise assigned or amended are now binding on JPMorgan and covered by this Complaint.

## IV.    FACTUAL ALLEGATIONS

### A.    JPMorgan's Role as a Depositary Bank for ADRs

20.    JPMorgan serves as a depositary bank for the issuance of ADRs and contracts with foreign stock corporations for the issuance of ADRs in the United States through Deposit Agreements. *See* Exs. 1 – 31 (Operative Deposit Agreements during putative Class Period for ADRs Plaintiffs held).  Under the ADRs and Deposit Agreements (collectively, the "Contract Documents"), JPMorgan holds shares issued by foreign companies on behalf of and for the benefit of U.S. investors in the ADRs ("ADR Holders").

21.    An ADR is a security that represents shares of non-U.S. companies held by a U.S. depositary bank, which allows U.S. investors to invest in foreign companies by trading in U.S. dollars.  JPMorgan issues ADRs to investors in the U.S. and distributes dollar-based Cash Distributions to ADR Holders when foreign companies pay dividends and/or cash distributions to their investors.  The non-U.S. companies pay ADR dividends to JPMorgan in foreign currency and the Bank converts that currency to USD prior to paying the Cash Distribution to ADR Holders, including Plaintiffs and Class members.  This conversion takes place through a Foreign Exchange or "FX" transaction, whereby foreign currency is exchanged for USD at a particular rate available in the currency market.

22.    In its role as a depositary, JPMorgan exercised control over ADR Holders and their assets when executing FX conversions of Cash Distributions.

23.     Plaintiffs and Class members are consumers who purchased the ADRs at issue

through JPMorgan's ADR Department.

24.     Plaintiffs and the Class are parties to the Contract Documents.[3]

**B.      The Contract Documents Govern the Conversion, Fees and Expenses for Cash Distributions to ADR Holders**

25.     JPMorgan entered into Deposit Agreements with foreign companies for all ADRs

that define the underlying securities that the ADRs represent and set forth the rights and

obligations of JPMorgan, the foreign companies, and the ADR Holders.   Upon purchasing

ADRs, ADR Holders become parties to the Deposit Agreements.   The ADRs are annexed to and

incorporated into the Deposit Agreements and contain additional terms that are incorporated by

reference into the terms of the respective Deposit Agreements.[4]

26.     The Contract Documents are governed by New York law.[5]

---

[3] Ex. 4 at cover (stating that agreement is between Chunghwa, JPMorgan and "Holders and Beneficial Owners of American Depositary Receipts"); Ex. 26 at cover (stating that agreement is between Rio Tinto PLC, JPMorgan, and "Owners and Holders of American Depositary Receipts); Ex. 28 (stating that agreement is between Sanofi-Avantis, JPMorgan, and "all Owners and Beneficial Owners from time to time of American Depositary Shares"); Ex. 1 at § 7.04 ("The Holders and owners of Receipts from time to time shall be parties to this Deposit Agreement and shall be bound by all of the terms and conditions hereof and of the Receipts by acceptance thereof.");  Ex. 5 at § 18) ("The Holders and owners of ADRs from time to time shall be parties to this Deposit Agreement and shall be bound by all of the provisions thereof."); Ex. 7 at preamble (stating that agreement is between the Company, the Depositary and "all Holders and Beneficial Owners"); Ex. 10 at § 18 ("The Holders and owners of ADRs from time to time shall be parties to the Deposit Agreement and shall be bound by all of the provisions hereof."); Ex. 13 at at § 18 ("The Holders of ADRs from time to time shall be parties to the Deposit Agreement and Holders and owners of ADRs shall be bound by all of the provisions hereof."); Ex. 16 at § 18 ("The Holders and owners of ADRs from time to time shall be parties to the Deposit Agreement and shall be bound by all of the provisions hereof."); Ex. 23 at § 19 ("EACH PARTY TO THIS DEPOSIT AGREEMENT (INCLUDING, FOR AVOIDANCE OF DOUBT, EACH HOLDER AND BENEFICIAL OWNER AND/OR HOLDER OF INTERESTS IN ADRS . . . ."); Ex. 23 at § 7.04 (Prudential Deposit Agreement) ("The Holders and owners of Receipts  from time to time shall be parties to this Deposit Agreement and shall be bound by all of the terms and conditions hereof and of the Receipts by acceptance thereof."); Ex. 30 at § 18 ("The Holders and owners of Receipts from time to time shall be parties to this Deposit Agreement and shall be bound by all of the terms and conditions hereof and of the Receipts by acceptance thereof.").

