USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_____9/29/16_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

BENJAMIN MICHAEL MERRYMAN, AMY : 
WHITAKER MERRYMAN TRUST, and B :
MERRYMAN AND A MERRYMAN 4TH :
GENERATION REMAINDER TRUST, :                    15-CV-9188 (VEC)
individually and on behalf of all others similarly :
situated, :                                       MEMORANDUM
                                  Plaintiffs, :   OPINION & ORDER
                                              :
            -against- :
                                              :
J.P. MORGAN CHASE BANK, N.A., :
                                              :
                                  Defendant. :
------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

Plaintiffs Benjamin Michael Merryman, Amy Whitaker Merryman Trust, and B

Berryman and A Merryman 4th Generation Remainder Trust, on behalf of themselves and all

others similarly situated as of January 1, 2002, bring this action against J.P. Morgan Chase Bank,

N.A. ("JPM"), alleging breach of contract, breach of the implied covenant of good faith and fair

dealing, and conversion.  Plaintiffs, owners of American Depositary Receipts ("ADRs") held on

deposit by JPM, claim that JPM collected impermissible "fees" when converting foreign

currency-denominated cash distributions into U.S. dollars before distributing the cash to

Plaintiffs.[1]  Plaintiffs allege that JPM converted the distributions to U.S. dollars at a rate more

favorable than the rate at which the distributions were ultimately paid to Plaintiffs, thereby

retaining a "fee" that was not permitted under the ADR contractual agreements.

---

[1]       At times the parties refer to the fee as a "spread."  The Court will adopt the parties' approach and use the
terms "fee" and "spread" interchangeably.  It will remain to be decided in later phases of this litigation whether the
existence of a "spread" between the rate at which JPM converts foreign currency to U.S. dollars and the rate at
which it pays in U.S. dollars distributions received in foreign currency can fairly be characterized as a "fee."

JPM has moved (1) to dismiss the Class Action Complaint pursuant to Rules 8(a), 9(b), 12(b)(1), and 12(b)(6) of the Federal Rules of Civil Procedure and the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. §§ 78bb(f)); and (2) to dismiss or stay all claims relating to the Chunghwa ADR in favor of arbitration.  JPM's motion is DENIED as to Plaintiffs' breach of contract claims but GRANTED as to breach of contract claims that accrued more than five years before the commencement of this lawsuit.  Also GRANTED are: JPM's motion to dismiss Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing, conversion, and punitive damages; JPM's motion to compel arbitration of all claims relating to the Chunghwa ADR; and JPM's motion to deny class standing as to ADR holders who held ADRs for which JPM served as the depositary but in which Plaintiffs did not invest.

BACKGROUND[2]

## A.  American Depositary Receipts

ADRs allow people in the United States to invest in the shares of foreign companies without accessing foreign exchanges or buying and selling securities in foreign currencies.  Compl. ¶ 21 (Dkt. 1).  An ADR is a security that represents a share of a non-U.S. company that is held by a U.S. depositary bank, and it is denominated in U.S. dollars.  *Id.*  A depositary bank contracts with foreign corporations in order to issue ADRs; those contracts are called Deposit Agreements.  *Id.* ¶ 20.  A depositary bank holds shares issued by the foreign corporation on behalf of and for the benefit of U.S. investors in the corresponding ADR ("ADR holders").  *Id.*  When a foreign company pays a dividend or makes a cash distribution to its shareholders, it pays the distribution to the depositary bank in a foreign currency.  *Id.* ¶ 21.  The depositary bank then

---

[2]     For the purposes of this motion, the Court assumes the well-pled factual allegations of the Class Action Complaint to be true.  *See Turkmen v. Hasty*, 789 F.3d 218, 233 (2d Cir. 2015).

converts the distribution into U.S. dollars, which it pays to the ADR holders.  *Id.*  The rate at which the distribution is converted from a foreign currency into U.S. dollars is the foreign exchange rate ("FX rate").  *Id.*

JPM serves as a depositary bank for the issuance of ADRs.  *Id.* ¶ 20.  Collectively, Plaintiffs purchased ADRs through JPM's ADR Department for twelve foreign companies: Banco Santander SA; Chunghwa Telecom Co., Ltd.; CNOOC Ltd.; ENEL SpA; Guangshen Railway; Nippon Telegraph & Telegraph Corp.; Novartis A.G.; Novo Nordisk A/S; Prudential PLC; Rio Tinto PLC; Sanofi; and Vale SA.  *Id.* ¶¶ 15-17, 23.

**B.  The Contractual Provisions Governing the Conversion, Fees, and Expenses for Cash Distributions to ADR Holders**

Each ADR is governed by a Deposit Agreement between JPM and the foreign issuer and "ADR terms."  *Id.* ¶ 25.  The ADRs themselves are annexed to the Deposit Agreements and contain additional terms ("ADR terms") that are incorporated by reference into the respective Deposit Agreements (collectively "Contract Documents"). [3]  *Id.*  New York law governs the Contract Documents.  *Id.* ¶ 26.  For convenience and as an example, the citations below, unless specified otherwise, are to the Contract Documents between JPM and Banco de Santander.  *Id.* Ex. 1.  Parallel citations to the Contract Documents for Plaintiffs' other ADRs are provided in a table attached as Exhibit 32 to the Complaint.  Although Plaintiffs allege that all or nearly all the Contract Documents contain substantially similar language, *id.* ¶ 27, the Court notes that the relevant provisions of Contract Documents are not identical for each ADR.

---

[3]     The Complaint attached the Contract Documents as exhibits.  The Complaint did not itself quote the relevant portions of the Contract Documents but did incorporate the Contract Documents by reference.  Accordingly, the Court may look to the Contract Documents themselves in deciding JPM's motion to dismiss.  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (holding that a complaint is "deemed to include . . . any statements or documents incorporated in it by reference" (citation omitted)).

The Contract Documents require JPM to distribute cash distributions from the ADRs to ADR holders after having converted the distributions into U.S. dollars.  *Id.* ¶ 28.  The Contract Documents provide that:

> Whenever the Depositary . . . shall receive any cash dividend or other cash distribution . . . the Depositary shall, after any necessary conversion of such distribution into U.S. dollars pursuant to Section 4.05 . . . subject to this Deposit Agreement, distribute the amount thus received . . . to the Holders . . . <u>provided</u> that the Depositary shall make appropriate adjustments in the amounts so distributed in respect of  . . . (b) any amounts . . . (ii) charged by the Depositary in connection with the conversion of foreign currency into U.S. dollars pursuant to Section 4.05.

*Id.* Ex. 1 § 4.01 (emphasis in original).  Regarding currency conversions specifically, section 4.05 of the Contract Documents provides:

> Whenever the Depositary . . . shall receive foreign currency, as a cash dividend or other distribution . . . which, in the judgment of the Depositary can then be converted on a reasonable basis into U.S. dollars which can then be transferred to the United States, the Depositary shall convert or cause to be converted, by sale or in any other manner that it may determine, such foreign currency into U.S. dollars and shall transfer the resulting U.S. dollars (net of its charges and expenses in effecting such conversion) to the United States.  Such U.S. dollars shall be distributed to the Holders entitled thereto . . . .

*Id.* Ex. 1 § 4.05.

The Contract Documents also set forth the "charges," "expenses," and "fees" to which JPM was entitled for its performance under the Contract Documents.  *Id.* ¶ 30.  The foreign companies for whom JPM issues ADRs pay all of JPM's charges and reasonable expenses incurred "in the exercise of its duties and obligations under the Deposit Agreement" as depositary, except, *inter alia*, "charges of the Depositary in connection with the conversion of foreign currency into U.S. dollars (which are paid out of such foreign currency)."  *Id.* Ex. 1 § 5.09; *id.* Ex. 1, at Ex. B.  The only depositary charges specifically designated for payment by

ADR holders are the "Delivery of Receipts against deposits of Shares" and "Withdrawal of Deposited Securities against surrender of Receipts." *Id.*

The Contract Documents expressly oblige JPM to act in good faith without gross negligence or bad faith and in accordance with reasonable commercial standards of fair dealing. *Id.* ¶ 29. Specifically, the Contract Documents provide that:

> Each of the Depositary and its agents assumes no obligation and shall be subject to no liability under this Deposit Agreement or the Receipts to Holders or other persons, except to perform such obligations as are specifically set forth and undertaken by it to perform in this Deposit Agreement without gross negligence or bad faith.

