**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| BENJAMIN MICHAEL MERRYMAN, AMY WHITAKER MERRYMAN TRUST, AND B MERRYMAN AND A MERRYMAN 4TH GENERATION REMAINDER TRUST, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>       v.<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>              Defendant. | **CIVIL ACTION NO. 1:15-cv-09188-VEC** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PARTIAL RECONSIDERATION**

## <u>TABLE OF CONTENTS</u>

**Page**

I.    PRELIMINARY STATEMENT ................................................................. 1

II.    PROCEDURAL HISTORY AND RELEVANT BACKGROUND ................................... 3

    A.    The Motion to Dismiss Opinion ..................................................3

    B.    The *Normand* and *Merryman (Citigroup)* ADR Opinions ......................................4

III.    LEGAL STANDARD .......................................................................... 6

IV.    ARGUMENT ................................................................................. 7

    A.    The Court Committed Clear Error in Determining that Plaintiffs Do Not Have Class Standing to Represent All ADR Holders ...............................................7

        1.    The Court Overlooked JPM's Admission that It Charges a Fee for Each Cash Distribution ...............................................................7

        2.    That Each Class Member May Have Different Damages Because of Different Spreads Charged Does Not Impact Plaintiffs' Class Standing ...............................................................11

        3.    The Disclosure Further Distinguishes this Case from *BNY Mellon* ...........11

    B.    The Court Committed a Clear Error of Law in Measuring the Timeliness of Plaintiffs' Claims from the Date of the New York Complaint ..........................14

V.    CONCLUSION ............................................................................. 16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Chandler v. Roy*,
    272 F.3d 1057 (8th Cir. 2001) ............................................................................15, 16

*City of Edinburgh Council v. Vodafone Grp. Pub. Co.*,
    2009 WL 980304 (S.D.N.Y. Apr. 9, 2009)............................................................6

*Gratz v. Bollinger*,
    539 U.S. 244 (2003)...............................................................................................14

*Harrell v. Joshi*,
    2015 WL 9275683 (S.D.N.Y. Dec. 18, 2015) ......................................................6

*Harris v. Las Vegas Sands L.L.C.*,
    2013 WL 5291142 (C.D. Cal. Aug. 16, 2013).......................................................14

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*,
    729 F.3d 99 (2d Cir. 2013)......................................................................................6

*McDowell v. Eli Lilly & Co.*,
    2015 WL 845720 (S.D.N.Y. Feb. 26, 2015) .........................................................6

*Merryman v. Citigroup, Inc.*
    No. 15-CV-9185 (CM), slip. op.(S.D.N.Y. Aug. 15, 2016) .........................5, 10, 13

*Merryman v. JPMorgan Chase Bank, N.A.*,
    2015 WL 7308666 (W.D. Ark. Nov. 19, 2015).....................................................16

*Montalvo v. Annetts*,
    2002 WL 31155044 (S.D.N.Y. Sept. 26, 2002).....................................................6

*Nat'l Council of La Raza v. Dep't of Justice*,
    2004 WL 2314455 (S.D.N.Y. Oct. 14, 2004) .......................................................6

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012).............................................................................5, 11, 13

*Normand v. Bank of New York Mellon*,
    2016 WL 5477783 (S.D.N.Y. Sept. 29, 2016)......................................4, 5, 10, 13

*Ret. Bd. of the Policeman's Annuity & Benefit Fund of the City of Chicago
    v. Bank of New York Mellon*,
    775 F.3d 154 (2d Cir. 2014)..............................................................................12, 13

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)................................................................................................11

**Statutes**

Ark. Code Ann. § 16-56-126 ................................................................................................15

**Other Authorities**

Ark. R. Civ. P. 3................................................................................................................15

Plaintiffs Benjamin Michael Merryman, Amy Whitaker Merryman Trust and B Merryman and A Merryman 4th Generation Remainder Trust ("Plaintiffs") submit this Memorandum of Law in Support of their Motion for Partial Reconsideration of the Court's Memorandum Opinion and Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, dated September 29, 2016 (Dkt. 35) ("Opinion").[1]

## I.    PRELIMINARY STATEMENT

Plaintiffs respectfully submit that this Court made clear errors in (i) overlooking facts which contradict the Court's conclusion that Plaintiffs do not have "class standing" to represent purchasers of ADRs that Plaintiffs did not themselves purchase, and (ii) using the date of Plaintiffs' New York complaint—instead of Plaintiffs' Arkansas complaint—to calculate the extent to which Plaintiffs' claims are timely under Arkansas' statute of limitations for breach of contract actions.

