# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BENJAMIN MICHAEL MERRYMAN, AMY WHITAKER MERRYMAN TRUST, B MERRYMAN AND A MERRYMAN 4TH GENERATION REMAINDER TRUST AND CHESTER COUNTY EMPLOYEES RETIREMENT FUND, individually and on behalf of all others similarly situated, | CIVIL ACTION NO. 1:15-cv-09188-VEC |
| Plaintiffs, |  |
| v. |  |
| JPMORGAN CHASE BANK, N.A., |  |
| Defendant. |  |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ..................................................................... 1

II.   THE SETTLEMENT WARRANTS APPROVAL ........................................ 4

    A.    The Settlement Meets the Standards for Final Approval Under Rule 23(e).......... 4

    B.    Plaintiffs and Lead Counsel Have Adequately Represented the Settlement Class .................................................................................................................. 7

    C.    The Settlement Was Negotiated at Arm's-Length ................................................ 8

    D.    The Relief that the Settlement Provides for the Settlement Class Is Adequate, Taking into Account the Costs, Risks, and Delay of Further Litigation and Other Relevant Factors .................................................................. 9

        1.    The Complexity, Expense, and Likely Duration of the Litigation ........... 9

        2.    The Risks of Continued Litigation.......................................................... 11

            (a)    Risks to Establishing Liability ..................................................... 11

            (b)    Risks to Establishing Damages .................................................... 12

            (c)    Risks to Maintaining the Class Action Through Trial ................. 12

        3.    The Reaction of the Settlement Class to Date ........................................ 13

        4.    Stage of the Proceedings and Amount of Discovery Completed............. 14

        5.    Ability of Defendant to Withstand a Greater Judgment ......................... 15

        6.    The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and the Risks of Litigation ...................... 15

    E.    The Other Rule 23(e)(2) Factors Support Final Approval of the Settlement ...... 17

    F.    The Settlement Treats Settlement Class Members Equitably Relative to Each Other ......................................................................................................... 19

III.  THE PLAN OF ALLOCATION WARRANTS APPROVAL ...................................... 19

IV.   THE NOTICE OF SETTLEMENT SATISFIES DUE PROCESS REQUIREMENTS AND IS REASONABLE ................................................... 21

V.    THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS .............................. 24

VI.   CONCLUSION ............................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Page**

**Federal Cases**

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
298 F.R.D. 171 (S.D.N.Y. 2014) ........................................................................5, 9

*In re Amgen Inc. Sec. Litig.*,
2016 WL 10571773 (C.D. Cal. Oct. 25, 2016).................................................. 10-11

*Annunziato v. Collecto, Inc.*,
293 F.R.D. 329 (E.D.N.Y. 2013) ...........................................................................13

*In re Barrick Gold Sec. Litig.*,
314 F.R.D. 91 (S.D.N.Y. 2016) ...............................................................................7

*In re Bear Stearns Cos., Inc. Sec., Deriv. and ERISA Litig.*,
909 F. Supp. 2d 259 (S.D.N.Y. 2012)................................................................12, 13

*In re Citigroup Inc. Bond Litig.*,
296 F.R.D. 147 (S.D.N.Y. 2013) ........................................................................ 9-10

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974), *abrogated on other grounds by*
*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000)...................6, 11, 14

*City of Providence v. Aéropostale, Inc.*,
2014 WL 1883494 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v.*
*Pierson*, 607 F. App'x 73 (2d Cir. 2015)...........................................................5, 16

*In re Currency Conversion Fee Antitrust Litig.*,
263 F.R.D. 110 (S.D.N.Y. 2009) ...........................................................................12

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001)........................................................................................9

*Davis v. J.P. Morgan Chase & Co.*,
827 F. Supp. 2d 172 (W.D.N.Y. 2011) ...................................................................15

*Dornberger v. Metro. Life Ins. Co.*,
203 F.R.D. 118 (S.D.N.Y. 2001) ...................................................................... 23-24

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015), *aff'd*, 674 F. App'x 37 (2d Cir.
Dec. 27, 2016)........................................................................................................14

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
  343 F. Supp. 3d 394 (S.D.N.Y. 2018) ............................................................................ *passim*

*In re Global Crossing Sec. and ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ................................................................................6, 11, 15

*Hefler v. Wells Fargo & Co.*,
  2018 WL 4207245 (N.D. Cal. Sept. 4, 2018) ........................................................................18

*In re IMAX Sec. Litig.*,
  283 F.R.D. 178 (S.D.N.Y. 2012) ......................................................................................19, 24

*In re Initial Pub. Offering Sec. Litig.*,
  671 F. Supp. 2d 467 (S.D.N.Y. 2009)........................................................................................10

*In re LinkedIn User Privacy Litig.*,
  309 F.R.D. 573 (N.D. Cal. 2015)..............................................................................................10

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
  233 F.R.D. 306 (E.D.N.Y. 2006) ..............................................................................................9

*Maley v. Del Global Techs. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002)......................................................................................13

*Meredith Corp. v. SESAC, LLC*,
  87 F. Supp. 3d 650 (S.D.N.Y. 2015)........................................................................................19

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  2007 WL 313474 (S.D.N.Y. Feb. 1, 2007)..............................................................................16

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  246 F.R.D. 156 (S.D.N.Y. 2007) ..............................................................................................21

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) ..............................................................................................8

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  2000 WL 37992 (S.D.N.Y. Jan. 18, 2000) ......................................................................19-20

*Newman v. Stein*,
  464 F.2d 689 (2d Cir. 1972)............................................................................................15-16

**TABLE OF AUTHORITIES**
**(continued)**

Page

*In re PaineWebber Ltd. P'ships Litig.*,
  171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997)....................................16

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  330 F.R.D. 11 (E.D.N.Y. 2019) ..................................................................................7, 11, 16

*In re Platinum & Palladium Commodities Litig.*,
  2014 WL 3500655 (S.D.N.Y. July 15, 2014) ........................................................................24

*In re Polaroid ERISA Litig.*,
  240 F.R.D. 65 (S.D.N.Y. 2006) ..............................................................................................8