[4] *See, e.g.*, Exs. 5, 10, 16 (stating on the face of the ADR that it is "annexed to and incorporated in" the Deposit Agreement).

[5] *See, e.g.*, Exs. 7 at §7.6 (stating the Deposit Agreement and ADR "shall be governed by" the laws of New York).

27.     On information and belief, all or nearly all Contract Documents that are pertinent to this action contain substantially similar language.

28.     The Contract Documents require JPMorgan to distribute to each ADR Holder, in proportion to the number of deposited securities that correspond to the ADR Holder's ownership of ADRs, any USD resulting from Cash Distributions by the foreign stock corporation.   In connection with the conversion of Cash Distributions, JPMorgan assumes custody and control over the Cash Distribution for the benefit of the ADR Holders, and assumes an express obligation to conduct any foreign exchange and allocate the Cash Distribution among the ADR Holders in proportion to their ownership of the ADRs.[6]

29.     JPMorgan agreed to perform its obligations and duties under the Contract Documents, including the conversion of ADR Cash Distributions from foreign currency into USD, in "good faith" and/or without "gross negligence" or "bad faith" and in observance of reasonable commercial standards of fair dealing.[7]

30.     Moreover, the Contract Documents clearly set forth the "[c]harges", "expenses" or "fee[s]" that JPMorgan was entitled to charge for services performed under the Contract Document, including FX services.[8]

31.     Thus, pursuant to the Contract Documents, and at all relevant times, JPMorgan was required to convert Cash Distributions paid on the underlying stock of the foreign stock corporation into USD for the benefit of ADR Holders such as Plaintiffs and Class members.   At no time did ADR Holders authorize JPMorgan to charge a spread over and above the FX rates

---

[6] *See* Ex. 32 under "Duty to Convert FX."

[7] *See* Ex. 32 under "Standard of Care."

[8] *See* Ex. 32 under "Charges of the Depositary."

JPMorgan converted Cash Distributions, or withhold any proceeds associated with converting Cash Distributions into USD, other than such fees specifically enumerated in the Contract Documents.

32.     In addition, JPMorgan is subject to an implied covenant of good faith and fair dealing under the Contract Documents which obligated the Bank to execute FX transactions on ADR Cash Distributions with good faith, honesty in fact and the observance of reasonable commercial standards of fair dealing.

33.     Plaintiffs and Class members performed their duties under the Contract Documents.

34.     Plaintiffs and Class members contracted with and relied on JPMorgan to convert Cash Distributions to USD under the terms of the Contract Documents, in good faith, without gross negligence, and in the observance of reasonable commercial standards of fair dealing and in compliance with its contractual duties and implied covenant.

**C.     JPMorgan Assigned an Unauthorized Spread Resulting in Unfavorable FX Rates in Violation of the Contract Documents**

35.     In breach of its contractual and implied obligations, JPMorgan charged Plaintiffs and Class members unauthorized fees by assigning unfavorable FX rates to Cash Distributions that reflected of unauthorized spreads above the prevailing interbank rates at which the Cash Distributions were converted.  In this way, JPMorgan has retained monies rightfully owed to ADR Holders in violation of the Contract Documents.

36.      When JPMorgan received Cash Distributions from foreign companies, it was charged with converting foreign funds into USD pursuant to the Contract Documents.

37.      However, rather than charging ADR Holders the rate JPMorgan received at the time the conversion was executed less contractually permitted fees and expenses, JPMorgan

instead, assigned ADR Holders FX rates that, in the vast majority of instances, were far less favorable than even the median rate available in the market for a given day. The rates JPMorgan charged its ADR Holders ***approached the worst possible rates achievable in the trading day almost a third of the time***.  This pattern is indicative of JPMorgan assigning undisclosed spreads – resulting in unfavorable rates – to ADR Holders as an additional fee not permitted by the Contract Documents.

38.     Shown below is a graph plotting a random sample of 400 individual FX transactions wherein JPMorgan converted Cash Distributions into USD during the period January 2002 through December 2014.  The percentages on the x-axis of the graph plot a score for the rates achieved by JPMorgan for daily FX rates relative to the rates available in the interbank market for the given trading day.  Trades scored at 100% were executed at the most favorable FX rate within a trading day, whereas trades scored at -100% were executed for Plaintiffs and Class members at the worst possible FX rate within a trading day.  The y-axis of the graph represents the frequency at which FX trades were executed at a certain deviation from the median rate.