*Id.* Ex. 1 § 5.03.

## C. Plaintiffs' Analysis Regarding FX Rates and JPM's FX Rate Disclosures

The crux of Plaintiffs' Complaint is that JPM converted foreign currency to U.S. dollars at a rate more favorable to JMP than the rate at which it ultimately paid ADR distributions to ADR holders. *Id.* ¶ 37. Specifically, Plaintiffs claim that the rates at which JPM paid ADR holders approached the worst interbank market FX rate of the trading day approximately one-third of the time. *Id.*

The Complaint includes a graph (inserted here) that plots a random sample of FX rates for 400 individual cash distribution conversions performed by JPM on behalf of ADR holders for 56 different ADRs from January 2002 through December 2014. *Id.* ¶¶ 38, 40, 41.



*Id.* ¶¶ 6, 39.  The graph aims to show the frequency with which and the degree to which the FX

rate used by JPM to make distributions to ADR holders was above or below the median

interbank market FX rate for the trading day on which the distribution was paid to the ADR

holder.  *Id.* ¶¶ 38, 41.  The "assigned FX rates" (i.e., the rates at which ADR holders were paid)

are not normally distributed around the daily median FX rate; the assigned FX rates are heavily

skewed toward the least favorable FX rates for the day, but the graph also shows that JPM paid

some distributions at the best FX rate of the day.  *Id.* ¶¶ 39, 40.  Plaintiffs claim that the graph

demonstrates that JPM intentionally exploited the FX interbank market by—before paying

distributions to ADR holders—adding a "spread" to the FX rate it received when converting the distributions, thereby retaining money owed to ADR holders.[4]   *Id.* ¶ 40.

In other words, Plaintiffs' theory is that JPM could not have simply had the bad luck to have traded currency on behalf of ADR holders consistently at the worst or near-worst FX rate of the day but instead must have added a spread to the FX rate it received in the interbank market when paying cash distributions to ADR holders in U.S. dollars.  Plaintiffs further allege that the additional spread was unrelated to JPM's reasonable or actual expenses associated with the conversion of foreign currency and thus was not a permitted "charge," "expense," or "fee" under the Contract Documents.  *Id.* ¶ 43.  Plaintiffs contend that JPM generated millions of dollars in unauthorized profits at the expense of ADR holders, resulting in claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and conversion.  *Id.* ¶¶ 42, 43, 45.

Finally, Plaintiffs allege that JPM actively concealed from ADR holders the fact that it was retaining a spread on top of the interbank market FX rate it obtained.  *Id.* ¶ 46.  Prior to 2012, the account statements provided by JPM to ADR holders detailed cash distributions paid on ADRs but did not disclose the FX rate at which JPM converted the distributions, the time of day at which the currency was converted,[5] or that JPM was profiting from the FX conversions.

---

[4]     Although the graph shows that more often than not the cash distributions were paid at an FX rate less favorable than the daily median interbank FX rate, it tells the reader little else.  In preparing the graph, Plaintiffs scored the assigned FX rate for each cash distribution on a scale of 100% to -100% in 10% increments, 100% reflecting the best interbank rate of the day, -100% reflecting the worse interbank rate of the day, and zero being the median interbank rate for a day.  Compl. ¶ 38.  Neither the graph nor the Complaint, however, explain how the scores were assigned.  How many basis points separate the median interbank rate on a given day and an FX rate that received a score of -90%, for example?  Or what is the proportional difference between the median interbank rate on a given day and an FX rate that received a score of -90%?  In addition, neither the graph nor the Complaint show the distribution of FX rates ADR by ADR, year by year, or currency by currency.  Do all the FX rates that are better than the daily interbank median FX rate (or equal to the worst daily rate) correspond to a single ADR, a single year, or single currency?  Is it meaningful to compare the rate paid to the median interbank rate as opposed to the mean?  Answering these questions will be important in proving Plaintiffs' claims.

[5]     Plaintiffs' theory appears to rest on the notion that there was a one-for-one conversion occurring at JPM; that is, on the day of a particular distribution, JMP received X amount in foreign currency and converted that amount into U.S. dollars.  Given that JPM is a major international money center bank that trades FX all the time and holds

*Id.* ¶ 47.  In 2012, JPM disclosed on its website—www.ADR.com—that dividends from foreign

issuers are "converted to U.S. dollars through a foreign exchange transaction with JPMorgan

Chase Bank, N.A. or an affiliate ('JPMorgan')" and that "[t]he Final Foreign Exchange Rate

[used for payment to ADR owners] will be net of any gain or loss incurred by JPMorgan on the

transaction and a fee of up to 20 basis points in connection with the conversion of the dividend

into U.S. dollars."  *Id.* ¶ 48.  Plaintiffs claim that, because prior to the 2012 disclosure JPM

disclosed neither the assigned FX rate nor the time and date at which it converted distributions

into U.S. dollars, Plaintiffs could not have known that JPM was adding a spread to the foreign

exchange conversions.  *Id.* ¶¶ 47-49.

## DISCUSSION

In evaluating a motion to dismiss "under Rule 12(b)(1), courts 'must take all

uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in

favor of the party asserting jurisdiction.'"  *Waltman v. U.S. S.E.C.,* No. 14–CV–1574 (VEC),

2014 WL 4357477 (S.D.N.Y. Sept. 2, 2014) (quoting *Tandon v. Captain's Cove Marina of

Bridgeport, Inc.,* 752 F.3d 239, 243 (2d Cir. 2014)).[6]  Similarly, to survive a motion to dismiss

under Rule 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible

claim for relief."  *Johnson v. Priceline.com*, Inc., 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell

Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).  "Although for the purposes of a motion to

dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to

_____

substantial reserves in U.S. dollars as well as other currencies, it seems unlikely that the premise of Plaintiffs'
Complaint is factually accurate.

[6]    JPM moves to dismiss under 12(b)(1) not for lack of subject matter  jurisdiction but for lack of standing.
"An objection to standing is properly made on a Rule 12(b)(1) motion." *Tasini v. New York Times, Co., Inc.*, 184 F.
Supp. 2d 350, 354 (S.D.N.Y. 2002).  When a court assesses a lack of standing argument on the basis of the
pleadings, it must accept as true the factual allegations in the complaint.  *WC Capital Mgmt., LLC v. UBS Sec., LLC*,
711 F.3d 322, 329 (2d Cir. 2013).

accept as true a legal conclusion couched as a factual allegation.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555). "[T]o survive a motion under Rule 12(b)(6), a complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enters.*, Ltd., 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted).

**I.     The Motion to Dismiss Plaintiffs' Breach of Contract Claim is Denied in Part**

   **A.  SLUSA Does Not Preclude Plaintiffs' Breach of Contract Claim**

Defendants argue that SLUSA precludes Plaintiffs' breach of contract claim. Congress enacted SLUSA to prevent plaintiffs from filing securities fraud class actions that are brought under state law in order to avoid the stringent pleading requirements for federal securities fraud class actions mandated by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 82 (2006); *see also Webster v. New York Life Ins. & Annuity Corp.*, 386 F. Supp. 2d 438, 439 (S.D.N.Y. 2005) ("SLUSA, in turn, was enacted to close a loophole by which claimants eluded the PSLRA's restrictions by filing in state court alleging state securities law claims."). SLUSA's aim is to "prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of the [PSLRA]." *Merrill Lynch*, 547 U.S. at 82. SLUSA accomplishes that aim by "forbid[ing] the bringing of large securities class actions based upon violations of state law." *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1062 (2014).

   Under SLUSA, a federal court must dismiss any action that:

   (1) is a "covered" class action (2) based on state statutory or common law that (3)
   alleges that defendants made a "misrepresentation or omission of a material fact"
   or "used or employed any manipulative device or contrivance in connection with
   the purchase or sale" (4) of a covered security.

*Romano v. Kazacos*, 609 F.3d 512, 518 (2d Cir. 2010) (citing 15 U.S.C. § 78bb(f)).