*First*, the Court overlooked Plaintiffs' allegations that Defendant JPMorgan Chase Bank, N.A. ("JPM") is liable for breach of contract to Plaintiffs and every ADR holder because it has ***admitted*** that it added a fee (in the form of a spread) in connection with the conversion of Cash Distributions (as that term is defined in Plaintiffs' Complaint) for ADRs. Complaint ¶48 (In 2012, JPM posted a disclosure on its website stating "***[t]he Final Foreign Exchange Rate will be net of*** … ***a fee of up to 20 basis points*** in connection with the conversion of the dividend into U.S. dollars" (hereinafter referred to the "Disclosure").

JPM's admitted common practice of charging a fee supports liability not just for breach of the Deposit Agreements underlying Plaintiffs' ADRs, but also for breach of the Deposit Agreements underlying all of the ADRs sponsored by JPM.  And this breach supports both

---

[1] Unless otherwise noted: (i) all defined terms shall have the same meaning as in the Opinion, (ii) all quotation marks, citations and footnotes are omitted, and (iii) any emphasis is added.

Plaintiffs' claims for monetary damages and its claim for injunctive relief. Complaint ¶¶2, 54. Put simply, if JPM added an impermissible fee for all Cash Distributions across all ADRs, then JPM breached the Deposit Agreements for all ADRs. JPM's admission thus runs counter to the Court's finding that "Plaintiffs will be required to prove that JPM added a spread in contravention of the governing agreements *with respect to each distribution associated with each ADR*." Opinion at 29 (emphasis in original). Rather, liability will be established by evidence that the Depository Agreements prohibit JPM's admitted conduct of adding a fee.

As such, JPM's conduct implicates the "same set of concerns" for Plaintiffs and all ADR holders. Indeed, the very same evidence (JPM's admitted, common practice of charging an impermissible fee) will establish JPM's breach of all of the Deposit Agreements. Any variation in the amount of the fee applied by JPM is irrelevant as to liability—JPM breached its obligations whether the impermissible fee was one basis point or 20 basis points.

Plaintiffs also respectfully submit that the Court misconstrued the significance of the histogram in the Complaint. The histogram shows that JPM's addition of a spread had the effect, in most cases, of causing a given FX rate to be unfavorable to ADR holders. But this does not mean that "favorable" FX rates did not likewise contain an embedded "fee" or spread. To the contrary, the Complaint alleges that JPM applied a spread to ***all*** Cash Distributions. *E.g.,*Complaint at ¶¶3, 35-45, 56. JPM's Disclosure merely confirmed this practice.

To the extent there was any variability in the amount of the spread (or "fee"), that amount is simply the measure of damages, and any potential individualized damages issues do not destroy class standing under Second Circuit law.

*Second*, the Court's conclusion that "Plaintiffs' breach of contract claims dating prior to November 21, 2010 are dismissed as time barred" rested on the incorrect notion that the

limitations period should be calculated from Plaintiffs' New York complaint. Instead, under Arkansas' savings statute, the Arkansas complaint dictates to what extent Plaintiffs' claims dating back to 2010 are timely. Because Plaintiffs' Arkansas Complaint was filed on May 1, 2015, the Arkansas statute of limitations would make timely claims dating back to May 1, 2010.

Accordingly, Plaintiffs respectively submit that the Court should reconsider its class standing holding in the Opinion and should allow Plaintiffs to proceed with their claims on behalf of all ADR holders. Plaintiffs also respectfully submit that the Court should reconsider its conclusion that Plaintiffs' claims prior to November 21, 2010 are time barred under Arkansas law, and instead find that these claims extend back to May 1, 2010.