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
  163 F.R.D. 200 (S.D.N.Y. 1995) .............................................................................................5

*Shapiro v. JPMorgan Chase & Co.*,
  2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ............................................................. *passim*

*Spann v. J.C. Penney Corp.*,
  314 F.R.D. 312 (C.D. Cal. 2016) ..........................................................................................24

*In re Sumitomo Copper Litig.*,
  189 F.R.D. 274 (S.D.N.Y. 1999) ...........................................................................................10

*In re Telik, Inc. Sec. Litig.*,
  576 F. Supp. 2d 570 (S.D.N.Y. 2008) ............................................................................. 20-21

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
  2018 WL 6333657 (S.D.N.Y. Dec. 4, 2018) .............................................................4-5, 21-22

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d. Cir. 2005)...............................................................................................5, 21

*White v. First Am. Registry, Inc.*,
  2007 WL 703926 (S.D.N.Y. Mar. 7, 2007) ............................................................................6

**Rules**

Fed. R. Civ. P. 23(c) ...............................................................................................................13, 23

Fed. R. Civ. P. 23(e) .......................................................................................................... *passim*

Pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule"), Benjamin Michael Merryman, Amy Whitaker Merryman Trust, and B Merryman and A Merryman 4th Generation Remainder Trust (collectively, the "Merryman Plaintiffs") and Chester County Employees Retirement Fund ("Chester County" and, together with the Merryman Plaintiffs, "Plaintiffs") respectfully submit this memorandum of law in support of their motion requesting: (1) final approval of the proposed settlement of the above-captioned action ("Settlement"), (2) approval of the proposed plan for allocating the net proceeds of the Settlement ("Plan of Allocation" or "Plan"), and (3) certification of the Settlement Class for purposes of effectuating the Settlement.[1]

## I.   PRELIMINARY STATEMENT

Subject to Court approval, Plaintiffs, through Lead Counsel, have obtained $9,500,000 in cash for the benefit of the Settlement Class, in exchange for the dismissal of all claims brought in the Litigation and a full release of claims against JPMorgan Chase Bank, N.A. ("Defendant" or "JPM") and the other Released Defendant Parties. The proposed Settlement is a very favorable result for the Settlement Class, providing a significant and certain recovery in a case that presented numerous hurdles and risks. Notably, the Settlement represents a substantial percentage of the Settlement Class's alleged damages (i.e., approximately $34 million) as calculated by Plaintiffs' damages expert.

As described in this memorandum and in the accompanying Nirmul Declaration, the decision to settle the Litigation was well-informed by an extensive investigation into the

---

[1]   Capitalized terms not defined herein have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated June 12, 2018 (ECF No. 99) ("Stipulation") or in the Declaration of Sharan Nirmul in Support of (I) Plaintiffs' Motion for Final Approval of Proposed Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Nirmul Declaration" or "Nirmul Decl."), filed herewith. Citations to "¶ __" herein refer to paragraphs in the Nirmul Declaration and citations to "Ex. __" herein refer to exhibits to the Nirmul Declaration.

misconduct alleged, hard-fought litigation, substantial discovery, and months of arm's-length negotiations between the Parties.[2] While Plaintiffs and Lead Counsel believe that the claims against JPM are meritorious, they also recognize that, in the absence of a settlement, they faced substantial risks to obtaining any recovery for the Settlement Class—let alone a recovery greater than the Settlement Amount.

In reaching the Settlement, Plaintiffs and Lead Counsel carefully considered the numerous risks associated with continued litigation. For example, at the time the Settlement was reached, Plaintiffs were just weeks away from filing their motion for class certification. This motion carried with it significant risk, particularly in light of the Court's determination, at the motion to dismiss stage, that Plaintiffs lacked class standing to represent claims of ADR holders who had not purchased the same securities as Plaintiffs, and it was entirely possible that the Court could have limited Plaintiffs' standing even further and restricted their ability to represent a class comprised of ADR holders who had not received the same Cash Distributions. In addition, at summary judgment, Plaintiffs faced the risk that the Court could find that they lacked contractual standing to assert claims with respect to ADRs for which they were not "registered holders," as the Court, in ruling on Defendant's motion to dismiss, acknowledged the ambiguity in the Deposit Agreements as to whether anyone other than a registered holder could assert such claims.[3]

---

[2]     The Nirmul Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*: the nature of the claims asserted (¶¶ 12-14); the procedural history of the Litigation (¶¶ 15-107); the negotiations leading to the Settlement (¶¶ 121-126); the risks of continued litigation (¶¶ 110-120); the terms of the Plan of Allocation (¶¶ 127-132); and the notice program (¶¶ 133-143).

[3]     *See* ECF No. 35 at 15 ("Given that the contract is ambiguous as to whether Plaintiffs have contractual standing to assert claims pursuant to the ten ADRs identified by JPM, at this juncture the Court denies JPM's motion to dismiss those breach of contract claims on the ground of lack of contractual standing without prejudice to renewing the arguments at summary judgment.").

Damages also would have been hotly contested. Here, unlike a typical securities case, where damages are subject to a "commonly accepted" damages methodology, Plaintiffs sought to establish class-wide damages in this case using a methodology with no prior roadmap and which was unique to the facts of this Litigation and tailored to the data maintained and produced by JPM. If a jury found JPM's expert's testimony on damages more credible, the Settlement Class's recovery could have been much less than the Settlement Amount, or zero. The foregoing risks all underscore the meaningful Settlement Amount obtained at this juncture in the Litigation.