39.     In a normal distribution—unaltered by the addition of a spread—the largest spike, or highest bar in the graph, should be near 0%. Thus, where the FX pricing is competitive, the graph would result in a bell-shaped distribution, or a symmetrical distribution around an average, where the average level has the largest number of observations, and the number of observations gradually reduce as they move away from the average.  Given a random sample, any significant divergence from a bell-shaped distribution demonstrates systematic bias in the pricing.



**Graph 1**

40.    As evidenced by the majority of conversions falling on the left side of the above graph, JPMorgan, in the vast majority of FX conversions of Cash Distributions, exchanged foreign-denominated dividends at a rate that was disadvantageous to ADR Holders.  Critically, this pattern of executing FX transactions at rates consistently unfavorable to ADR Holders, which extends to FX conversions in over 56 different companies and 400 different transactions, cannot be due to chance, but rather, reflects an intentional effort by JPMorgan to exploit the daily spread in FX prices by adding a spread to the rates it actually received and thereby retaining monies rightfully owed to Plaintiffs and Class members.

41.    The above graph was prepared by examining the rates at which JPMorgan exchanged foreign-denominated dividends (each transaction a "FX Dividend Conversion") for

USD in 400 instances from 56 unique companies from the period 2002 through 2014.  The analysis included comparing the rate stated on JPMorgan's website (www.ADR.com) for each FX Dividend Conversion, with the publicly available interbank rate for a similar period.  The individual FX Dividend Conversions performed by JPMorgan were compared to the median interbank rate for each respective trading day and then the FX Dividend Conversions were scored on a scale from -100% to 100% relative to how their respective rates compared to the median interbank rate for the similar period.  The rates at which investors received the least favorable FX Dividend Conversions are negative (with -100% equal to the least favorable rate available in the Interbank market), and the rates at which investors received the most favorable FX Dividend Conversions are positive (with 100% equal to the most favorable rate available in the interbank market).  In instances where JPMorgan failed to post the date on which it performed an FX Dividend Conversion, Plaintiffs limited the analysis to include companies that paid a dividend in a currency other than dollars, but also paid that dividend no more than 24 hours prior to JPMorgan distributing the dividends to investors in US dollars.

42.     In breach of its contractual and implied obligations owed to Plaintiffs and Class members, from at least January 1, 2002, the above analysis reveals a pattern whereby JPMorgan acted in bad faith or without good faith by secretly assigning a spread, and thus unfavorable FX rates, to the conversion of Cash Distributions executed on behalf of Plaintiffs and Class members.

43.     In breach of its contractual and implied obligations owed to Plaintiffs and Class members, this spread was unrelated to the Bank's reasonable and/or actual expenses associated with the FX conversions and was not permitted under the Contract Documents as a charge, expense or fee.

18

44.     As illustrated in the chart above, these pricing practices have resulted in ADR Holders getting FX rates that are grossly distorted over what they should have obtained absent the spread added by JPMorgan.

45.     As a result of this conduct, during the Class Period, JPMorgan generated millions of dollars in unauthorized profits at the expense of ADR Holders and breached its contractual and implied duties to Plaintiffs and Class members.   Accordingly, Plaintiffs bring this suit, individually and as a class action on behalf of all similarly affected clients, to recover all retained monies and damages resulting from JPMorgan's wrongful conduct and to enjoin JPMorgan from any further breach of the Contract Documents and/or its implied duties.

**D.     JPMorgan Actively Concealed its Practices**

46.     JPMorgan possessed material information related to the FX rates available in the interbank market at the time it received the ADR Cash Distributions from foreign companies, and failed to provide this information to Plaintiffs and Class members.   Plaintiffs and Class members had no way of obtaining this information or deciphering the Bank's misconduct absent disclosure by JPMorgan.

47.     Prior to 2012, JPMorgan provided Plaintiffs and Class members with account statements detailing Cash Distributions paid on ADRs that did not disclose the rate at which the Bank acquired the currency for Cash Distributions, the time of day at which the underlying trade was executed, or that the Bank was profiting from the spread on FX rates.   JPMorgan did not time-stamp FX conversions, and reported only a portion of the dates on which conversions occurred, leaving Plaintiffs and Class members (a) unaware of the exact time and date, and therefore the actual value, of the currencies exchanged in the FX Dividend Conversions; and (b) unable to detect JPMorgan's pattern of consistently pricing FX Dividend Conversions for ADR

Holders at the worst rate of the day, rather than the rate at which JPMorgan received the foreign funds.