9

Only the third element—that JPM made a misrepresentation or omission of material fact—is in dispute.[7]  To determine whether a plaintiff has alleged "misrepresentation or omission of a material fact," a court must assess (1) whether the allegation of misrepresentation or omission is "of conduct by the defendant, or by a third party," and (2) whether "the allegation is necessary to or extraneous to liability under the state law claims."  *In re Kingate Mgmt. Ltd. Litig.*, 784 F.3d 128, 142 (2d Cir. 2015).  "Only conduct by the defendant is sufficient to preclude an otherwise covered class action," and "[i]f the allegation is extraneous to the complaint's theory of liability, it cannot be the basis for SLUSA preclusion."  *Id.*  Underlying this analysis is the notion that "plaintiffs should not be permitted to escape SLUSA by artfully characterizing a claim as dependent on a theory other than falsity when falsity nonetheless is essential to the claim, such as by characterizing a claim of falsity as a breach of the contractual duty of fair dealing."  *Id.* at 140.  "Courts must therefore look to the substance of a complaint's allegations rather than conduct 'a formalistic search through the pages of the complaint for magic words' to determine whether a complaint sounds in fraud."  *Zweiman v. AXA Equitable Life Ins. Co.*, 146 F. Supp. 3d 536, 546 (S.D.N.Y. 2015) (quoting *Romano*, 609 F.3d at 520)).

JPM argues that this Court should dismiss the Complaint pursuant to SLUSA because the Complaint is predicated on JPM's alleged failure to disclose the assigned FX rates and points to (i) language in Plaintiffs' class action allegations (Compl. ¶¶ 55(d)-(e)), (ii) allegations made to support Plaintiffs' claim that the fraudulent concealment doctrine and the discovery rule apply (*id.* ¶¶ 46-49), and (iii) Plaintiffs' pleading in an earlier Arkansas action.  Def. Mem. 7-9 (Dkt.

---

[7]     This action is a covered class action because it is brought on behalf of more than 50 prospective class members and purports to raise "questions of law or fact common to those persons."  15 U.S.C. §§ 78bb(f)(5)(B); Compl. ¶¶ 53, 55.  The ADRs, which are traded on national exchanges, are covered securities.  15 U.S.C. § 77r(b)(1)(A).  The Complaint also alleges state law claims.  Accordingly, the first, second, and fourth elements are satisfied.

20).  JPM's alleged failure to disclose the FX rate at which it paid ADR distributions is, however, extraneous to Plaintiffs' breach of contract claim.[8]

  The heart of Plaintiffs' breach of contract claim is that JPM added a spread to the FX rate it received in converting cash distributions from foreign currencies into U.S. dollars and that the addition of a spread breached the Contract Documents.  Failure to disclose is not essential to Plaintiffs' breach of contract claim; indeed, Plaintiffs allege that JPM's breach of contract continues, even though JPM disclosed the spread in 2012.  Pls. Opp. 24 (Dkt. 24) (citing Compl. ¶¶ 50-51).  The purpose of Plaintiffs' allegations that JPM failed to disclose the spread is to allege fraudulent concealment in order to toll the statute of limitations; it is not otherwise essential to Plaintiffs' breach of contract claim.  *See id.* ¶¶ 46-49; *see also Freeman Investments, L.P. v. Pac. Life Ins. Co.*, 704 F.3d 1110, 1116 (9th Cir. 2013) (allegations of non-disclosure in support of a statute of limitations tolling argument does not convert a breach of contract claim into a fraudulent omission claim for the purpose of SLUSA preclusion).  Plaintiffs' class action allegations do seem to resemble fraud allegations, as JPM points out, but "[w]hen the success of a class action claim [does not] depend[] on a showing that the defendant committed false conduct conforming to SLUSA's specifications, the claim will [not] be subject to SLUSA," *In re Kingate Mgmt.*, 784 F.3d at 149.  *See Merryman et al v. Citigroup et al.*, No. 15-CV-9185 (CM), slip op. at 19 (S.D.N.Y. Aug. 15, 2016) (hereinafter "*Merryman (Citigroup)*") (holding in a nearly identical lawsuit brought by same Plaintiffs that SLUSA did not preclude Plaintiffs' breach of contract claim because allegations that defendant's conduct was "secretive" were extraneous to the breach of contract claim).  In short, SLUSA does not preclude Plaintiffs' breach of contract claim.

---

[8]  The Court does not separately address SLUSA with respect to Plaintiffs' implied covenant and conversion claims because, as explained below, those claims are dismissed either as duplicative or for failure to state a claim.

**B.  Defendant's Motion to Dismiss on the Ground that Plaintiffs Lack Contractual Standing Is Denied**

JPM argues that Plaintiffs lack contractual standing to assert claims under ten of the ADRs held by Plaintiffs because Plaintiffs are not parties to those ADR Contract Documents. Def. Mem. 11-13.  First, according to JPM, seven of the ADRs contain negation clauses that exclude beneficial owners, which include Plaintiffs, as parties to those Contract Documents.  *Id.* at 11.  The CNOOC, Guangshen, Nippon, Novartis, Novo Nordisk (2010), and Vale Contract Documents define "Holders" as the "person or persons in whose name an ADR is registered on the ADR Register" and provide that the "Deposit Agreement is for the exclusive benefit of the Company [i.e., the issuer], the Depositary, the Holders, and their respective successors hereunder, and shall not give any legal or equitable right, remedy or claim whatsoever to any other person."[9]  The 2010 Novo Nordisk Contract Documents also provide that "neither the Depositary nor the Company will have any obligation or be subject to any liability under the Deposit Agreement to any holder of an ADR, unless such holder is the Holder thereof."  Compl. Ex. 23 ¶ 3.  Similarly, the Enel Contract Documents provide that "[s]ubject to Section 4.10 hereof, a Beneficial Owner shall be able to exercise any right or receive any benefit hereunder solely through the person who is the Holder of the ADR(s) evidencing the ADSs[10] owned by such Beneficial Owner."  *Id.* Ex. 7 § 1.5.

---

[9]      Compl. Ex. 5 §§ 1(i), 18 (CNOOC); *id.* Ex. 10 §§ 1(g), 18 (Guangshen); *id.* Ex. 13 §§ 1(g), 18 (Nippon); *id.* Ex. 16 §§ 1(i), 18 (Novartis); Compl. Ex. 23 §§ 1(i), 18 (Novo Nordisk 2010); *id.* Ex. 30 §§ 1(i), 18 (Vale).

[10]      An ADS is an "American Depositary Share."  *See, e.g.*, Compl. Ex. 7 § 1.2.  An ADS represents an interest in the shares of a non-U.S. company that are being held by a depositary.  U.S. Securities Exchange Commission, *Investor Bulletin: American Depositary Receipts* 1 (August 2012), https://www.sec.gov/investor/alerts/adr-bulletin.pdf.  An ADR represents the ownership interest in ADSs.  *Id.*  The terms ADR and ADS are often used interchangeably.  *Id.*

Second, according to JPM, two other ADRs—Santander and Prudential—contain language that JPM argues excludes beneficial owners, like Plaintiffs, as parties to the Contract Documents.  Def. Mem. 12-13.[11]  Although those ADRs do not contain a negation clause, *see* Pls. Opp. Ex. B, JPM points to the following language in the Contract Documents for those ADRs: "This American Depositary Receipt is . . . executed and delivered pursuant to the Deposit Agreement . . . by and among the Bank, the Depositary and all registered holders ("Holders") from time to time of Receipts, each of whom by accepting a Receipt becomes a party thereto . . . . The Deposit Agreement sets forth the rights of the Holders . . . ."[12]  JPM acknowledges that the Contract Documents also state that "[t]he Holders and owners of ADRs from time to time shall be parties to this Deposit Agreement and shall be bound by all provisions hereof,"[13] but JPM points out that it is contractually entitled to treat Holders as the "absolute owner[s]" for all purposes.[14]  Def. Mem. 13 n.12.

Despite the language cited by JPM, the Court agrees with Plaintiffs, *see* Pl. Opp. 16, and finds the Contract Documents to be ambiguous as to whether beneficial owners are parties to those agreements and whether they have any rights to assert under those agreements.  Although JPM acknowledges the following language and seeks to reconcile it with its theory, the provision stating that the "[t]he Holders and owners of ADRs from time to time shall be parties to this

---

[11]    JMP also makes this argument relative to Novo Nordisk (1991).  Def. Mem. 12-13.  In light of the Court's ruling on the statute of limitations, *see* Part I(D) *infra*, and the fact that JMP and Novo Nordisk entered into an amended and restated Deposit Agreement in 2010, *see* Compl. Ex. 23, it is not necessary to decide whether a claim would lie under the pre-2010 Novo Nordisk Deposit Agreement.