## II.   PROCEDURAL HISTORY AND RELEVANT BACKGROUND

### A.   The Motion to Dismiss Opinion

On September 29, 2016, this Court granted in part and denied in part JPM's motion to dismiss. Three issues from the Opinion are relevant here. First, this Court sustained Plaintiffs' breach of contract claims in their entirety. As this Court recognized, the "heart of Plaintiffs' breach of contract claim is that [1] ***JPM added a spread*** to the FX rate it received in converting cash distributions from foreign currencies into U.S. dollars [2] ***and that the addition of a spread breached the Contract Documents***." Opinion at 11; *see also id.* at 17 ("Plaintiffs allege that JPM failed to pay the amount received upon conversion because it [1] ***added a spread***, and [2] ***the spread that it added is not an enumerated expense or charge permitted as a deduction from the converted sum***."). Accepting these allegations as true, as is proper on a motion to dismiss, the Court held that Plaintiffs had adequately stated a claim for breach of contract.

Second, with respect to class standing, this Court determined that Plaintiffs do not have class standing to represent investors in the 107 JPM-sponsored ADRs in which Plaintiffs did not invest. Opinion at 26. Specifically, this Court held that Plaintiffs did not share "the same set of

concerns" with investors who had not purchased the same ADRs because "Plaintiffs will be required to prove that JPM added a spread in contravention of the governing agreements *with respect to each distribution associated with each ADR*." Opinion at 29 (emphasis in original). In reaching this conclusion, the Court noted that "there may be no uniform pattern because JPM's FX rate practices may have varied depending on the ADR or the currency." *Id.* This Court also reasoned that the "graph in Plaintiffs' Complaint itself suggests that the alleged practice of adding a spread was not uniform." Opinion at 29. According to the Court, "[a]lthough the graph shows that the distribution of assigned FX rates is skewed toward the least favorable daily interbank FX rate, it also shows that sometimes the assigned FX rate was not worse than the daily median interbank FX rate—and sometimes the assigned FX rate was much better than the median interbank FX rate." *Id.* Finally, the Court reasoned that "as in *BNY Mellon*, Plaintiffs have not explained how they have a personal and concrete stake in proving this case relative to ADRs that they do not own beyond the notion that introducing evidence might augment the evidence supporting their own claims." *Id.* at 30.

Third, this Court concluded that, under Arkansas law, which Defendants conceded applied to the timeliness of Plaintiffs' claims, Plaintiffs had not demonstrated that they could not have discovered JPM's breach with reasonable diligence in some earlier time period. Opinion at 22. Accordingly, the Court dismissed all of Plaintiffs' claims prior to November 21, 2010 – i.e., five years from the date of Plaintiffs' New York complaint. *Id.*

## B.    The *Normand* and *Merryman (Citigroup)* ADR Opinions

After this Court released the Opinion, Judge Oetken issued an opinion granting in part and denying in part defendant Bank of New York Mellon's ("BNYM") motion to dismiss in a substantially similar case. *Normand v. Bank of New York Mellon*, 2016 WL 5477783 (S.D.N.Y. Sept. 29, 2016) ("*Normand*"). In *Normand*, like here, the plaintiffs alleged that BNYM breached

its contractual obligations, under substantially similar deposit agreements, in pricing FX for ADR cash distributions. *Id.* at *1. Also like this case, the *Normand* plaintiffs alleged that BNYM's practice of adding a spread was uniform across all ADRs. *Id.* at *1, 7.

In sustaining the Plaintiffs' breach of contract claims in *Normand,* Judge Oetken held that "Plaintiffs have alleged the existence of an agreement and identified a particular provision that was allegedly breached by BNYM," and that "this is sufficient to survive a motion to dismiss." *Id.* at *4.

Judge Oetken, however, departed from this Court's reasoning in finding that the plaintiffs had alleged sufficient facts to survive a motion to dismiss as to the issue of class standing. In concluding that the issue of class standing was "best resolved on a motion for  class certification," and citing to Judge McMahon's opinion in *Merryman (Citigroup)*, Judge Oetken held: "[a]t this stage, Plaintiffs have alleged the existence of a common contractual obligation and common conduct with respect to each ADR. This is enough to survive a motion to dismiss." *Id.* at *8. Judge Oetken further explained, "[a]s long as the terms of the ADRs and their corresponding Deposit Agreements are as alleged, the proof necessary for each class member will be substantially the same, and Plaintiffs can adequately represent the interest of the entire purported class." *Id.* (citing *Merryman (Citigroup)* at 24).