By its Preliminary Approval Order, the Court preliminarily approved the Settlement and provisionally certified the Settlement Class for purposes of effectuating the Settlement. ECF No. 104. By the same Order and the subsequent Notice Modification Order (ECF No. 118), the Court approved the process by which Settlement Class Members would receive notice of the Settlement and submit claims, objections, or requests for exclusion. In accordance with these Orders, the Court-authorized Claims Administrator, KCC, mailed notice via postcard ("Postcard Notice") to over 700,000 Registered Holder Settlement Class Members and the Court-authorized Publication Notice Plan Administrator, HF Media, effected a modern, comprehensive multi-media notice program—comprised of direct advertisement targeting to over two million potential Settlement Class Members whose physical addresses were successfully matched to an IP address, publications in various magazines, newspapers, and investment e-newsletters, and Internet banner ads served over a variety of business, news, and investment websites, and social media platforms—to specifically target the Settlement Class.[4] The long-form Notice, Claim Form, and other important

---

[4]      *See* Declaration of Justin R. Hughes Regarding (A) Receipt of Registered Holder Data; (B) Mailing of the Postcard Notice; (C) Establishment of the Telephone Hotline; (D) Establishment of the Settlement Website; and (E) Report on Requests for Exclusion Received to Date ("Hughes Declaration" or "Hughes Decl.") attached to the Nirmul Declaration as Exhibit 1, at ¶ 4 and Declaration of Jeanne C. Finegan, APR Concerning Implementation of Notice to Settlement Class

documents have also been made available on a dedicated website maintained for the Settlement. Ex. 1, ¶ 10. The deadline to submit objections or request exclusion from the Settlement Class is July 3, 2019. While this deadline has not yet passed, to date—following the mailing of Postcard Notices to over 700,000 Registered Holder Settlement Class Members and an extensive multi-media notice campaign reaching millions of additional Settlement Class Members—not one Settlement Class Member has objected to the Settlement or Plan of Allocation (¶¶ 6, 132, 142) and only 51 requests for exclusion (out of millions of Settlement Class Members) have been received. Ex. 1, ¶ 15.

For these reasons, Plaintiffs submit that the Settlement readily meets the standards for final approval under Rule 23 and is a fair, reasonable, and adequate result for the Settlement Class. Accordingly, Plaintiffs respectfully request that the Court grant final approval of the Settlement. In addition, the Plan of Allocation, which was developed with the assistance of Plaintiffs' damages expert, is a fair and reasonable method for distributing the Net Settlement Fund among Authorized Recipients and should also be approved by the Court. Finally, Plaintiffs respectfully request that the Court certify the Settlement Class for purposes of effectuating the Settlement.

## II.     THE SETTLEMENT WARRANTS APPROVAL

### A.      The Settlement Meets the Standards for Final Approval Under Rule 23(e)

Rule 23(e) of the Federal Rules of Civil Procedure provides that a class action settlement must be presented to the Court for approval. The Court may approve the settlement "only after a hearing and only on finding that it is fair, reasonable, and adequate[.]" Fed. R. Civ. P. 23(e)(2). This determination entails scrutiny of both the procedural and substantive aspects of the proposed

---

Members Through Multi-Media Notice Program ("Finegan Declaration" or "Finegan Decl.") attached to the Nirmul Declaration as Exhibit 2, at ¶¶ 14, 17-44.

settlement. *See In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2018 WL 6333657, at *1 (S.D.N.Y. Dec. 4, 2018) ("[T]he settlement must be both procedurally and substantively fair.").[5]

"The procedural and substantive fairness of a settlement should be examined in light of the strong judicial policy in favor of settlement[ ] of class action suits." *In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 175 (S.D.N.Y. 2014); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d. Cir. 2005) ("We are mindful of the strong judicial policy in favor of settlements, particularly in the class action context."); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995) ("It is well established that there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions."). Moreover, absent fraud or collusion, the Court "should be hesitant to substitute its judgment for that of the parties who negotiated the settlement." *City of Providence v. Aéropostale, Inc.*, 2014 WL 1883494, at *4 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015).

Rule 23(e)(2) provides that the Court should determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

    (A)    the class representatives and class counsel have adequately represented the class;

    (B)    the proposal was negotiated at arm's-length;

    (C)    the relief provided for the class is adequate, taking into account:

        (i)    the costs, risks, and delay of trial and appeal;

        (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

        (iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

---

[5]    Unless otherwise noted, all internal quotation marks and citations are omitted.

(iv)   any agreement required to be identified under Rule 23(e)(3); and

(D)   the proposal treats class members equitably relative to each other.

*See* Rule 23(e)(2). Consistent with these factors, courts in the Second Circuit have long considered the following factors set forth in *City of Detroit v. Grinnell Corp.* in evaluating a class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000), *see also In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 343 F. Supp. 3d 394, 409 (S.D.N.Y. 2018) (conducting *Grinnell* analysis in approving settlement).[6] In deciding whether to approve a settlement, however, a court "should not attempt to approximate a litigated determination of the merits of the case lest the process of determining whether to approve a settlement simply substitute one complex, time consuming and expensive litigation for another." *White v. First Am. Registry, Inc.*, 2007 WL 703926, at *2 (S.D.N.Y. Mar. 7, 2007).

Below, Plaintiffs will discuss the fairness, reasonableness, and adequacy of the Settlement principally in relation to the four Rule 23(e)(2) factors, and will also discuss the application of the non-duplicative *Grinnell* factors. *See* Fed. R. Civ. P. 23(e)(2) advisory committee note to 2018 amendments (noting that the four Rule 23(e)(2) factors are not intended to "displace" any factor

---

[6]   "In finding that a settlement is fair, not every factor must weight in favor of settlement, rather the court should consider the totality of these factors in light of the particular circumstances." *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004).

previously adopted by the Court of Appeals, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."). *See also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019) ("The Court understands the new Rule 23(e) factors to add to, rather than displace, the *Grinnell* factors."). As demonstrated herein, the Settlement readily satisfies each of the Rule 23(e)(2) and Second Circuit *Grinnell* factors, meets the favored public policy goal of resolving class action claims, and warrants this Court's final approval.

**B.    Plaintiffs and Lead Counsel Have Adequately Represented the Settlement Class**

In determining whether to approve a class action settlement, the court should consider whether "class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A); *see generally In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016) (noting that "the adequacy requirement entails inquiry as to whether: (1) plaintiffs' interests are antagonistic to the interest of other members of the class and (2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation").