48.     In 2012, JPMorgan began partially disclosing its FX practices on its website—*www.ADR.com*—by stating that ADR dividends are "converted to U.S. dollars through a foreign exchange transaction with JPMorgan Chase Bank, N.A. or an affiliate ('JPMorgan')" and that "[t]he Final Foreign Exchange Rate will be net of any gain or loss incurred by JPMorgan on the transaction and a fee of up to 20 basis points in connection with the conversion of the dividend into U.S. dollars."   Prior to this disclosure, Plaintiffs and Class members had no way of knowing that JPMorgan was using FX conversions performed through its affiliates to extract a basis point fee from ADR Holders.

49.     As a result of the manner and method of JPMorgan's reporting to ADR Holders, Defendant's breaches of its contractual and implied obligations under the Contract Documents have been inherently undiscoverable absent the full disclosure of such information by Defendant. Plaintiffs and Class members did not know, and through the exercise of due diligence, could not have known of JPMorgan's contractual breaches giving rise to their claims and damages prior to the Bank's 2012 partial disclosure and Plaintiffs' investigation thereafter.   Plaintiffs and Class members affirmatively plead the doctrines of fraudulent concealment and the discovery rule, and allege that their claims are not precluded by the applicable statutes of limitations.

**E.     JPMorgan Continues to Charge ADR Holders Impermissible FX Fees**

50.     The Bank continues to retain an unreasonable spread on the conversion of Cash Distributions for ADR Holders.   Each of the dividend payments made by foreign companies to ADR Holders are marketable-sized transactions, in excess of $1,000,000 per transaction in the aggregate when converted by JPMorgan, on which banks such as JPMorgan typically charge at most 1-2 basis points above the prevailing interbank rate for currency conversion. While a

reasonable interbank market rate for conversion of Cash Distributions should not exceed 1-2 basis points, JPMorgan charges ADR Holders "up to 20 basis points" on its FX conversions to perpetuate a continual revenue stream at the expense of its clients.

51.     JPMorgan's continued collection of FX conversion fees that are not permitted under the Contract Documents and bear no relation to any reasonable interbank market rates and/or the Bank's reasonable expenses is in violation of its contractual and implied duties to Plaintiffs and Class members.

## V.     CLASS ACTION ALLEGATIONS

52.     Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of all persons or entities who, from or after January 1, 2002 to the present (the "Class Period"), are or were holders of depositary receipts for which JPMorgan Chase Bank, N.A. served as the depositary bank and converted foreign-currency dividends or other distributions into USD (the "Class").  Excluded from the Class are JPMorgan Chase Bank, N.A. and its officers, directors, legal representatives, heirs, successors, corporate parents, subsidiaries, and/or assigns.

53.     The members of the Class are so numerous that joinder of all members is impracticable.  Plaintiffs believes that there are hundreds, if not thousands, of proposed Class members.

54.     JPMorgan continues to breach its contractual and implied duties to Plaintiffs and Class members on grounds that apply generally to the Class so that final injunctive relief is appropriate respecting the Class as a whole.

55.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. These common questions include, but are not limited to:

(a)     Whether JPMorgan imposes FX rates for ADR Cash Distributions that reflect a spread over and above the FX rates the Bank received and/or the interbank trading rate at the time of execution;

(b)     Whether JPMorgan deducts impermissible and/or unreasonable charges from Cash Distributions paid to ADR Holders;

(c)     Whether JPMorgan is in breach of its contractual obligations owed to ADR Holders by charging FX fees that are not permitted under the Contract Documents;

(d)     Whether JPMorgan is in breach of and/or breached its implied covenant of good faith and fair dealing by charging and not disclosing FX fees in the form of a spread over the interbank trading rates at the time of execution or the FX rate JPMorgan actually received;

(e)     Whether JPMorgan is in breach of and/or breached its contractual obligations owed to ADR Holders by failing to disclose the FX rate at which the Bank received Cash Distributions, the unreasonable nature of the FX rates it charges ADR Holders, and that the Bank is earning fees over and above those contractually permitted;

(f)     Whether JPMorgan has converted assets belonging to Plaintiffs and Class members;

(g)     Whether Plaintiffs and Class members suffered monetary damages as a result of JPMorgan's conduct; and

(h)     The appropriate measure of damages.

56.     Plaintiffs' claims are typical of the claims of the Class. As alleged herein, Plaintiffs and Class members all sustained damages arising out of Defendant's unlawful course of conduct.