[12]    Compl. Ex. 3 ¶ 1 (Santander); *id.* Ex. 24 ¶ 1 (Prudential).

[13]    Compl. Ex. 5 § 18 (CNOOC); *id.* Ex. 10 § 18 (Guangshen); *id.* Ex. 13 § 18 (Nippon); *id.* Ex. 16 § 18 (Novartis); Compl. Ex. 23 § 18 (Novo Nordisk 2010); *id.* Ex. 30 § 18 (Vale); *id.* Ex. 7 § 7.4, Dep. Ag. Preamble (stating the agreement is between the Company, the Depositary and "all Holders and Beneficial Owners") (Enel)

[14]    Compl. Ex.1 § 2.01(b) (Santander); *id.* Ex. 3, ¶ 8 (Santander); *id.* Ex. 24 § 2.01(c), ¶ 9 (Prudential).

Deposit Agreement and shall be bound by all of the provisions hereof" immediately follows and is within the very same section as the negation clause on which JPM relies.[15]  The Court does not agree with Plaintiffs that it would be a "bizarre result" to strip away a party's rights under a contract while simultaneously burdening a party with obligations under the contract, *see* Pls. Opp. 16; parties may generally assign rights and obligations under a contract as they wish. Nevertheless, it is not clear how to reconcile the negation clause with the sentence that follows.[16] In other words, given the negation clause, it is unclear under what circumstances an ADR owner may be a party to the ADR Contract Documents.

As explained above, JPM argues that the Contract Documents allow Holders to be treated as owners for all purposes, but it is unclear from the Contract Documents whether that provision, which appears in a provision concerning transferability, should be read into the sentence following the negation clause, which is an entirely separate section of the agreement, especially because that argument would appear to render the "and owners" language in "[t]he Holders and owners of ADRs from time to time shall be parties" completely superfluous.  *See LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (Under New York law, "[a]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible." (quotation marks and citation omitted)).  A similar problem arises in the interpretation of the Santander and

---

[15]    Compl. Ex. 5 § 18 (CNOOC); *id.* Ex. 10 § 18 (Guangshen); *id.* Ex. 13 § 18 (Nippon); *id.* Ex. 16 § 18 (Novartis); Compl. Ex. 23 § 18 (Novo Nordisk 2010); *id.* Ex. 30 § 18 (Vale); *id.* Ex. 7 § 7.4 (Enel).

[16]    JPM relies heavily on *Repsol, S.A. v. Bank of N.Y. Mellon*, which held that a beneficial owner of an ADR did not have contractual standing to sue under the ADR agreement.  2014 N.Y. Misc. LEXIS 586, 2014 NY Slip Op. 30352(U), at *9-10 (App. Div. Feb. 4, 2014).  *Repsol* involved an identical negation clause, identical language stating that Registered Holders would be owners for all purposes, and identical language stating that Holders and owners of ADRs from time to time shall be parties to the Deposit Agreement.  *Id.* at 9-10, 25-26.  *Respol*, however, is not binding on this Court, and the Court disagrees with that decision to the extent it did not find the Deposit Agreement to have been ambiguous as to non-registered holders' rights under the Agreement.

Prudential Contract Documents.  As explained above, those Contract Documents do not include

a negation clause.  But, like the Contract Documents for the seven ADRs containing negation

clauses, the Contract Documents for Santander and Prudential entitle JPM to treat Holders as the

"absolute owner[s]" for all purposes[17] and provide that "[t]he Holders and owners of Receipts

from time to time shall be parties . . . ."[18]  It is equally unclear as to these two ADRs as in the

case of the Contract Documents for the other seven ADRs whether the former provision should

be read into the latter, especially because doing so here would, again, appear to render

superfluous the "and owners" language in the latter provision.

Given that the contract is ambiguous as to whether Plaintiffs have contractual standing to

assert claims pursuant to the ten ADRs identified by JPM, at this juncture the Court denies

JPM's motion to dismiss those breach of contract claims on the ground of lack of contractual

standing, without prejudice to renewing the argument at summary judgment.  See *Bayerische

Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 53 (2d Cir. 2012)

(explaining that contract language must unambiguously exclude third party beneficiary on its

face in order for exclusion to be enforced); *Eternity Global Master Fund Ltd. v. Morgan Guar.

Trust Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) ("Unless for some reason an ambiguity must

be construed against the plaintiff, a claim predicated on a materially ambiguous contract term is

not dismissible on the pleadings.").

### C.  Plaintiffs Have Alleged a Breach of Contract

JPM argues that Plaintiffs have failed to allege a breach of contract because no provision

of the Contract Documents requires JPM to convert cash distributions into U.S. dollars at a

---

[17]     Compl. Ex.1 § 2.01(b) (Santander); *id.* Ex. 3, ¶ 8 (Santander); *id.* Ex. 24 § 2.01(c), ¶ 9 (Prudential).

[18]     Compl. Ex. 1 § 7.04 (Santander); *id.* Ex. 24 § 7.04 (Prudential).

specified rate, let alone at the interbank rate.  Def. Mem. 21-23.  Instead, according to JPM, the

Contract Documents give JPM total discretion to determine the FX rate when converting cash

distributions for ADR holders.  *Id.* at 23; Transcript of Oral Argument 9-11, Aug. 30, 2016 (Dkt.

33) ("Tr").

  "To make out a viable claim for breach of contract a complaint need only allege (1) the

existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach

of contract by the defendant, and (4) damages."  *Eternity Glob. Master Fund Ltd.*, 375 F.3d at

177 (quotation marks and citation omitted).  Only the third element is at issue here.  At the

motion to dismiss stage, any contractual ambiguities must be resolved in plaintiff's favor.

*Subaru Distributors Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005).

  In *Merryman (Citigroup)*, Judge McMahon denied a motion to dismiss a virtually

identical breach of contract claim brought against Citigroup by the same Plaintiffs that are now

before this Court.  Slip op. at 1-2.  The operative language in Citigroup's ADR Contract

Documents is virtually identical to the relevant language in JPM's.  *Id.* at 9.  Judge McMahon

held that Plaintiffs successfully alleged a breach of contract, *id.* at 9-13, and this Court adopts her

reasoning.

  As in *Merryman (Citigroup)*, the breach of contract is allegedly a failure by JPM to

distribute to Plaintiffs all sums owed to them under the terms of the ADR Contract Documents.

Each ADR obligated JPM to convert cash distributions from foreign currency into U.S. dollars

and then to distribute those amounts to ADR registered holders:

> Whenever the Depositary  . . . shall receive any cash dividend or other cash
> distribution on any Deposited Securities, the Depositary . . . shall, after any
> necessary conversion of such distribution into U.S. dollars pursuant to Section
> 4.05 . . .  subject to this Deposit Agreement, *distribute the amount thus received*
> . . . to the Holders . . . <u>provided</u> that the Depositary shall make appropriate
> adjustments in the amounts so distributed in respect of . . . (b) any amounts . . . (ii)

charged by the Depositary or withheld from distribution in connection with the
conversion of foreign currency into U.S. dollars pursuant to Section 4.05

Compl. Ex. 24 § 4.01 (Prudential) (emphasis added).[19]  Section 4.05, governing conversion of

foreign currency, obligates JPM to "transfer the resulting U.S. dollars (net of its charges and

expenses in effecting such conversion) to the United States."  *Id.* at § 4.05.  Construing this

provision against JPM as the presumed drafter, the Court agrees with Judge McMahon that one

reading of the contract is that once JPM converts distributions received from a foreign issuer (at

whatever rate it actually converts the funds), it must distribute to the ADR Holders that amount,

less specified charges but net of nothing else.  *See Merryman (Citigroup)*, slip. op. at 10

(applying *expressio unius* canon of interpretation in adopting this interpretation).  Plaintiffs

allege that JPM failed to pay the amount received upon conversion because it added a spread,

and the spread that it added is not an enumerated expense or charge permitted as a deduction

from the converted sum.  Thus, Plaintiffs argue, charging a spread breached the Contract

Documents.