Judge Oetken's decision is consistent with the Judge McMahon's holding in *Merryman (Citigroup)*.  In concluding that "this case appears far more like *NECA* than [*BNY Mellon*]," Judge McMahon reasoned that "Plaintiffs allege that Citi breached its contractual obligations in exactly the same way with respect to each ADR—by adding a spread to the FX rate obtained for cash distributions." *Merryman (Citigroup)*  at 24.[2]

---

[2] On October 7, 2016, the defendant in the *Merryman (Citigroup)* action asked Judge McMahon to certify her motion to dismiss opinion for interlocutory appeal. *Merryman v. Citigroup, Inc.*, No. 15-cv-9185 (CM) (S.D.N.Y.

### III.    LEGAL STANDARD

As the Second Circuit has instructed, "[a] motion for reconsideration should be granted only when the [moving party] identifies 'an intervening change of controlling law, the availability of new 'evidence, or the need to correct a clear error or prevent manifest injustice.'" *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013). Thus, "[u]nder Federal Rule of Civil Procedure 59(e) and Local Civil Rule 6.3, a party seeking reconsideration must 'demonstrate controlling law or factual matters put before the court on the underlying motion that the movant believes the court overlooked and that might reasonably be expected to alter the court's decision.'" *McDowell v. Eli Lilly & Co.*, 2015 WL 845720, at *2 (S.D.N.Y. Feb. 26, 2015) (quoting *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC,* 842 F. Supp. 2d 682, 715 (S.D.N.Y. 2012)).

Although the standard for reconsideration is high, courts in this District, including this Court, have nonetheless granted such motions in appropriate circumstances. *See, e.g., Harrell v. Joshi*, 2015 WL 9275683, at *4 (S.D.N.Y. Dec. 18, 2015) (Caproni, J.) (granting reconsideration in part, based on evidence the court failed to consider); *City of Edinburgh Council v. Vodafone Grp. Pub. Co.*, 2009 WL 980304, at *1 (S.D.N.Y. Apr. 9, 2009) (granting reconsideration based on fact that court "overlooked"); *Nat'l Council of La Raza v. Dep't of Justice*, 2004 WL 2314455, at *1 (S.D.N.Y. Oct. 14, 2004) (exercising discretion to consider new evidence on reconsideration); *Montalvo v. Annetts*, 2002 WL 31155044, at *1 (S.D.N.Y. Sept. 26, 2002) (granting reconsideration based on argument that the Court "overlooked").

---

Oct. 7, 2016), Dkts. 43-45.  The two issues that the defendant seeks appellate review for are: (1) whether named plaintiffs have standing to assert a breach-of-contract claim related to ADRs that plaintiffs do not own; and (2) under Federal Rule of Civil Procedure 9(b), what allegations are necessary to sufficiently plead the reasonable diligence element of fraudulent concealment for purposes of tolling the statute of limitations. *Id.*, Dkt. 44 at 1. In light of this Court's Opinion, the defendant in the *Merryman (Citigroup)* action has argued that there are "substantial grounds for differences of opinion" as to both issues.

## IV.    ARGUMENT

### A.    The Court Committed Clear Error in Determining that Plaintiffs Do Not Have Class Standing to Represent All ADR Holders

For the reasons explained below and in view of the applicable legal standard, Plaintiffs respectfully submit reconsideration is appropriate here because the Court overlooked key facts showing that JPM's practice of adding an impermissible "fee" to all Cash Distributions is common for all ADRs, including those not held by Plaintiffs. And, as explained further below, that JPM may have charged divergent spreads from transaction to transaction (i.e., "up to 20 basis points") bears only on the quantum of damages for any ADR holder whose dividends were subject to that transaction, not to JPM's liability for breach of contract. Accordingly, Plaintiffs share the "same set of concerns" with all JPM-sponsored ADR holders.

### 1.    The Court Overlooked JPM's Admission that It Charges a Fee for Each Cash Distribution

In its class standing analysis, the Court overlooked a key and critical fact alleged in this matter: JPM ***admitted*** to engaging in a common practice of charging a fee on conversions of Cash Distributions on its ADR.com website on or around December 2012.  Plaintiff alleges that this practice constitutes a breach of ***all*** of the ADR Deposit Agreements under which JPM served as a depositary bank.  The Court sustained these allegations, finding that Plaintiffs had adequately alleged that the addition of any spread over and above the rate the Bank obtained for the FX conversion of Cash Distributions plausibly constituted a breach of the Deposit Agreements.  Thus, JPM's 2012 admission establishes the conduct that gives rise to its liability not only to the Plaintiffs but also to each ADR holder that received a Cash Distribution.