Here, Plaintiffs have adequately represented the Settlement Class. Throughout the Litigation, Plaintiffs monitored and engaged in the prosecution of the Litigation—communicating with Lead Counsel on litigation strategy and case developments and reviewing significant Court filings. In connection with discovery, Plaintiffs performed searches for responsive documents, facilitated Lead Counsel's access to responsive documents in their possession and in the possession of their financial advisors, and produced over 10,000 pages of documents in response to JPM's discovery requests. ¶ 108. Plaintiffs also conferred with Lead Counsel during the Parties' settlement discussions. *Id*.

Plaintiffs—investors who received Cash Distributions as a result of their eligible ADR holdings and suffered damages as a result of the fees JPM deducted for conducting FX conversion of Cash Distributions in connection with such ADR holdings ("Conversions")—have claims that are typical of and coexistent with those of other Settlement Class Members, and have no interests antagonistic to the interests of other Settlement Class Members. On the contrary, Plaintiffs, like the rest of the Settlement Class, have an interest in obtaining the largest possible recovery from Defendant. *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members.").

Lead Counsel also have "adequately represented the class" throughout the Litigation. Lead Counsel is a firm highly qualified and experienced in complex litigation. *See* Ex. 3-C. Armed with this experience and the knowledge from three years of extensive litigation efforts here, including a comprehensive investigation, substantial discovery and consultation with a damages expert (*see* ¶¶ 15-107), Lead Counsel carefully considered the strengths and weaknesses of the claims asserted and the risks of further litigation when agreeing to resolve the Litigation, and firmly believes the Settlement represents a favorable result for the Settlement Class. *See Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *2 (S.D.N.Y. Mar. 24, 2014) (noting counsel "experience[d] in prosecuting complex class actions, strongly believe the Settlement is in the best interests of the Class, an opinion which is entitled to great weight"); *accord In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998).

**C.     The Settlement Was Negotiated at Arm's-Length**

Rule 23(e)(2)(B) supports final approval because the Settlement was achieved after extensive litigation efforts, including substantial discovery, followed by several months of hard-fought negotiations by the Parties. ¶¶ 15-107, 121-123. Even after agreeing to the material terms

of the Settlement, the Parties spent two additional months negotiating the specific terms of the Stipulation and documenting the Settlement. ¶ 124. Where, as here, a settlement agreement is the product of non-collusive, arm's-length negotiations, courts have afforded a presumption of fairness. *See Facebook*, 343 F. Supp. 3d at 408 ("When a settlement is the product of arms-length negotiations between experienced, capable counsel after meaningful discovery, it is afforded a presumption of fairness, adequacy, and reasonableness."); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001); *Advanced Battery Techs.*, 298 F.R.D. 171 at 176.

In short, "[t]he hard-fought and arduous settlement negotiations demonstrate that the Settlement is the result of fair and honest negotiations," and Lead Counsel, "who have extensive experience in the prosecution of complex class action litigation, with particular expertise in commercial and financial litigation, have made a considered judgment that the Settlement is not only fair, reasonable and adequate, but an excellent result for the Settlement Class." *See Shapiro*, 2014 WL 1224666, at *8. The Court can thus take comfort that the Settlement Class's interests were protected throughout the negotiations that produced the Settlement.

### D.     The Relief that the Settlement Provides for the Settlement Class Is Adequate, Taking into Account the Costs, Risks, and Delay of Further Litigation and Other Relevant Factors

#### 1.     The Complexity, Expense, and Likely Duration of the Litigation

Rule 23(e)(2)(C)(i) and the first *Grinnell* factor support final approval of the Settlement, as courts consistently recognize that the expense, complexity, and possible duration of the litigation are key factors in evaluating the reasonableness of a settlement. *See In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006) ("Class action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation."); *In re Citigroup Inc. Bond Litig.*, 296 F.R.D. 147, 155 (S.D.N.Y. 2013) ("[T]he more complex, expensive, and time consuming the future litigation, the

more beneficial settlement becomes as a matter of efficiency to the parties and to the Court."). "Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015).

"[C]lass action suits in general have a well-deserved reputation as being most complex." *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999). This Litigation—involving, in its initial scope, alleged misconduct spanning over thirteen years and concerning hundreds of Conversions for fifty-nine unique ADRs, as well as a highly contested damages methodology—is no exception. Plaintiffs were weeks away from filing their motion for class certification when the Settlement was reached. This motion, along with summary judgment, posed significant risks to the survival of Plaintiffs' claims and could have resulted in the case being dismissed outright or a material reduction in class size and potential damages. ¶¶ 110-120. And, even if Plaintiffs succeeded in obtaining certification of the full class and their claims survived summary judgment, achieving a litigated verdict at trial (and sustaining any such verdict in the appeals that would inevitably ensue) would have been a very complex and risky undertaking that would have required significant time and expense. *See In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 481 (S.D.N.Y. 2009) (finding that the complexity, expense and duration of continued litigation supports final approval where, among other things "motions would be filed raising every possible kind of pre-trial, trial and post-trial issue conceivable"). Moreover, litigating this case through trial and post-trial appeals would have required significant time and expense and, any potential recovery "would occur years from now, substantially delaying payment . . . to the Settlement Class." *Shapiro*, 2014 WL 1224666, at *8; *see also generally In re Amgen Inc. Sec. Litig.*, 2016 WL 10571773, at *3 (C.D. Cal. Oct. 25, 2016) ("A trial of a complex, fact-intensive case like this

could have taken weeks, and the likely appeals of rulings on summary judgment and at trial could have added years to the litigation."). In contrast, the Settlement avoids the risk, expense, and delay of continued litigation while providing an immediate and substantial recovery for the Settlement Class.