57.     Plaintiffs are willing and prepared to serve the proposed Class in a representative capacity with all of the obligations and duties material thereto.   Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to, or which conflict with, the interests of other members of the Class.

58.     Plaintiffs' interests are co-extensive with and not antagonistic to those of absent Class members.   Plaintiffs will undertake to represent and protect the interests of absent Class members.

59.     Plaintiffs have engaged the services of the undersigned counsel.   Counsel is experienced in complex class action litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiffs and absent Class members.

60.     The questions of law and fact common to the Class, as summarized above, predominate over any questions affecting only individual members, in satisfaction of Rule 23(b)(3), and each such common question warrants class certification under Rule 23.

61.     A class action is superior to other available methods for the adjudication of this controversy.   Individualized litigation increases the delay and expense to all parties and the court system given the complex legal and factual issues of the case, and judicial determination of the common legal and factual issues essential to this case would be far more fair, efficient, and economical as a class action maintained in this forum than in piecemeal individual determinations.

62.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.   Compared to individualized actions, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.   <u>COUNTS</u>

**COUNT I**
**<u>BREACH OF CONTRACT</u>**

63.     Plaintiffs restate and incorporate the allegations contained in each paragraph above as though fully set forth herein.

64.     Plaintiffs and Class members purchased ADRs and accepted the contractual terms offered by JPMorgan in the Deposit Agreements by agreeing to become a party to the Deposit Agreement corresponding to each ADR that was purchased.   The ADRs and their terms were annexed to and incorporated into the Deposit Agreements.

65.     The Deposit Agreements and the ADRs (collectively, the "Contract Documents") make up a valid and enforceable contract.   JPMorgan, Plaintiffs and Class members are parties to and bound by the terms and provisions of the Contract Documents, and the Contract Documents are substantially uniform across all ADRs and Class members.

66.     The Contract Documents set forth JPMorgan's obligations and duties to ADR Holders and require JPMorgan to convert foreign currency received through Cash Distributions to USD in "good faith" and/or without "gross negligence" or "bad faith" and in observance of reasonable commercial standards of fair dealing.   Moreover, the Contract Documents specifically enumerate the lawful fees that JPMorgan may charge ADR Holders.

67.     Plaintiffs and Class members have no control over FX conversions related to Cash Distributions and no knowledge of the reasonable FX rate available at the time of the trade execution.  JPMorgan has sole knowledge of the time the Cash Distribution is received and the reasonable interbank FX rate available at that time, as well as the FX rate the Bank actually received.

68.     JPMorgan breached its obligations and duties under the Contract Documents by assigning unfavorable FX rates – in the form of unauthorized spreads – to the conversion of Cash Distributions for ADR Holders.

69.     JPMorgan breached its obligations and duties under the Contract Documents by adding a spread to the FX rates for Cash Distributions paid to ADR Holders that was unrelated to the Bank's reasonable and/or actual expenses associated with the FX conversions and was not permitted as a fee under the Contract Documents.

70.     JPMorgan further breached its obligations and duties by retaining monies rightfully owed to Plaintiffs and Class members under the Contract Documents.

71.     To date, JPMorgan continues to breach its obligations and duties under the Contract Documents by deducting unreasonable fees of "up to 20 basis points" on FX conversions of ADR Holders' Cash Distributions, which is neither a permissible fee nor reasonable expense under the Contract Documents.

72.     Plaintiffs and Class members performed their duties under the Contract Documents.

73.     Plaintiffs and Class members have been and continue to be damaged as a direct and proximate result of JPMorgan's breach of its obligations and duties under the Contract

Documents, and the Bank's unlawful pocketing of Plaintiffs' and Class Members' monies, and are entitled to damages.

## COUNT II
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

74.     Plaintiffs restate and incorporate the allegations contained in each paragraph above as though fully set forth herein.

75.     JPMorgan is subject to an implied covenant of good faith and fair dealing under the Contract Documents.  Under that implied covenant, at all times, JPMorgan was obligated to execute FX transactions on ADR Cash Distributions with good faith, honesty in fact and the observance of reasonable commercial standards of fair dealing.  The implied covenant protects Plaintiffs and Class members from self-dealing by the Bank.

76.     JPMorgan breached its implied covenant of good faith and fair dealing by assigning FX rates in a manner intended to deprive Plaintiffs and Class members of the benefits of their Contract Documents—specifically, their rightful Cash Distributions.

77.     Based on the allegations herein, JPMorgan failed to act in good faith, consistent with its implied covenant of good faith and fair dealing.