       That is not, however, the only possible interpretation of the contract.  Ultimately

Plaintiffs will have to persuade a fact finder that their view of the conversion process is accurate.

An equally plausible view, and one that would not breach the contract, is the one pressed by

JMP, namely that the conversion of foreign currency does not start and end with the interbank

rate.  According to JPM, the conversion process includes adding a spread because a spread is part

of the FX rate (i.e., it is part of the "price" of the foreign currency).[20]  Under that view of the

---

[19]     Having reviewed the Contract Documents for the other eleven ADRs, the Court finds that their
corresponding provisions are substantially the same, at least for the purpose of deciding JPM's motion to dismiss
Plaintiffs' breach of contract claims.

[20]     Although Plaintiffs at times characterize the spread as an impermissible fee, several courts have held that
the spread between the interbank and retail FX rate is not a fee but simply part of the price of the foreign currency,
*see e.g.*, *Louisiana Mun. Police Employees' Ret. Sys. v. JPMorgan Chase & Co.*, No. 12 CIV. 6659 (DLC), 2013
WL 3357173, at *8, 9-11 (S.D.N.Y. July 3, 2013).

process, the "amount thus received," as that phrase is used in the Contract Documents, is the amount that exists after the entire conversion process (including the addition of a spread) is complete. *See* Tr. 9-11. While JPM's version is plausible, the Court cannot pick between equally plausible scenarios when deciding a motion to dismiss.[21] *See Cortes v. Armor-All Prot. LLC*, No. 3:15CV1788 (JBA), 2016 WL 3023210, at *3 (D. Conn. May 23, 2016) (denying motion to dismiss on the basis that plaintiff's and defendant's version of events are "equally plausible"); *Jalee Consulting Grp., Inc. v. XenoOne, Inc.*, 908 F. Supp. 2d 387, 399 (S.D.N.Y. 2012) (same); *Rispler v. Sol Spitz Co.*, No. 04-CV-1323 DLI ARL, 2007 WL 1926531, at *5 (E.D.N.Y. June 6, 2007) (same).

Given the ambiguity in the Contract Documents, whether the spread is an expense, charge, or fee that is or is not permitted under the terms of the agreements are questions of fact to

---

[21]     JPM also argues that there is no contractual breach because the Contract Documents grant JPM full discretion in converting the distributions, including the ability to add a spread:

> [1] Whenever the Depositary . . . shall receive foreign currency . . . , and*, in the judgment of the Depositary*, the foreign currency so received can then be converted on a reasonable basis into U.S. dollars . . ., [2] the Depositary shall convert . . . by sale *or in any other manner that it may determine*, such foreign currency into U.S. dollars.

Compl. Ex. 24 § 4.05 (Prudential) (emphasis added). This provision, however, does not unambiguously give JPM total discretion in conducting foreign exchange transactions. The first part of the provision only gives JPM discretion to determine whether it is possible ("can") to convert the currency on a reasonable basis, not what constitutes a reasonable conversion. That distinction becomes clear in light of a later provision in that section, which states, "If at any time the Depositary shall determine that in its judgment any foreign currency received by the Depositary is not convertible on a reasonable basis into U.S. dollars," JPM may either distribute the foreign currency or hold it on behalf of the ADR holders. *Id.* Thus, the Contract Documents seem to give JPM discretion not to convert when the market for a currency is turbulent or illiquid, making a reasonable exchange rate near-impossible. The terms of the agreement do not, however, expressly give JPM discretion to assign what it believes to be a reasonable price by adding a spread but only to decide whether it is possible to convert on a reasonable basis. Nor does the second part of the provision (i.e., "the Depositary shall convert . . . by sale or in any other manner that it may determine") unambiguously give JPM the broad discretion it claims. Those terms appear only to give JPM discretion as to the manner in which it does the conversion, for example, whether by trading with another institution, trading internally with another customer of JPM, or using currency already on hand. That does not necessarily equate to granting JPM discretion to add a spread on top of the FX rate it actually achieved, whether by sale or internal trade.

be resolved at summary judgment or trial.  The Court notes, however, that just because Plaintiffs

say the spread was a fee does not make it so.[22]

For these reasons, JPM's motion to dismiss Plaintiffs' breach of contract claims for

failure to state a claim is denied, subject, however, to the Court's statute of limitations ruling in

the following section.[23]

### D.  Plaintiffs' Breach of Contract Claims Dating Prior to November 21, 2010 Are Time-Barred

Arkansas's five-year statute of limitations for breach of contract claims, Ark. Code Ann.

§ 16-56-111(a), rather than New York's six-year statute of limitations, N.Y. C.P.L.R. § 213(2),

governs Plaintiffs' breach of contract claims.  Pursuant to New York's borrowing statute, N.Y.

C.P.L.R. § 205, when a non-resident brings a claim, the shorter of New York's statute of

limitations or the statute of limitations where the claim accrued must be applied.  *In re Gaston &*

*Snow*, 243 F.3d 599, 608 (2d Cir. 2001) (citing *Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d

525, 526 (1999)).  "A nonresident's contract claim accrues where the nonresident resides."  *Id.*

---

[22]    The Court is reminded of a riddle that has been attributed to Abraham Lincoln.  Question: If you call a tail a leg, how many legs does a dog have?  Answer: Four.  Calling a tail a leg does not make it a leg.

[23]    The Complaint alleges a second breach of contract, namely that JPM also breached the Contract Documents' express covenant of good faith and fair dealing.  Compl. ¶¶ 29, 66.  The Contract Documents include a limitation of liability clause, which provides:

> Each of the Depositary and its agents assumes no obligation and shall be subject to no liability under this Deposit Agreement or the Receipts to Holders or other persons, except to perform such obligations as are specifically set forth and undertaken by it to perform in this Deposit Agreement without gross negligence or bad faith.

Compl. Ex. 24 § 5.03 (Prudential).  The way in which JPM allegedly breached this covenant is the same way in which it allegedly breached the cash distributions provisions—by failing to remit all money owed by charging an impermissible spread when it converted distributions.  Thus, there can be no breach of the good faith and fair dealing terms if there is no breach of the cash distribution provisions, and the limitation of liability clause is not an independent basis on which to assert a breach of contract.  *See Merryman (Citigroup)*, slip op. at 13.

(citing *Global Fin. Corp.*, 93 N.Y.2d at 526). Mr. Merryman is a resident of Arkansas. [24] Compl. ¶ 15. Accordingly, Arkansas's five-year limitation period applies.

Plaintiffs assert breach of contract on behalf of a putative class stretching back more than thirteen years to January 1, 2002, the start of the asserted Class Period. Compl. ¶ 52. Plaintiffs contend that the statute of limitations on their breach of contract claims has been tolled under the doctrine of fraudulent concealment. *Id.* ¶ 49; Pls. Opp. 20. JPM argues that because Plaintiffs have not adequately pled fraudulent concealment, the statute of limitations has not been tolled. Def. Mem. 28-29.

"[I]n borrowing a foreign statute, all the extensions and tolls applied in the foreign state must be imported with the foreign statutory period . . . ." *Norex Petroleum Ltd. v. Blavatnik*, 23 N.Y.3d 665, 676 (2014). In Arkansas, "once it is clear from the face of the complaint that an action is barred by an applicable statute of limitations, the burden shifts to the plaintiff to prove that the limitation period was in fact tolled." *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011) (citations omitted). In order to toll a statute of limitations on the basis of fraudulent concealment, a plaintiff must allege "'(1) a positive act of fraud (2) that is actively concealed, and (3) is not discoverable by reasonable diligence.'" *Paine v. Jefferson Nat. Life Ins. Co.*, 594 F.3d 989, 992 (8th Cir. 2010) (quoting *Bomar v. Moser*, 251 S.W.3d 234, 242 (Ark. 2007)). "'Concealed fraud means fraud which is furtively planned and secretly executed.'" *Id.* (quoting *Shelton v. Fiser*, 8 S.W.3d 557, 562-63 (Ark. 2000)). "No mere ignorance on the part of the plaintiff of his rights, nor the mere silence of one who is under no obligation to speak, will prevent the statute bar . . . if the plaintiff, by reasonable diligence, might have detected the fraud,

---

[24] The Complaint does not provide any information regarding where the other Plaintiffs—the trusts—reside. For the purpose of deciding which state's statute of limitations applies, the Court assumes that the trusts are also residents of Arkansas.

he is presumed to have had reasonable knowledge of it." *Wilson v. Gen. Elec. Capital Auto Lease, Inc.*, 841 S.W.2d 619, 620 (Ark. 1992) (quotation marks and citation omitted). "Importantly, '[f]raud suspends the running of the statute of limitations . . . until the party having the cause of action discovers the fraud or should have discovered it by the exercise of reasonable diligence.'" *Summerhill, Inc.*, 637 F.3d at 880 (quoting *Martin v. Arthur*, 3 S.W.3d 684, 687 (Ark. 1999)). Allegations of fraudulent concealment for tolling purposes must be pled with particularity pursuant to Federal Rule of Civil Procedure 9(b). *Id.* (citation omitted).