The Complaint explains the substance and significance of JPM's Disclosure as it relates to JPM's FX practices at issue here as follows:

In 2012, JPMorgan began partially disclosing its FX practices on its website—*www.ADR.com*—by stating that ADR dividends are "converted to U.S. dollars through a foreign exchange transaction with JPMorgan Chase Bank, N.A. or an affiliate ('JPMorgan')" and that "*[t]he Final Foreign Exchange Rate <u>will be net of</u>* any gain or loss incurred by JPMorgan on the transaction and *<u>a fee of up to 20 basis points</u>* in connection with the conversion of the dividend into U.S. dollars."

Complaint ¶ 48 (as defined above, the "Disclosure").  In the Disclosure, JPM represents that the final FX rate "*<u>will be net of</u>* . . . a *fee of up to 20 basis points*."  This uncontested allegation unambiguously establishes that JPM engaged in a common practice of charging ADR holders a fee *on each Cash Distribution*, which the Court determined is "not an enumerated expense or charge permitted [under the Deposit Agreements] as a deduction from the converted sum." Opinion at 17. JPM's addition of a spread in each case thus breached the obligations under the Deposit Agreements in an identical way.

In the Opinion, however, the Court expressed concern that "just because JPM added a spread to the FX rate for the distributions of one ADR does not necessarily mean it did so with respect to another ADR."  *Id.* at 29.  Respectfully, this is incorrect.  As explained above, the Disclosure makes clear that JPM engaged in a common practice of charging a fee on each Cash Distribution for each ADR.   The Disclosure does not say, for instance, that JPM will "sometimes" charge a fee, or that the final FX rate "may" be net of a fee. Rather, the Disclosure unequivocally states that the final FX rate "*will be*" net of a "fee of up to 20 basis points." Plaintiffs therefore respectfully submit that the Court overlooked the language and significance of the Disclosure.

Further, the Court's conclusion that "Plaintiffs will need to introduce proof regarding the . . . FX rates used by JPM for each distribution associated with each ADR" likewise respectfully misapprehends the significance of the Disclosure.  *Id.*   To prove a breach of the Deposit Agreements, Plaintiffs need only show that JPM charged an impermissible fee.  The Disclosure

independently establishes that JPM engaged in a common practice of charging impermissible fees and supports Plaintiffs' theory of a breach that applies to *all* ADRs. As discussed further below, the amount of any such fee bears only on damages, not liability or Plaintiffs' class standing.

Finally, the fact that Plaintiffs' histogram suggests that "sometimes the assigned FX rate was much better than the median interbank FX rate," *id.*, does not lessen the import of the Disclosure. Respectfully, Plaintiffs submit that the Court misconstrued Plaintiffs' allegations relating to the histogram, which reveals the skewed distribution of rates that JPM assigned to ADR holders over the ADRs and Cash Distributions in the study. Plaintiffs do not allege that JPM breached the Deposit Agreements by charging an unfavorable rate. Instead, Plaintiffs allege that JPM breached (and continues to breach) the Deposit Agreements by charging a "fee" on top of whichever rate—favorable or unfavorable—that JPM assigned to ADR holders for Cash Distributions. Thus, the uneven distribution of FX rates shown in the histogram plausibly alleges that JPM's admitted common practice disclosed in 2012 extended throughout the proposed Class Period because the frequency of disadvantageous FX rates assigned to ADR holders across a spectrum of different ADRs suggests that a spread was consistently added to ADR Cash Distributions going back as far as 2002. This is because, barring the addition of a spread by JPM, one would expect the distribution of FX rates for Cash Distributions to be distributed along a bell-shaped curve. Importantly, moreover, the fact that a rate appears on the advantageous side of the mean intra-day FX price does not demonstrate that no spread was added. Rather, it simply means that the spread added did not result in the ultimate FX rate assigned to ADR holders being on the disadvantageous side of the mean.