### 2.    The Risks of Continued Litigation

In assessing the fairness, reasonableness, and adequacy of a settlement, courts should also consider the "risks of establishing liability," "the risks of establishing damages," and "the risks of maintaining the class action through the trial." *Grinnell*, 495 F.2d at 463. In this assessment, "the Court [is not required] to adjudicate the disputed issues or decide unsettled questions; rather, the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement." *Payment Card Interchange*, 330 F.R.D. at 37. Here, Plaintiffs faced significant risks to achieving a better result for the Settlement Class through continued litigation. *See generally Global Crossing*, 225 F.R.D. at 459 ("Courts approve settlements where plaintiffs would have faced significant legal and factual obstacles to proving their case.").

### (a) Risks to Establishing Liability

Although this Court sustained Plaintiffs' breach of contract claims at the pleading stage, the MTD Order noted several open questions with respect to these claims. In particular, the Court stated that "[g]iven the ambiguity in the Contract Documents, whether the spread is an expense, charge or fee that is or is not permitted under the terms of the agreements are questions of fact to be resolved at summary judgment or trial." ¶ 117. Further, JPM and its fact witnesses maintained that the spread it retained was an acceptable (and commercially reasonable) means of compensating it for conducting the Conversions. *Id*. JPM would have relied on these arguments, and others, had the Litigation continued.

**(b) Risks to Establishing Damages**

Even if Plaintiffs prevailed in establishing liability, they would have faced substantial challenges to establishing damages. Unlike a typical securities case, where damages are subject to a "commonly accepted" damages methodology, there was no template for Plaintiffs' damages expert, G. William Brown of 8 Rivers Capital, to follow in this Litigation. ¶ 119. JPM would have challenged Professor Brown's analysis (either at class certification or later) and would have put forth competing expert opinions seeking to undermine Professor Brown's damages methodology. ¶ 120. Whether and to what extent the Court or fact finder agreed with JPM's arguments would have significantly impacted the available damages under Dr. Brown's analysis. Ultimately, the issue of damages would have come down to a battle of the experts at trial and, as Courts have long recognized, the substantial uncertainty as to which side's experts' view might be credited by the jury presents a substantial litigation risk. *See In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 123 (S.D.N.Y. 2009) (finding settlement reasonable where, among other things, "proving damages . . . would have required significant expert testimony and analysis."); *In re Bear Stearns Cos., Inc. Sec., Deriv. and ERISA Litig.*, 909 F. Supp. 2d 259, 267 (S.D.N.Y. 2012) ("When the success of a party's case turns on winning a so-called battle of experts, victory is by no means assured.").

**(c) Risks to Maintaining the Class Action Through Trial**

Finally, Plaintiffs faced risks to obtaining certification of the full class. As previously determined by the Court in its MTD Order, Plaintiffs lacked class standing to represent the claims of ADR holders who had not purchased the same securities as Plaintiffs, finding that Plaintiffs' claims did not implicate the "same set of concerns as the claims of absent class members." ECF No. 35 at 30. By a ruling on class certification, it is possible that the Court could have limited Plaintiffs' class standing even further, restricting Plaintiffs' ability to represent a class of anyone

other than those ADR holders that received the same Cash Distributions as Plaintiffs. ¶ 115. Although Plaintiffs believe they would have succeeded in obtaining certification of the broader class, the Settlement removes any uncertainty with respect to certification and it eliminates the risk that any certified class might have been decertified either before or during trial. *See* Fed. R. Civ. P. 23(c)(1)(C); *Annunziato v. Collecto, Inc.*, 293 F.R.D. 329, 340 (E.D.N.Y. 2013) ("[U]nder rule 23, district courts have the power to amend class definitions or decertify classes as necessary . . . .") (alterations in original); *Shapiro*, 2014 WL 1224666, at \*11 ("The possibility of decertification . . . favors settlement.").

### 3.    The Reaction of the Settlement Class to Date

The class's reaction to a proposed settlement is an important factor to be weighed in considering its fairness and adequacy. *See, e.g.*, *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) ("It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy."); *Bear Stearns*, 909 F. Supp. 2d at 266-67. In accordance with the Notice Modification Order, KCC has mailed Postcard Notices to over 700,000 Registered Holder Settlement Class Members, and HF Media has conducted an extensive multi-media notice campaign specifically targeting the Settlement Class. Ex. 1, ¶¶ 4-5 & Ex. 2. Additional information about the Litigation and Settlement is available on the website created for the Settlement, www.JPMorganADRFXSettlement.com, as well as on the general informational website, www.ADRFXSettlement.com. Ex. 1, ¶¶ 9-13. Although the deadline for Settlement Class Members to object to any aspect of the Settlement, or

request exclusion from the Settlement Class, has not yet passed, to date, there have been no objections (¶¶ 6, 142), and only 51 requests for exclusion from the Settlement Class. Ex. 1, ¶ 15.[7]

### 4.    Stage of the Proceedings and Amount of Discovery Completed

The third *Grinnell* factor considers "the stage of the proceedings and the amount of discovery completed" in determining the fairness, reasonableness, and adequacy of a settlement. *Grinnell*, 495 F.2d at 463. For this factor, "the question is whether the parties had adequate information about their claims such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement." *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 2015 WL 6971424, at *4 (S.D.N.Y. Nov. 9, 2015), *aff'd*, 674 F. App'x 37 (2d Cir. Dec. 27, 2016).

As detailed in the Nirmul Declaration, during the course of this Litigation, Plaintiffs, through their counsel, spent significant time and resources analyzing and litigating the legal and factual issues of this case, including *inter alia*: (i) conducting a comprehensive factual and legal investigation into the claims asserted; (ii) opposing a jurisdictional transfer; (iii) opposing two motions to dismiss; (iv) drafting three complaints, including the detailed Amended Complaint; (v) engaging in extensive (and hotly-contested) discovery efforts, including the review of more than 250,000 pages of documents produced by JPM, participation in numerous meet and confers, and depositions of six fact and 30(b)(6) witnesses; (vi) consulting with an expert to develop a class-wide damages methodology; and (vii) engaging in several months of settlement negotiations with Defendant's Counsel. ¶¶ 15-107, 121-123. At the time the Settlement was reached, Lead Counsel

---

[7]    Any objections or additional requests for exclusion received after this submission will be addressed in Plaintiffs' reply papers to be filed with the Court on or before August 1, 2019.

was actively preparing Plaintiffs' motion for class certification and had already begun assembling the proofs necessary for summary judgment. ¶¶ 103-107.