78.     JPMorgan's acts were deliberately undertaken to wrongfully deprive Plaintiffs and Class members of their lawful right to receive ADR Cash Distributions at reasonable FX rates.  The Bank engaged in self-dealing by charging unfavorable rates to ADR Holders in order to pocket the spread and reap profits at ADR Holders' expense.

79.     Based on the allegations herein, JPMorgan failed to act in good faith, consistent with its implied covenant of good faith and fair dealing.

80.     As a direct and proximate cause of JPMorgan's breach of its implied covenant of good faith and fair dealing, Plaintiffs and Class members have suffered injury and incurred damages, which they are entitled to recover from JPMorgan.

81.     JPMorgan continues to breach its implied covenant of good faith and fair dealing by deducting unreasonable FX conversion fees of "up to 20 basis points" to siphon monies rightfully owed to ADR Holders, and Plaintiffs and Class members continue to suffer injury and incur damages.

**COUNT III**
**CONVERSION**

82.     Plaintiffs restate and incorporate the allegations contained in each paragraph above as though fully set forth herein.

83.     Defendant wrongfully and intentionally caused and/or causes deductions to be taken from Plaintiffs' and Class members' ADR Cash Distributions.

84.     Pursuant to their rights under the Contract Documents, Plaintiffs and Class members hold possessory rights or interests, and are entitled to receive converted USD equivalents of the ADR Cash Distributions, less a reasonable fee.

85.     By charging ADR Holders unreasonable and grossly unfavorable FX rates to extract an additional fee not permitted by the Contract Documents, JPMorgan unlawfully retains a portion of the ADR Cash Distributions to which Plaintiffs and the Class hold possessory rights or interests.

86.     JPMorgan has retained these funds unlawfully without the consent of Plaintiffs or Class members and deprived them of exercising control over the funds which belong to Plaintiffs and Class members.

87.   The Bank continues to unlawfully charge and retain unreasonable fees on the conversion of Cash Distributions for ADR Holders.

88.   JPMorgan intends to permanently deprive Plaintiffs and Class members of these funds, which are specific and readily identifiable pursuant to documents in the control of the Bank.

89.   As a direct and proximate result of JPMorgan's wrongful conduct as alleged herein, Plaintiffs and Class members have suffered and suffer injury and damages and are entitled to recover from Defendant all damages, costs and amounts wrongfully converted.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs requests the following:

(a)   Certification of this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as Class representatives and Plaintiffs' counsel as counsel for the Class;

(b)   An Order enjoining JPMorgan from any further breach of the Contract Documents and/or its implied duties;

(c)   Compensatory, consequential, and general damages in an amount to be determined at trial;

(d)   Disgorgement and/or restitution of all earnings, profits, compensation, and benefits received by JPMorgan as a result of its unlawful acts, omissions, and practices, and the imposition of an equitable constructive trust over all such amounts for the benefit of the Class;

(e)   Punitive damages for each claim to the maximum extent available under the law due to the outrageous nature of JPMorgan's willful and wanton disregard for the rights of Plaintiffs and Class members;

    (f)      Costs and disbursements of the action;

    (g)      Pre- and post-judgment interest;

    (h)      Reasonable attorneys' fees and costs; and

    (i)      Such other and further relief as this Court may deem just and proper.

## VIII.  **JURY TRIAL DEMANDED**

A jury trial is hereby demanded.

Dated: November 20, 2015

/s/ Sharan Nirmul
**KESSLER TOPAZ MELTZER**
**& CHECK, LLP**
Joseph H. Meltzer
Sharan Nirmul
Ethan Bartlieb (pro hac vice motion to be filed)
Jonathan Neumann (pro hac vice motion to be filed)
280 King of Prussia Road
Radnor, PA  19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056
Email: jmeltzer@ktmc.com
Email: snirmul@ktmc.com
Email: ebartlieb@ktmc.com
Email: jneumann@ktmc.com


G. Chadd Mason (pro hac vice motion to be filed)
Arkansas Bar No. 93035
**MASON LAW FIRM, PLC**
P.O. Box 1265
Fayetteville, AR 72702-1265
Tel:  (479) 442-6464

Amy C. Martin (pro hac vice motion to be filed)
Arkansas Bar No. 97075
**EVERETT, WALES and COMSTOCK**
1944 East Joyce Boulevard
PO Box 8370
Fayetteville, AR 72703
Tel: (479) 443-0292
Fax: (479) 443-0564
Email: amy@everettfirm.com