Plaintiffs allege that JPM's account statements sent to ADR holders actively concealed the fact that JPM was adding a spread to the FX rates it achieved in the interbank market and that JPM did not disclose the time of day when foreign currency exchanges were executed, leaving Plaintiffs unable to discover whether JPM's assigned FX rates included an embedded fee. Pls. Opp. 20-21 (citing Compl. ¶¶ 46-49). Plaintiffs also allege that they were reasonably diligent because until JPM disclosed its practice of adding a spread in 2012 and until government investigations began to reveal wide spread FX rate misconduct among banks, they had no reason to scrutinize their account statements or JPM's disclosures and could not have been on notice of JPM's practice regarding FX rates. *Id.* at 21. According to Plaintiffs, these allegations satisfy Arkansas's fraudulent concealment requirements. *Id*. In addition, Plaintiffs contend that they would not have had the resources or information to uncover the breach of contract because in order to discern a practice of adding a spread in breach of contract, Plaintiffs required hundreds of cash distribution data points, which were not readily available to Plaintiffs because ADRs generally pay no more than four cash distributions per year. *Id.*

Plaintiffs, however, have not adequately alleged that JPM's practice of adding a spread to FX rates was not previously discoverable with reasonable diligence. The Court agrees with JPM,

*see* Def. Mem. 29, that Plaintiffs could have done the analysis on which their Complaint is based at any time.  The information needed to reveal JPM's alleged breach of contract was always available to Plaintiffs; the data they would have relied upon simply would have covered an earlier period in time, such as from 1997 to 2002, 2002 to 2007, or 2007 to 2012, instead of 2002 to 2014.  Plaintiffs have also not alleged that they needed twelve years of data to discern a pattern or that five years of data, falling within the statute of limitations, would not have been sufficient.[25]  The fact that Plaintiffs (and their counsel) did not think to scrutinize Plaintiffs' ADR account statements and to collect, analyze, and graph the data until 2014—two years after JPM had made its 2012 disclosure and after other plaintiffs in other lawsuits had accused JPM and other financial institutions of manipulating FX rates in different circumstances—does not mean that this alleged breach was not discoverable by reasonable diligence.  Plaintiffs' allegation that they were not on notice until at least JPM's 2012 disclosure is conclusory; Plaintiffs have not alleged any type of data that was available to them when preparing this Complaint that was not available to them five or even ten years earlier.[26]

Accordingly, Plaintiffs' breach of contract claims dating prior to November 21, 2010 are dismissed as time-barred.  *See Summerhill*, 637 F.3d at 881 (affirming grant of motion to dismiss complaint as time-barred because plaintiff did not adequately allege facts to support fraudulent concealment); *Paine*, 594 F.3d at 992 ("[A] trial court may resolve the question [of fraudulent concealment] as a matter of law when there is no evidentiary basis for reasonable differences of opinion." (citing *Delanno, Inc. v. Peace*, S.W.3d 81, 84 (Ark. 2006)).

---

[25]    During oral argument, Plaintiffs' counsel conceded that fewer years of data could have possibly revealed a pattern.  Tr. 32:12-21, 44:20-45:6.

[26]    Plaintiffs' counsel essentially conceded this point at oral argument.  Tr. 41-45

**II.     The Motion to Dismiss Counts Two and Three and the Request for Punitive Damages Is Granted**

   **A. Plaintiffs' Breach of the Implied Covenant of Good Faith and Fair Dealing Claim Is Dismissed**

"Under New York law, a covenant of good faith and fair dealing is implied in all contracts." *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011). "[A] claim for breach of the implied covenant of good faith and fair dealing will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *Boart Longyear Ltd. v. All. Indus., Inc.*, 869 F. Supp. 2d 407, 419 (S.D.N.Y. 2012) (quotation marks and citation omitted). Plaintiffs' breach of contract and implied covenant claims are duplicative because they arise out of the same facts, namely that JPM retained a spread between the FX rate at which it converted cash distributions into U.S. dollars and the FX rate that it used to pay ADR holders their distributions. *See Merryman (Citigroup)*, slip op. at 14 (dismissing Plaintiffs' claim for the breach of the implied covenant of good faith).

   Plaintiffs argue that their implied covenant claim should not be dismissed as duplicative because it is pled in the alternative pursuant to Federal Rule of Civil Procedure 8(a)(3). Pls. Opp. 18. As JPM points out, however, courts in this Circuit dismiss implied covenant claims, even when pled in the alternative, when the implied covenant and contract claims are based on the same facts. *See, e.g.*, *Usov v. Lazar*, No. 13 CIV. 818 (RWS), 2013 WL 3199652, at *6 (S.D.N.Y. June 25, 2013) (dismissing implied covenant claim as duplicative although pled in the alternative); *Spread Enterprises, Inc. v. First Data Merch. Servs. Corp.*, No. 11-CV-4743 (ADS) (ETB), 2012 WL 3679319, at *5 (E.D.N.Y. Aug. 22, 2012) ("[I]n the context of a claim for breach of the covenant of good faith and fair dealing, claims are not 'in the alternative' when

they are based on the exact same allegations." (quotation marks and citation omitted)); *Boart Longyear Ltd.*, 869 F. Supp. 2d at 419 ("While I have previously held that a duplicative implied covenant of good faith and fair dealing claim may stand as an alternative cause of action, more recent Second Circuit case law indicates that dismissal for redundancy is the appropriate outcome here.").

Plaintiffs' claim that JPM breached its implied covenant of good faith and fair dealing is, therefore, dismissed.

### B.  Plaintiffs' Conversion Claim Is Dismissed

"A cause of action for conversion cannot be predicated on a mere breach of contract," *Fesseha v. TD Waterhouse Inv'r Servs., Inc.*, 761 N.Y.S.2d 22, 24 (App. Div. 2003), but must instead "stem from a wrong independent of the alleged breach of contract," *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 416 (S.D.N.Y. 2013).  Just as with Plaintiffs' implied covenant claim, Plaintiffs have not alleged that JPM engaged in wrongful conduct independent of the alleged breach of contract.  Moreover, "[a] conversion claim cannot be based only on the allegation that a defendant received money and failed to remit payment to the plaintiff," *Interstate Adjusters, Inc. v. First Fid. Bank, N.A.*, 675 N.Y.S.2d 42, 44 (1998), which is exactly what Plaintiffs allege here.

Plaintiffs argue that their allegations satisfy the elements of conversion, namely that Plaintiffs had lawful title to the cash distributions, which were specific, identifiable funds, and that JPM interfered with Plaintiffs' right to those funds.  Pls. Opp. 19-20.  Plaintiffs, however, do not allege specific, identifiable funds.  Plaintiffs do not identify a specific sum of money that is owed to them, nor do they even specify by how much JPM allegedly "overcharged" them for foreign exchange transactions.  *Cf. Newbro v. Freed*, 409 F. Supp. 2d 386, 395 (S.D.N.Y. 2006)

("[T]he conversion claim must be for recovery of a particular and definite sum of money . . . ." (quotation marks and citation omitted)), *aff'd*, No. 06-1722 (CV), 2007 WL 642941 (2d Cir. Feb. 27, 2007); *Manufacturers Hanover Trust Co. v. Chem. Bank*, 160 A.D.2d 113, 125 (N.Y. App. Div. 1990) (although dismissed as duplicative, complaint adequately alleged conversion with respect to a wire transfer for the specific sum of $223,280.74).