It bears noting that one of JPM's primary arguments in its motion to dismiss was that Plaintiffs are simply complaining of poor FX rates and the Deposit Agreements do not specify the FX rates to be applied. *See, e.g.,* Def. Mem. at 1 (Dkt. 20). (Plaintiffs seek "effectively free foreign exchange ('FX') services at interbank rates, or at least better FX rates, without any contractual entitlement to such a benefit").   Yet, the inclusion of the histogram was not to illustrate that Plaintiffs' got poor rates (or even good rates), but to demonstrate that the manipulated FX rates received created a plausible inference that a spread was being added throughout the Class Period.   Indeed, the Court rejected JPM's attempt to rewrite Plaintiffs' allegations at this stage in the proceeding. Opinion at 17-18. Under this Court's Opinion, the particular rate charged for FX is irrelevant to the issue of whether or not JPM breached the Deposit Agreements by adding an impermissible fee to each Cash Distribution. *See id; accord Normand*, 2016 WL 5477783, at *3 (rejecting BNYM's argument that it was under no obligation to provide a more favorable rate for ADR holders because "the propriety of the FX rate used and the method used to determine that rate present a ***separate question*** from [the breach]"); *Merryman (Citigroup)* at 5 (finding breach of contract while acknowledging that "[n]owhere do the applicable contracts require Citi to convert any distributions at the prevailing interbank rate ***or any other rate***"). Instead, the critical issue is whether or not JPM added a fee to the rate ultimately assigned—a practice that was confirmed in the Disclosure.

In short, variation in the spread that was ultimately assessed (or the final FX rate applied) simply does not contradict or disprove JPM's admitted, common practice of adding a spread ***in all cases***.

### 2. That Each Class Member May Have Different Damages Because of Different Spreads Charged Does Not Impact Plaintiffs' Class Standing

Plaintiffs' respectfully submit that the Court's opinion conflates liability and damages issues when it states: "[t]he graph in Plaintiffs' Complaint itself suggests that the alleged practice of adding a spread was not uniform . . . . The lack of a uniform pattern makes obvious that Plaintiffs will have to introduce evidence with respect to each distribution associated with each ADR." Opinion at 29. As described above, Plaintiffs can establish liability for breach of contract by demonstrating that an impermissible fee (of any amount) was added to Cash Distributions. Thus, it matters not for liability whether the fee was the same or "uniform." Rather, the amount of the fee is a damages issue, and Plaintiffs will need to "introduce evidence with respect to each distribution" only to quantify damages. As the Second Circuit has explained, "it is well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification … *let alone class standing*." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 164–65 (2d Cir. 2012) ("*NECA*"); *see also Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 409 (2d Cir. 2015) (district court's refusal to certify class because damages could not be measured on a class wide basis was error because "the law of this Circuit—left undisturbed by *Comcast*—[is that] that individualized damages determinations alone cannot preclude certification under Rule 23(b)(3)"). In any event, Plaintiffs will be able to establish at class certification that class wide damages are susceptible to a common damages methodology. Accordingly, Plaintiffs respectfully submit that the Court erred in allowing individualized issues of damages to preclude class standing.

### 3. The Disclosure Further Distinguishes this Case from *BNY Mellon*

Plaintiffs also respectfully submit that this Court erred in concluding that this case was "more like *BNY Mellon* than *NECA*." Opinion at 29.

In a putative class action, a plaintiff has class standing if he "plausibly alleges": (1) that he has personally suffer actual injury as a result of the defendant's conduct; and (2) such conduct implicates the "same set of concerns" as the conduct alleged to have caused injury to other members of the putative class. *NECA*, 693 F.3d at 162. This Court agreed that Plaintiffs satisfied the first element of class standing, but determined that Plaintiffs failed to meet the second prong. The Court's class standing analysis relies extensively on *Retirement Board of the Policeman's Annuity & Benefit Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154 (2d Cir. 2014). *See* Opinion at 26-30. The presence of the Disclosure, however, distinguishes this matter from *BNY Mellon*.

In *BNY Mellon*, the plaintiffs alleged that defendant BNYM breached its contract where: (1) the mortgage originators failed to follow underwriting guidelines; (2) the originators' failure triggered a duty to act by the trustee, BNYM; and (3) BNYM failed to take any action. 775 F.3d at 162. In support of their class standing argument, the plaintiffs in *BNY Mellon* argued that "evidence of BNYM's policy of 'inaction' in the face of widespread defaults will be applicable to all of the trusts at issue." *Id.* The Second Circuit, however, found that this allegation did not sufficiently implicate the "same set of concerns," noting that:

> [E]ven proof that BNYM *always* failed to act when it was required to do so would not prove their case [as to all putative class members], because they would still have to show which trusts actually had deficiencies that required BNYM to act in the first place.