Following these efforts, Lead Counsel had sufficient familiarity with the issues in the case, as well as a thorough understanding of the strengths and weaknesses of Plaintiffs' Claims and their obstacles to success. Accordingly, Plaintiffs and Lead Counsel had the requisite information at the time of settlement to make an informed decision about the relative benefits of litigating or settling the Litigation and "developed an informed basis from which to negotiate a reasonable compromise." *Global Crossing*, 225 F.R.D. at 459; *see also Facebook*, 343 F. Supp. 3d at 412 (finding support for settlement where plaintiffs and their counsel had a "sufficient understanding of the case to gauge the strengths and weaknesses of their claims as well as the adequacy of the settlement").

### 5.    Ability of Defendant to Withstand a Greater Judgment

It is clear that JPM could withstand a greater judgment than the monetary amount it will pay for this Settlement, but "a defendant is not required to empty its coffers before a settlement can be found adequate." *Shapiro*, 2014 WL 1224666, at *11. Further, JPM's financial wherewithal "do[es] not ameliorate the force of the other *Grinnell* factors, which lead to the conclusion that the settlement is fair, reasonable and adequate." *Id*; *see also Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 178 (W.D.N.Y. 2011) (assigning "relatively little weight to th[is] factor" because "it is more important to assess the judgment in light of plaintiffs' claims and the other factors").

### 6.    The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and the Risks of Litigation

The final two *Grinnell* factors—the reasonableness of the settlement in light of the best possible recovery and the risks of litigation—also weigh in favor of approval of the Settlement. As the Second Circuit has explained, there is "a range of reasonableness with respect to a

settlement" that "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972); *Payment Card Interchange*, 330 F.R.D. at 48 (in considering a settlement's reasonableness, "a court must compare the terms of the compromise with the likely rewards of litigation"); *Shapiro*, 2014 WL 1224666, at *11 (recognizing "that the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes"). A fairness determination turns not on a "mathematical equation yielding a particularized sum . . . . but rather . . . [on] the strengths and weaknesses of the plaintiffs' case." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 130 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997). The $9.5 million cash Settlement meets this threshold.

Here, Settlement Class Members stand to recover, on a gross basis, 27.9% of their alleged damages as calculated by Plaintiffs' damages expert for the fifty-four eligible ADRs (*i.e.*, approximately $34 million). This result far exceeds the median recovery as a percentage of damages in recent securities class action settlements, which was 8.4% for years 1996 through 2018 in cases with investor losses between $20 million and $49 million.[8] *See also City of Providence*, 2014 WL 1883494, at *9 (finding recovery in the range of approximately 9.2% to 21% of estimated damages to fall "well within the range of possible approval"); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (approving settlement representing approximately 6.25% of estimated damages and noting recovery was at the "higher end of the range of reasonableness of recovery in class actions securities litigations").

---

[8]     *See* Stefan Boettrich & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review*, NERA Economic Consulting, Jan. 29, 2019, at 35, https://www.nera.com/content/dam/nera/publications/2019/PUB_Year_End_Trends_012819_Final.pdf.

In comparison, if the Litigation had continued, Plaintiffs and the Settlement Class would have faced numerous risks to obtaining a recovery in an amount greater than the Settlement Amount, or any recovery at all. *See generally Facebook*, 343 F. Supp. 3d at 414 ("Even if $35 million amounts to one-tenth–or less–of Plaintiffs' potential recovery, the risk of a zero- or minimal–recovery scenario are real.").

### E.   The Other Rule 23(e)(2) Factors Support Final Approval of the Settlement

Rule 23(e)(2), as amended, also considers: (i) "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" (ii) "the terms of any proposed award of attorney's fees, including timing of payment;" (iii) any agreement made in connection with the proposed settlement; and (iv) the equitable treatment of class members. *See* Rule 23(e)(2)(C)(ii), (iii), and (iv); Rule 23(e)(2)(D). These additional considerations weigh in favor of the Settlement.

First, the Settlement proceeds will be allocated to (i) Registered Holder Settlement Class Members and (ii) Non-Registered Holder Settlement Class Members who submit valid Claim Forms. KCC will review and process all claims received, provide claimants with an opportunity to cure any deficiency in their claim or request judicial review of the denial of their claim, and will ultimately, upon Court approval, mail or wire claimants their *pro rata* share of the Net Settlement Fund as calculated under the Plan of Allocation. This type of claims processing and method for distributing settlement proceeds is standard in securities and other class actions and is routinely found to be effective. Further, given the data negotiated for by Lead Counsel and provided by JPM's transfer agent, Registered Holder Settlement Class Members are not required to file a Claim

Form in order to be eligible to receive a distribution from the Settlement—an additional benefit of the Settlement. And, none of the settlement funds will revert to JPM.[9]

Second, the relief provided for the Settlement Class by the Settlement is also adequate when considering the terms of the proposed award of attorneys' fees. As discussed in the accompanying Fee Memorandum, the requested attorneys' fees of 33⅓% of the Settlement Fund, to be paid upon approval by the Court, are reasonable in light of the efforts of Plaintiffs' Counsel and the risks in this Litigation. Of particular note, the approval of attorneys' fees is entirely separate from the approval of the Settlement, and neither Plaintiffs nor Lead Counsel may terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees. *See* Stipulation ¶ 19.