For these reasons, Plaintiffs' conversion claim is dismissed. *See Merryman (Citigroup)*, slip op. at 14 (dismissing Plaintiffs' conversion claim).

### C.  Plaintiffs' Punitive Damages Claim Is Dismissed

"[P]unitive damages are not recoverable in an ordinary breach of contract case, as their purpose is not to remedy private wrongs but to vindicate public rights." *Tartaro v. Allstate Indem. Co.*, 868 N.Y.S.2d 281, 282 (App. Div. 2008).  Punitive damages are only available "where the conduct associated with the breach of contract is first actionable as an independent tort," where the conduct "is sufficiently egregious to warrant the additional imposition of exemplary damages," and where the "conduct was part of a pattern of similar conduct directed at the public generally." *Id.* (citing *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 315-16 (1995); *Rocanova v. Equitable Life Assur. Soc. of U.S.*, 83 N.Y.2d 603, 613 (1994)).

Plaintiffs' pleadings do not state a claim that entitles them to punitive damages.  The conduct associated with the alleged breach of contract is not actionable as an independent tort because Plaintiffs have not alleged that any legal duty independent of the contract has been violated. *Bayerische Landesbank*, 692 F.3d at 58 ("Under New York law, a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated.").  Thus, "where a party is merely seeking to enforce its bargain"—as Plaintiffs are seeking to do here—"a tort claim will not lie." *New York Univ.*, 87 N.Y.2d at 316.  Moreover,

JPM's alleged conduct, which was directed only to its ADR holders, was not directed at the public generally. *See TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 95-96, 95 n.12 (2d Cir. 2005) (dismissing claim for punitive damages because the conduct associated with the breach of contract was not aimed at the public generally and noting that since *Rocanova*, 83 N.Y.2d 603, 613 (1994), New York courts and the Second Circuit have applied a public aim requirement to punitive damages). Finally, at least some of the Contract Documents include punitive damages waivers.[27]

For all these reasons, Plaintiffs' claim for punitive damages is dismissed.

## III. Plaintiffs Do Not Have Class Standing to Represent ADR Holders Who Held ADRs Not Owned by Plaintiffs

Plaintiffs seek to represent holders of all JPM-sponsored ADRs. Compl. ¶ 52; Pls. Opp. 13. JPM argues that Plaintiffs do not have class standing to represent holders of the 107 ADRs sponsored by JPM in which Plaintiffs did not invest. Def. Mem. 13-15.

Class standing has two requirements:

> [I]n a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant, . . . and (2) that such conduct implicates "the same set of concerns" as the conduct alleged to have caused injury to other members of the putative class by the same defendants.

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 161 (2d Cir. 2012) (citations omitted). When those two requirements are met, "the named plaintiff's litigation incentives are sufficiently aligned with those of the absent class members that the named plaintiff may properly assert claims on their behalf." *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York*

---

[27]    Compl. Ex. 4 § 5.3 (Chunghwa); *id.* Ex. 9 § 2.18 (Enel); *id.* Ex. 14 § 3.02 (Nippon); *id.* Ex. 27 ¶ 18 (Sanofi); *id.* Ex. 30 ¶ 14 (Vale).

*Mellon*, 775 F.3d 154, 157 (2d Cir. 2014) ("*BNY Mellon*"), *cert. denied sub nom. Ret. Bd. of Policemen's Annuity & Annuity & Ben. Fund of City of Chicago v. Bank of New York Mellon*, 136 S. Ct. 796 (2016).  For the reasons discussed above, Plaintiffs satisfy the first element of class standing.  The only question is whether the alleged improper conduct implicates the "same set of concerns" for members of the putative class who invested in ADRs in which Plaintiffs did not invest.

The parties dispute whether this case is more like *BNY Mellon*, which denied class standing, or like *NECA*, which granted class standing.  In *NECA*, the plaintiff, which had purchased residential mortgage backed securities ("RMBS") in two of seventeen offerings sold pursuant to one shelf-registration statement, alleged that the issuer made false representations about loan originators' underwriting guidelines, in violation of the Securities Act.  693 F.3d at 151-52.  The Second Circuit held that insofar as the named plaintiff's investments and the absent class members' investments were backed by loans from the same originators, the named plaintiff's and absent class members' claims shared the same set of concerns, notwithstanding the fact that the claims emanated from different offerings.  *Id.* at 164.  On the other hand, the Second Circuit denied class standing with respect to investment offerings backed by loans not made by the originators that made the loans that underlay plaintiff's investments.  *Id.* at 163.

In *BNY Mellon*, plaintiffs brought breach of contract claims on behalf of investors in 530 RMBS trusts, even though plaintiffs had invested in only twenty-six of the trusts.  775 F.3d at 155-57, 162.  The plaintiffs alleged that BNY Mellon, the trustee of all of the trusts, violated its duties when it failed to take the necessary steps in response to the originators' breaches of the governing agreements, including notifying investors, forcing

the originator to repurchase defaulted mortgage loans, and ensuring mortgage loans were properly documented.  *Id.* at 162.  The Second Circuit held that the plaintiffs' claims concerning the twenty-six trusts and absent class member's claims concerning the other 504 trusts did not share the same set of concerns because proving that the "[originator] breached its obligations under the governing agreements (thus triggering BNYM's duty to act) requires examining its conduct with respect to each trust."  *Id.*  The Second Circuit rejected plaintiffs' argument that all claims as to all trusts shared the same set of concerns because BNYM allegedly had a widespread policy of inaction in the face of defaults, explaining that plaintiffs "would still have to show which trusts actually had deficiencies that required BNYM to act" in order to prove their case.  *Id.*

The Second Circuit distinguished *BNY Mellon* from *NECA* because in the latter, "proving that those [underwriting] guidelines were materially misleading as to loans held by one trust would tend to prove that those same guidelines were similarly misleading as to loans [made by the same originator] held by other trusts," *id.*, but in the former, the alleged misconduct "must be proved loan-by-loan and trust-by-trust," *id.*  The Second Circuit also emphasized that "[t]he core question is whether a plaintiff who has a personal stake in proving her own claims against the defendant has a sufficiently personal and concrete stake in proving other, related claims against the defendant."  *Id.* at 163.  In *BNY Mellon*, the answer to that question was no; the fact that the plaintiffs could expand the evidence necessary to prove their own claims to include evidence that would prove absent class members' claims was not enough to establish that plaintiffs had "any real interest in litigating the absent class members' claims."  *Id.*  As the Second Circuit noted:

"The fact that it would be possible for a plaintiff to litigate a given claim plainly does not imply that she should be the one to litigate it."  *Id*. (citations omitted).

This case is more like *BNY Mellon* than *NECA*.  Plaintiffs allege that JPM engaged in a widespread practice of adding a spread to the FX rate assigned to ADR holders and that the ADR Contract Documents, which were essentially the same for all ADRs, prohibited such a "fee." Nevertheless, just as in *BNY Mellon*, in order to prove their case, Plaintiffs will be required to prove that JPM added a spread in contravention of the governing agreements *with respect to each distribution associated with each ADR.  See BNY Mellon*, 775 F.3d at 162.  To succeed in proving that there was a breach of contract with respect to each ADR, *inter alia*, Plaintiffs will need to introduce proof regarding the ADR Contract Documents and FX rates used by JPM for each distribution associated with each ADR.  The graph in Plaintiffs' Complaint itself suggests that the alleged practice of adding a spread was not uniform.  Although the graph shows that the distribution of assigned FX rates is skewed toward the least favorable daily interbank FX rate, it also shows that sometimes the assigned FX rate was not worse than the daily median interbank FX rate—and sometimes the assigned FX rate was much better than the median interbank FX rate.  Compl. ¶ 39.  The lack of a uniform pattern makes obvious that Plaintiffs will have to introduce evidence with respect to each distribution associated with each ADR.  As discussed *supra* in note 4, there may be no uniform pattern because JPM's FX rate practices may have varied depending on the ADR or the currency.  The bottom line is that just because JPM added a spread to the FX rate for the distributions of one ADR does not necessarily mean it did so with respect to another ADR.  *See NECA*, 693 F.3d at 163 (finding no same set of concerns between plaintiff's and absent class members' claims arising from different offerings backed by loans originated by different originators "because, to the extent the representations in the Offering

Documents were misleading with respect to one Certificate, they were not necessarily misleading with respect to others").[28]  Moreover, as in *BNY Mellon*, Plaintiffs have not explained how they have a personal and concrete stake in proving this case relative to ADRs that they do not own beyond the notion that introducing such evidence might augment the evidence supporting their own claims; that incentive, however, does not suffice to establish class standing.  *BNY Mellon*, 775 F.3d at 163.