*Id.* (emphasis in original). In other words, BNYM's alleged common policy of inaction did not support a class-wide breach unless plaintiffs also proved the underlying prior failures by the originators. In order to show prior failure by the originators, the plaintiffs in *BNY Mellon* would have had to prove which of the thousands of loans in each of the 530 MBS trusts were defective. *Id.* at 162. Under such circumstances, the Second Circuit held, "[w]e see no way in which

12

answering these questions for the trusts in which Plaintiffs invested will answer the same questions for the numerous trusts in which they did not invest." *Id.*

Here, in contrast, there is no predicate requirement analogous to the plaintiffs' obligation in *BNY Mellon* to establish that the underwriting guidelines had been violated or that a given trust contained defective loans. Nor is there a distinction between JPM's class-wide conduct and the breach. As explained above, JPM admitted in the Disclosure that it charged (and still charges) a fee for each and every Cash Distribution, and the Court has sustained Plaintiffs' allegations that this fee breached the Deposit Agreements. The Disclosure not only establishes a common practice by JPM, but this common practice ***on its own constitutes a breach***.

Plaintiffs in this case therefore have a "personal and concrete stake in proving other, related claims against the defendant." *Id.* at 163. In *BNY Mellon*, the Court found that plaintiffs had no personal stake where proving a breach with respect to trusts in which the plaintiffs did not invest would merely "augment the evidence that they would otherwise rely upon to prove their claims." *Id.* Here, no such "expanded evidentiary showing," *id.*, is necessary to establish JPM's contractual liability. If, consistent with the Disclosure, JPM engaged in a common practice of adding an impermissible fee to all Cash Distributions, then Plaintiffs have established liability as to both the ADRs they purchased and the ADRs they did not purchase. Accordingly, *BNY Mellon* does not preclude class standing in this case. *See id.* at 161 (explaining that the plaintiffs in *NECA* "had the right incentives, largely because the proof contemplated for all of the claims would be sufficiently similar"); *see also Merryman (Citigroup)* at 24 (holding that plaintiffs had adequately alleged class standing because "this case appears far more like *NECA* than [*BNY Mellon*]"); *Normand*, 2016 WL 5477783 at *7-8 (same).[3]

---

[3] A determination that Plaintiffs have adequately ***alleged*** class standing does not automatically mean that Plaintiffs will be able to represent investors who purchased ADRs that Plaintiffs did not likewise purchase. Indeed, as both

Additionally, Plaintiffs have sought injunctive relief to foreclose JPM from charging the disclosed extra-contractual fees for FX conversion.   Complaint at ¶¶2, 54.  There can be no question that this relief implicates the same set of concerns for every ADR holder.  To the extent Plaintiffs demonstrate that JPM's admitted practice of charging a "fee of up to 20 basis points" to ADR Cash Distributions constitutes an impermissible fee under Plaintiffs' Deposit Agreements, it will have demonstrated a basis for injunctive relief that should extend to every Deposit Agreement with identical provisions.  Thus, at a minimum, Plaintiffs' claims implicate the same set of concerns as every ADR holder with respect to this injunctive remedy.  *See Gratz v. Bollinger*, 539 U.S. 244, 267 (2003) (plaintiffs who sought injunctive relief shared "the same set of concerns is implicated by the University's use of race in evaluating all undergraduate admissions applications under the guidelines"); *Harris v. Las Vegas Sands L.L.C.*, 2013 WL 5291142, at *5 (C.D. Cal. Aug. 16, 2013) (citing *NECA*, 639 F.3d at 162) (plaintiff who sought injunctive relief shared "same set of concerns" under *NECA* with putative class who will be harmed by defendants' future conduct).

**B.     The Court Committed a Clear Error of Law in Measuring the Timeliness of Plaintiffs' Claims from the Date of the New York Complaint**

Plaintiffs respectfully submit that the Court committed a clear error of law in using the date of Plaintiffs' New York complaint to calculate the applicable limitations period. As explained below, under Arkansas law, which the Court otherwise applied, Plaintiffs' claims were tolled from the date of the Arkansas complaint.