Lastly, amended Rule 23 asks the court to consider the fairness of the proposed settlement in light of "any agreements required to be identified under Rule 23(e)(3)." *See* Fed. R. Civ. P. 23(e)(2)(C)(iv). Here, the Parties entered into a confidential Supplemental Agreement "setting forth certain conditions under which JPM may terminate the Settlement if potential Settlement Class Members who meet certain criteria exclude themselves from the Settlement Class." *See* Stipulation ¶ 32. As ordered by the Court, the Parties' Supplemental Agreement was submitted to the Court *in camera* on July 16, 2018. ECF Nos. 102-103. This type of agreement is standard in securities class actions and has no negative impact on the fairness of the Settlement. *See, e.g.*, *Hefler v. Wells Fargo & Co.*, 2018 WL 4207245, at *11 (N.D. Cal. Sept. 4, 2018) ("The existence of a termination option triggered by the number of class members who opt out of the Settlement

---

[9] "The Settlement is not a claims-made settlement. As of the Effective Date, neither JPM nor any other Person who paid any portion of the funds in the Escrow Account, shall have any right to the return of the Net Settlement Fund or any portion thereof irrespective of the number of Claims, the collective amount of losses, or the amounts to be paid to Authorized Recipients from the Net Settlement Fund." *See* Stipulation ¶ 11.

does not by itself render the Settlement unfair."). The only other agreement entered into by the Parties (other than the Stipulation itself) was a side letter agreeing that the Settlement would be amended upon the Court's entry of the Modified Notice Order. This side letter was submitted to the Court with Plaintiffs' Notice Modification Motion on November 1, 2018. *See* ECF No. 106-6. In connection with Plaintiffs' supplemental submission in support of the Notice Modification Motion filed with the Court on January 31, 2019, this side letter was updated to refer to the revised proposed order being submitted with Plaintiffs' supplemental submission and re-executed with a date of January 31, 2019.

F.     **The Settlement Treats Settlement Class Members Equitably Relative to Each Other**

Finally, the proposed Settlement treats members of the Settlement Class equitably relative to one another. As discussed below in Section III, pursuant to the Plan of Allocation, the Net Settlement Fund will be distributed among all Settlement Class Members in accordance with the Plan of Allocation, which provides a fair and equitable method of allocation. More specifically, all Authorized Recipients will receive their *pro rata* share of the recovery based on the eligible ADRs they held and the Cash Distributions they received in connection with such holdings during the relevant time period.

III.    **THE PLAN OF ALLOCATION WARRANTS APPROVAL**

To merit approval, a plan of allocation "must also meet the standards by which the settlement was scrutinized—namely, it must be fair and adequate." *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 667 (S.D.N.Y. 2015); *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012). A plan of allocation "need not be perfect"; rather, an allocation formula "need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *Meredith Corp.*, 87 F. Supp. 3d at 667. Accordingly, in determining whether a plan

of allocation is fair, courts look largely to the opinion of counsel. *Facebook*, 343 F. Supp. 3d at 414; *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 2000 WL 37992, at *2 (S.D.N.Y. Jan. 18, 2000).

The proposed Plan is designed to achieve an equitable distribution of the Net Settlement Fund among as many Settlement Class Members as possible.[10] In developing the Plan, Lead Counsel worked with Plaintiffs' damages expert to calculate the average annual margin for each of the eligible ADRs (identified in the Appendices to the Notice), utilizing data produced by JPM concerning the amount (if any) it retained for Cash Distributions issued for the eligible ADRs during the relevant time period. ¶¶ 127-128.

The Plan will calculate a "Recognized Loss Amount Per ADR Per Year" for each eligible ADR that was held by a Settlement Class Member during the relevant time period (i.e., November 21, 2010 to July 18, 2018, inclusive for those ADRs contained on Appendix 1 to the Notice and November 21, 2012 to July 18, 2018, inclusive for those ADRs contained on Appendix 2 to the Notice) and for which they received a Cash Distribution by multiplying the gross amount of the Cash Distribution received by the Settlement Class Member for the eligible ADR for that year by the Average Margin Per Year for the eligible ADR as set forth in Table 1 of the Plan. The sum of each Settlement Class Member's Recognized Loss Amounts Per ADR Per Year will be their "Recognized Claim," and the Net Settlement Fund will be distributed to Authorized Recipients on a *pro rata* basis based on the size of their Recognized Claim in comparison to the total Recognized Claims. ¶ 129. *See generally In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 581 (S.D.N.Y. 2008) ("Pro-rata distribution of settlement funds based on investment loss is clearly a reasonable

---

[10]   As noted above, Registered Holder Settlement Class Members do not need to file a Claim Form in order to be eligible to receive a distribution from the Settlement. KCC will use the holding and Cash Distribution information provided by JPM's transfer agent to calculate their claims.

approach.").[11] Once KCC has processed all claims and provided Non-Registered Holder Settlement Class Members the opportunity to cure any deficiencies in their claims or challenge the rejection of their claims, Lead Counsel will seek authorization from the Court to distribute the Net Settlement Fund to Authorized Recipients. ¶ 130.

Here, the Plan has a "reasonable, rational basis," and is the product of careful consideration by Lead Counsel, who is experienced and sophisticated in managing and resolving complex class actions, and Plaintiffs' damages expert. Thus, the Plan should be approved.

## IV. THE NOTICE OF SETTLEMENT SATISFIES DUE PROCESS REQUIREMENTS AND IS REASONABLE

Plaintiffs have provided the Settlement Class with notice of the Settlement that satisfies the Rule 23(e) requirements and due process, which require notice of a settlement to be "reasonable"—*i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Visa*, 396 F.3d at 114; *see also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 166 (S.D.N.Y. 2007) ("Notice need not be perfect, but need be only the best notice practicable under the circumstances, and each and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members."); *Virtus Inv. Partners, Inc.*, 2018 WL 6333657, at *4 ("The standard for the

---

[11] As set forth in the Plan, in no event shall the Plan result in the payment of more than 100% of a Settlement Class Member's alleged damages (inclusive of alleged interest), as calculated by Professor Brown in his expert report dated March 5, 2018 ("Calculated Damages"). To the extent the Plan would result in the payment of more than 100% of a Settlement Class Member's Calculated Damages, any amount in excess of 100% of the Calculated Damages shall be reallocated to other Authorized Recipients. To the extent all Authorized Recipients have received 100% of their Calculated Damages, any excess amount shall be contributed to a nonsectarian charitable organization selected by the Court upon application by the Parties. ¶ 129 n.13; *see also* Ex. 1-C (copy of long-form Notice).

adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness."). Moreover, "[t]here are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements." *Visa*, 396 F.3d at 114. As noted in the advisory committee notes to the 2018 amendments to Rule 23, "[i]Instead of preferring any one means of notice, . . . the amended rule relies on courts and counsel to focus on the means or combination of means most likely to be effective in the case before the court."