Because Plaintiffs' claims do not present the same set of concerns as the claims of the absent claims members who held the other 107 ADRs sponsored by JPM, Plaintiffs lack class standing to represent them.  Dismissal for lack of class standing is appropriate at the motion to dismiss stage.  *See BNY Mellon*, 775 F.3d at 163 (affirming dismissal for lack of class standing at motion to dismiss stage); *DiMuro*, 572 F. App'x at 29 (same); *In re: Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *41 (dismissing for lack of class standing at motion to dismiss stage).

## IV.    Defendant's Motion to Compel Arbitration of the Claims Related to the Chunghwa ADR is Granted

According to JPM, because the Chunghwa ADR Contract Documents include an arbitration provision, Plaintiffs' claims related to the Chunghwa ADR must be arbitrated.  Def. Mem. 15-16.  Specifically, the Chunghwa Deposit Agreement provides that:

---

[28]    *See also DiMuro v. Clinique Labs., LLC*, 572 F. App'x 27, 29 (2d Cir. 2014) (summary order) (affirming dismissal for lack of class standing in consumer fraud case because plaintiffs' claims regarding the three beauty products they purchased would not raise the same set of concerns as absent class members' claims regarding four other beauty products that were not purchased or used by plaintiffs and that contained different ingredients and were advertised differently); *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MC-2543 (JMF), 2016 WL 3920353, at *41 (S.D.N.Y. July 15, 2016) (denying class standing in product liability case to bring claims on behalf of customers who purchased or leased General Motors vehicle models not purchased or leased by plaintiffs to the extent the vehicles did not have substantially similar defects as plaintiffs' models because whether General Motors engaged in fraudulent omission or concealment depended on individual facts particular to each vehicle model); *In re: LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2016 WL 1558504, at *9 (S.D.N.Y. Apr. 15, 2016) (denying class standing in LIBOR price-fixing case for  trader-based claims because named plaintiffs and absent class members' trader-based claims did not raise the same set of concerns given that "[p]roof that a bank caused an artificial price one day will not determine whether it did so on another day").

> Any controversy, claim or cause of action brought by any party or parties hereto
> against any other party or parties hereto arising out of or relating to the Deposit
> Agreement shall be settled by arbitration in accordance with the Commercial
> Arbitration Rules of the American Arbitration Association . . . .

Compl. Ex. 4 § 7.8(i).  The arbitration clause includes a condition precedent, namely, the

arbitration provisions apply only "[i]n the event the Depositary has[sic] is advised that a

judgment of a United States court may not be recognized or enforced in the R.O.C. . . . ."  *Id.* at

§ 7.8.  The parties dispute whether the condition precedent has been satisfied and whether it is

even within this Court's purview to decide whether the condition precedent has been satisfied.

The parties also dispute whether New York law or federal law pursuant to the New York

Convention governs the condition precedent issue.  Pls. Opp. 29; Def. Reply 9 (Dkt. 26).

Plaintiffs argue that the New York choice of law clause in the Deposit Agreement requires

application of New York law and that New York law requires the Court, not the arbitrator, to

decide whether the condition precedent has been satisfied.  Pls. Opp. 29.  The choice of law

provision, which does not apply to the arbitration provisions specifically but to the Deposit

Agreement generally, provides that "[t]his Deposit Agreement and the Receipts shall be

interpreted and all rights . . . and provisions . . . shall be governed by the laws of the State of

New York."  Compl. Ex. 4 § 7.6.  JPM argues that federal law applies, notwithstanding the

choice of law provision, and that federal law requires the arbitrator, not the Court, to decide

whether the condition precedent to arbitration has been satisfied.  Def. Reply 9.

The Court agrees with JPM.  The arbitration agreement is enforceable under the New

York Convention and the Federal Arbitration Act, 9 U.S.C. §§ 201-208, because it is a written

agreement that provides for arbitration in the United States regarding the securities of a foreign

company.  *See Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198

F.3d 88, 92 (2d Cir. 1999) ("The Convention and the implementing provisions of the FAA set

31

forth four basic requirements for enforcement of arbitration agreements under the Convention: (1) there must be a written agreement; (2) it must provide for arbitration in the territory of a signatory of the convention; (3) the subject matter must be commercial; and (4) it cannot be entirely domestic in scope"). Under federal law, procedural questions, such as conditions precedent, are presumptively questions for the arbitrator to resolve. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84-85 (2002).

In *Bechtel do Brasil Construcoes Ltda. v. UEG Araucaria Ltda.*, 638 F.3d 150 (2d Cir. 2011), the Second Circuit held that parties had not contracted around that default rule despite the presence of New York choice of law provisions. Specifically, the Second Circuit held that the question of timeliness, which is a question for the courts under New York law, was a question for the arbitrator—not the court—despite the parties' New York choice of law provisions. 638 F.3d at 158. In that case, there were two choice of law provisions that specifically addressed arbitration: (1) "Any arbitration proceeding or award rendered hereunder and the validity, effect and interpretation of this agreement to arbitrate shall be governed by the laws of the state of New York," and (2) "The law governing the procedure and administration of any arbitration . . . is the law of the State of New York." *Id.* at 152. The Second Circuit did not read those provisions to invoke—in place of the ICC rules specifically incorporated in the arbitration clause—the New York statute permitting parties to raise timeliness before the court as a bar to arbitration. *Id.* at 155-57. The Second Circuit found the contract to be ambiguous and resolved the ambiguity in favor of arbitration, noting that "general choice-of-law clauses . . . may be read to address only 'substantive rights and obligations, and not the State's allocation of power between alternative tribunals.'" *Id.* at 157-158 (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 60 (1995)). Drawing on *Bechtel*, the district court in *Alfa Laval U.S. Treasury Inc. v. Nat'l*

*Union Fire Ins. Co. of Pittsburgh, PA*, also held that a broad New York choice of law provision did not bring the timeliness question before the court, especially given the comprehensive scope of the arbitration clause.  857 F. Supp. 2d 404, 416-17 (S.D.N.Y. 2012).[29]

Likewise, in this case, a general choice of law provision combined with a broad arbitration provision covering "any controversy . . . arising out of or relating to the Deposit Agreement" does not evidence an intent to displace with New York law the general federal rule that the arbitrator should resolve whether the condition precedent to arbitration has been met. Unlike *Bechtel*, the choice of law provision here does not even apply to arbitration specifically but to the Deposit Agreement as a whole, just as in *Alfa Laval*.  Moreover, also as in *Alfa Laval*, the arbitration clause is sufficiently broad to cover the parties' dispute regarding the condition precedent.  *See* 857 F. Supp. 2d at 417.  Accordingly, whether the condition precedent to this arbitration agreement has been satisfied is an issue for the arbitrator to decide, and JPM's motion to compel arbitration of all claims related to the Chunghwa ADR is granted.[30]

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED in part and DENIED in part.  The parties must appear for a second initial pretrial conference on **October 21, 2016, at 10:00 a.m.** in courtroom 443 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, NY 10007.  No later than **October 13, 2016**, the parties must submit a joint letter and

---

[29]     The choice of law provision stated that "[a]ll matters of interpretation and/or construction . . . are to be interpreted and construed under New York law," *Alfa Laval*, 857 F. Supp. 2d at 416, and the arbitration clause was limited to "[a]ll disputes arising out of the interpretation of this Agreement," *id.* at 417.

[30]     Pursuant to *Katz v. Cellco P'ship*, Plaintiffs' claims arising from the Chunghwa ADR are stayed pending arbitration.  794 F.3d 341, 345-47 (2d Cir.), *cert. denied*, 136 S. Ct. 596 (2015).

Case Management Plan in accordance with the Court's November 30, 2015 order (Dkt. 5). The

Clerk of Court is respectfully directed to close docket entry 19.


**SO ORDERED.**

**Date:  September 29, 2016**            **VALERIE CAPRONI**
       **New York, New York**            **United States District Judge**