As this Court correctly recognized, Arkansas' five year limitations period applies to Plaintiffs' breach of contract claims absent tolling based on fraudulent concealment. Opinion at

---

Judge McMahon and Judge Oetken recognized, JPM will have an opportunity to challenge Plaintiffs' ability to represent such investors at class certification.

19. Further, under New York's borrowing statute, "all the extensions and tolls applied in the foreign state must be must be imported with the foreign statutory period." *Id.* at 20 (citing *Norex Petroleum Ltd. v. Blavatnik*, 23 N.Y.3d 665, 676 (2014)).

The Arkansas savings statute tolls the applicable limitations period from the date of the first filed complaint. That statute provides in relevant part: "[1] if any action is commenced within the time prescribed ... and [2] the plaintiff therein suffers a nonsuit ... the plaintiff may commence a new action [3] within (1) one year after the nonsuit suffered." Ark. Code Ann. § 16-56-126. Under Ark. R. Civ. P. 3, "[a] civil action is commenced by filing a complaint with the clerk of the court." As the Eight Circuit has recognized, "the Arkansas Supreme Court, however, has construed the commencement requirement of the Arkansas savings statute liberally to ensure that litigants do not forfeit their rights, and has applied it even when the original court lacks subject matter jurisdiction over the action. *Chandler v. Roy*, 272 F.3d 1057, 1058 (8th Cir. 2001) (citing *Linder ex rel. Linder v. Howard,* 296 Ark. 414, 416-18 (1988)). Moreover, "a nonsuit occurs when plaintiffs from causes incident to the administration of law, are compelled to abandon their present action, whether by their own act or the act of the court, when either would leave them a cause of action, yet undetermined." *Id.* at 1059 (citing *State Bank v. Magness,* 11 Ark. 343, 346 (1850)).

In this case, all of the criteria for application of Arkansas' savings statute are met. First, Plaintiffs' Arkansas complaint, which was filed on May 1, 2015[4], was timely commenced within Arkansas' five year limitations period. Second, the dismissal of Plaintiffs' Arkansas Complaint constituted a nonsuit. And third, Plaintiffs filed their New York Complaint, on November 21, 2015, Dkt. 1, within two days of the Arkansas complaint being dismissed, on November 19,

---

[4] *See* Exh. 2 to Shulman Decl. in Support of Deft.'s Mot. to Dismiss, Dkt. 21-2.

2015. *Merryman v. JPMorgan Chase Bank, N.A.*, 2015 WL 7308666, at *1 (W.D. Ark. Nov. 19, 2015) (order dismissing Plaintiffs' Arkansas complaint for lack of personal jurisdiction).

Accordingly, the Court should have measured the limitations period from May 1, 2015—the date of the Arkansas complaint—not November 21, 2015. Plaintiffs' claims that accrued on or after May 1, 2010 are thus timely. *See Chandler*, 272 F.3d at 1059 (plaintiff's claims were properly tolled from the date of her first filed complaint following dismissal of suit for lack of jurisdiction).

## V.     CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Partial Reconsideration.

Dated:  October 13, 2016                    Respectfully Submitted,

*/s/ Sharan Nirmul*
**KESSLER TOPAZ MELTZER**
**& CHECK, LLP**
Joseph H. Meltzer
Sharan Nirmul
Daniel C. Mulveny (*pro hac vice* motion to be filed)
Ethan Barlieb (*admitted pro hac vice*)
Jonathan Neumann
280 King of Prussia Road
Radnor, PA  19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056
Email: jmeltzer@ktmc.com
Email: snirmul@ktmc.com
Email: dmulveny@ktmc.com
Email: ebarlieb@ktmc.com
Email: jneumann@ktmc.com

G. Chadd Mason (*pro hac vice* motion to be filed)
Arkansas Bar No. 93035
**MASON LAW FIRM, PLC**
P.O. Box 1265
Fayetteville, AR 72702-1265
(479) 442-6464

Amy C. Martin (*pro hac vice* motion to be filed)
Arkansas Bar No. 97075
**EVERETT, WALES and COMSTOCK**
1944 East Joyce Boulevard
PO Box 8370
Fayetteville, AR 72703
Tel: (479) 443-0292
Fax: (479) 443-0564
Email: amy@everettfirm.com