Given the unique characteristics of the Settlement Class here (*e.g.*, the numerous securities involved, the size of the Settlement Class, and the length of the *two* class periods), Lead Counsel retained two administrators to ensure that notice of the Settlement was provided to the Settlement Class in the most effective and cost-effective fashion. ¶ 143. In accordance with the Notice Modification Order, KCC mailed Postcard Notices via first-class mail to the Registered Holder Settlement Class Members identified by JPM's transfer agent. KCC also posted the long-form Notice, Claim Form, and other relevant documents on a website developed for the Settlement (www.JPMorganADRFXSettlement.com), and manages a call center to respond to inquiries about the Settlement. Ex. 1, ¶¶ 4-5, 7-8, 10. Likewise, HF Media has coordinated an extensive media and Internet-based notice campaign in which, over the course of seventy-eight days, the Summary Notice was or will be published in a total of seven magazines, three newspapers, and investment e-newsletters, as well as transmitted over *PR Newswire*, and banner ads were served over a variety of business, news and investment websites, and across social media platforms. Ex. 2, ¶¶ 14-17-35, 41-44. Additionally, utilizing cutting-edge technology, HF Media was able to match a large portion of the physical mailing addresses provided in response to KCC's initial nominee outreach efforts

to IP addresses in order to directly serve ads to Settlement Class Members on multiple occasions. Ex. 2, ¶¶ 36-37.[12]

The Postcard Notice, Summary Notice, and banner ads directed recipients to the websites and the long-form Notice for additional information. These various methods of notice, in combination with the long-form Notice, provide all of the necessary information for Settlement Class Members to make an informed decision regarding the Settlement. Specifically, the Notice informs Settlement Class Members of, among other things: (1) the nature of the Litigation; (2) the definition of the Settlement Class; (3) the claims and defenses asserted; (4) the right of a Settlement Class Member to enter an appearance through an attorney if it so desires; (5) the right of a Settlement Class Member to be excluded from the Settlement Class; (6) the right of a Settlement Class Member to object to any aspect of the Settlement; (7) the time and manner for requesting exclusion or objecting; (8) a description of the terms of the Settlement; (9) the binding effect of the Settlement on Settlement Class Members that do not elect to be excluded; and (10) the date and time of the Final Approval Hearing. *See* Fed. R. Civ. P. 23(c)(2)(B). The Notice also advises that Lead Counsel will apply for attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund as well as Litigation Expenses, including Service Awards to Plaintiffs.

This combination of individual first-class mail to those Settlement Class Members who could be identified with reasonable effort (*i.e.*, the Registered Holder Settlement Class Members) combined with an extensive media and Internet-based campaign was "the best notice . . . practicable under the circumstances" in this Litigation. Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118, 123–24 (S.D.N.Y. 2001) (approving notice

---

[12]     As the multi-media notice campaign is set to end on June 21, 2019—a day after this submission—Ms. Finegan will provide a supplemental declaration providing the final results of the notice campaign with Plaintiffs' reply submission due on or before August 1, 2019.

plan and concluding that "reasonable efforts were taken to notify all members of the class" where part of the class received direct mail notice and part of the class was covered by publication notice).[13] Thus, both the substance of the notice and the method of its dissemination to the Settlement Class satisfied the standards of Rule 23(e) requirements and due process.

## V.   THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS

In connection with their motion for preliminary approval of the Settlement, Plaintiffs requested provisional certification of the Settlement Class for settlement purposes so that notice of the Settlement, the Final Approval Hearing, and the rights of Settlement Class Members to request exclusion, object or submit Claim Forms, if required, could be issued. In its Preliminary Approval Order, the Court provisionally certified the Settlement Class solely for the purpose of effectuating the Settlement. *See* ECF No. 104, ¶¶ 5-7 (analyzing how the Litigation satisfies each element for class certification); *see also IMAX*, 283 F.R.D. at 186 (certification of a settlement class "has been recognized throughout the country as the best, most practical way to effectuate settlements involving large numbers of claims by relatively small claimants"). Nothing has changed to alter the propriety of the Court's provisional certification of the Settlement Class and, for all the reasons stated in the Memorandum of Law in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement (ECF No. 98) incorporated herein

---

[13]    *See also Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 330 (C.D. Cal. 2016) (approving notice program that "utilizes a combination of individual notice to known class members in the form of Email Notices and Post–Card Notices and a schedule of publication notices in English and Spanish in magazines, on certain internet networks, on Facebook, and in a press release" and for which, according to notice expert, "the notices will reach 75% of targeted potential class members, on average, 2.3 times"); *In re Platinum & Palladium Commodities Litig.*, 2014 WL 3500655, at *14 (S.D.N.Y. July 15, 2014) (approving publication notice as "best practicable notice plan under the circumstances" where a "direct notice program is not feasible" for part of the settlement class).

by reference, Plaintiffs respectfully request that the Court finally certify the Settlement Class for purposes of settlement.

## VI.    CONCLUSION

For the reasons stated herein and in the Nirmul Declaration, Plaintiffs respectfully request that the Court grant final approval of the proposed Settlement, approve the proposed Plan of Allocation, and certify the Settlement Class for purposes of settlement.

Dated:  June 20, 2019                                    Respectfully Submitted,


**KESSLER TOPAZ MELTZER**
**& CHECK, LLP**

_s/Sharan Nirmul_
Joseph H. Meltzer
Sharan Nirmul
Ethan J. Barlieb
Jonathan F. Neumann
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile:  (610) 667-7056
jmeltzer@ktmc.com
snirmul@ktmc.com
ebarlieb@ktmc.com
jneumann@ktmc.com

_Counsel for Plaintiffs and_
_the Settlement Class_