# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BENJAMIN MICHAEL MERRYMAN, AMY WHITAKER MERRYMAN TRUST, B MERRYMAN AND A MERRYMAN 4TH GENERATION REMAINDER TRUST AND CHESTER COUNTY EMPLOYEES RETIREMENT FUND, individually and on behalf of all others similarly situated, | CIVIL ACTION NO. 1:15-cv-09188-VEC |
| Plaintiffs, | |
| v. | |
| JPMORGAN CHASE BANK, N.A., | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S
MOTION FOR AN AWARD OF ATTORNEYS' FEES AND
<u>REIMBURSEMENT OF LITIGATION EXPENSES</u>**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    PRELIMINARY STATEMENT ...................................................................... 1

II.    LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES IS REASONABLE AND SHOULD BE APPROVED ...................................................................... 5

    A.    Counsel Is Entitled to a Reasonable Fee Award from the Common Fund ........... 5

    B.    The Requested Fee is Reasonable Under Either the Percentage of the Fund or Lodestar Method .................................................................................. 6

        1.    The Fee Request is Reasonable Under the Percentage Method ................ 6

        2.    The Fee Request is Reasonable Under the Lodestar Method ................... 8

    C.    The Goldberger Factors Confirm that the Requested Fee is Reasonable ........... 11

        1.    The Time and Labor Expended Support the Requested Fee ................... 12

        2.    The Magnitude and Complexity of the Litigation Support Requested Fee ........................................................................................ 13

        3.    The Risk of the Litigation Support the Fee Request .............................. 14

        4.    The Quality of Lead Counsel's Representation Supports the Fee Request ............................................................................................ 18

        5.    The Requested Fee in Relation to the Settlement ................................... 19

        6.    Public Policy Considerations Support the Requested Fee ...................... 19

        7.    The Reaction of the Settlement Class ................................................... 20

III.    LEAD COUNSEL'S EXPENSES WERE REASONABLY INCURRED AND NECESSARY TO THE PROSECUTION OF THE LITIGATION AND SHOULD BE APPROVED .................................................................................. 21

IV.    SERVICE AWARDS TO PLAINTIFFS ARE WARRANTED .................................... 23

V.    CONCLUSION.................................................................................................. 24

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
   127 F. Supp. 2d 418 (S.D.N.Y. 2001).......................................................................16

*In re BankAtlantic Bancorp, Inc.*,
   2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) .........................................................17

*In re Bear Stearns Cos. Sec. Derivative & ERISA Litig.*,
   909 F. Supp. 2d 259 (S.D.N.Y. 2012).......................................................................9

*Bellifemine v. Sanofi-Aventis U.S. LLC*,
   2010 WL 3119374 (S.D.N.Y. Aug. 6, 2010)...........................................................22

*In re BioScrip, Inc. Sec. Litig.*,
   273 F. Supp. 3d 474 (S.D.N.Y. 2017).......................................................................9

*Blum v. Stenson*,
   465 U.S. 886 (1984)....................................................................................................6

*Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
   2012 WL 2064907 (S.D.N.Y. June 7, 2012) ...........................................................23

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980)....................................................................................................5

*Brown v. Phillips Petroleum Co.*,
   838 F.2d 451 (10th Cir. 1988) ...................................................................................6

*Camden I Condo. Ass'n, Inc. v. Dunkle*,
   946 F.2d 768 (11th Cir. 1991) ...................................................................................6

*In re China Media Express Holdings, Inc. S'holder Litig.*,
   2015 WL 13639423 (S.D.N.Y. Sept. 18, 2015).........................................................7

*In re China Sunergy Sec. Litig.*,
   2011 WL 1899715 (S.D.N.Y. May 13, 2011) .........................................................21

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974)......................................................................................17

*City of Providence v. Aeropostale, Inc.*,
   2014 WL 1883494 (S.D.N.Y. May 9, 2014), *aff'd, Arbuthnot v. Pierson*, 607
   F. App'x 73 (2d Cir. 2015) ....................................................................5, 7, 14, 16

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Comverse Tech., Inc. Sec. Litig.*,
   2010 WL 2653354 (E.D.N.Y. June 24, 2010) ....................................................4, 19

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
   2007 WL 2230177 (S.D.N.Y. July 27, 2007) .........................................................10

*In re Facebook, Inc.*,
   674 F. App'x 37 (2d Cir. 2016) ...............................................................................9

*In re Flag Telecom Holdings Ltd. Sec. Litig.*,
   2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ............................................................4

*Fleisher v. Phoenix Life Ins. Co.*,
   2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015)...................................... 4, 6, 19-20, 21

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995).......................................................................................6

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
   279 F.R.D. 151 (S.D.N.Y. 2011) .......................................................................7, 18

*In re Global Crossing Sec. & ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) ...........................................................................21

*Goldberger v. Integrated Res., Inc.*,
   209 F.3d 43 (2d Cir. 2000)............................................................................. *passim*

*Grice v. Pepsi Beverages Co.*,
   363 F. Supp. 3d 401 (S.D.N.Y. 2019)...................................................................8, 9

*Harman v. Lyphomed, Inc.*,
   945 F.2d 969 (7th Cir. 1991) ...................................................................................6

*In re Hi-Crush Partners LP Sec. Litig.*,
   2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ........................................................10

*Hicks v. Morgan Stanley*,
   2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) .........................................................20

*In re IMAX Sec. Litig.*,
   2012 WL 3133476 (S.D.N.Y. Aug. 1, 2012) ............................................................7

## TABLE OF AUTHORITIES
### (continued)

Page

*In re Initial Pub. Offering Sec. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y. 2009).................................................................................10

*Johnston v. Comerica Mortg. Corp.*,
   83 F.3d 241 (8th Cir. 1996) ..........................................................................................6

*Khait v. Whirlpool Corp.*,
   2010 WL 2025106 (E.D.N.Y. Jan. 20, 2010) ..........................................................7

*Luciano v. Olsten Corp.*,
   109 F.3d 111 (2d Cir. 1997).........................................................................................10

*Maley v. Del Global Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002)....................................................................... 7-8

*In re Marsh ERISA Litig.*,
   265 F.R.D. 128 (S.D.N.Y. 2010) ....................................................... 7, 9-10, 19, 23

*McDaniel v. Cty. of Schenectady*,
   595 F.3d 411 (2d Cir. 2010)................................................................................ 5, 14-15

*Meredith Corp. v. SESAC, LLC*,
   87 F. Supp. 3d 650 (S.D.N.Y. 2015).........................................................................16

*In re MetLife Demutualization Litig.*,
   689 F. Supp. 2d 297 (E.D.N.Y. 2010) ....................................................................15

*Missouri v. Jenkins*,
   491 U.S. 274 (1989)........................................................................................................10

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)........................................................................................17

*In re Oracle Corp. Sec. Litig.*,
   2009 WL 1709050 (N.D. Cal. June 19, 2009) .......................................................17

*In re Platinum & Palladium Commodities Litig.*,
   2015 WL 4560206 (S.D.N.Y. July 7, 2015) ...........................................................11

*Robbins v. Koger Props. Inc.*,
   116 F.3d 1441 (11th Cir. 1997) .................................................................................17

## TABLE OF AUTHORITIES
### (continued)

Page

*Rudman v. CHC Grp. Ltd.*,
   2018 WL 3594828 (S.D.N.Y. July 24, 2018) ................................................................ 10-11

*Seijas v. Republic of Argentina*,
   2017 WL 1511352 (S.D.N.Y. Apr. 27, 2017) ....................................................................18

*Stefaniak v. HSBC Bank USA, N.A.*,
   2008 WL 7630102 (W.D.N.Y. June 28, 2008) ...................................................................7

*In re Sumitomo Copper Litig.*,
   189 F.R.D. 274 (S.D.N.Y. 1999) ......................................................................................13

*Swedish Hosp. Corp. v. Shalala*,
   1 F.3d 1261 (D.C. Cir. 1993) .............................................................................................6

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
   2004 WL 1087261 (S.D.N.Y. May 14, 2004) ...................................................................14

*In re Telik, Inc. Sec. Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008) ...................................................................... 11, 14-15

*In re Thirteen Appeals Arising out of the San Juan
   Dupont Plaza Hotel Fire Litig.*,
   56 F.3d 295 (1st Cir. 1995) ................................................................................................6

*In re Veeco Instruments Inc. Sec. Litig.*,
   2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ...................................................................19

*Velez v. Novartis*,
   2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) ................................................................7, 8

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002) ...........................................................................................6

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005) .........................................................................................5, 6, 9

*Willix v. Healthfirst, Inc.*,
   2011 WL 754862 (E.D.N.Y. Feb. 18, 2011) .....................................................................8

*Woburn Ret. Sys. v. Salix Pharm., Ltd.*,
   2017 WL 3579892 (S.D.N.Y. Aug. 18, 2017) .................................................................10

Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz" or "Lead Counsel"), on behalf of Plaintiffs' Counsel,[1] respectfully submits this memorandum of law in support of its request for an award of attorneys' fees in the amount of 33⅓% of the Settlement Fund. Lead Counsel also seeks reimbursement of $269,680.05 in Litigation Expenses that were reasonably and necessarily incurred in prosecuting and resolving the Litigation, which amount *includes* proposed Service Awards to Plaintiffs in the aggregate amount of $5,000.00. These requests are supported by (1) the Nirmul Declaration, which details the extensive efforts that led to the successful prosecution of this Litigation and the pending Settlement, including Plaintiffs' contributions to the case; and (2) a declaration submitted on behalf of Kessler Topaz detailing the firm's lodestar and expenses.

## I. PRELIMINARY STATEMENT

The Settlement, if approved by the Court, will resolve this case in its entirety in exchange for a $9.5 million cash payment pursuant to the Stipulation. The Settlement brings to a close, with a very favorable result, three years of hard-fought litigation, including significant motion practice and discovery efforts, followed by several months of hard-fought, arm's-length negotiations between counsel. Indeed, the Settlement represents a substantial portion of the approximately $34 million of alleged damages in this Litigation, as calculated by Plaintiffs' damages expert, and will

---

[1]    References herein to "Plaintiffs' Counsel" includes Kessler Topaz, along with additional counsel G. Chadd Mason, Esq. of Prevost, Shaff, Mason & Carns, PLLC (formerly of Mason Law Firm, PLC) and Amy C. Martin, Esq. of Amy C. Martin P.A. (formerly of Everett, Wales and Comstock). All other capitalized terms used herein have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated June 12, 2018 (ECF No. 99) ("Stipulation") or in the Declaration of Sharan Nirmul in Support of (I) Plaintiffs' Motion for Final Approval of Proposed Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Nirmul Declaration" or "Nirmul Decl."), filed herewith. Citations to "¶ __" herein refer to paragraphs in the Nirmul Declaration and citations to "Ex. __" herein refer to exhibits to the Nirmul Declaration. Unless otherwise noted, all internal quotation marks and citations are omitted.

provide meaningful compensation to the Settlement Class while avoiding further delay and the significant risks of continued litigation.

The benefits of the Settlement are clear when weighed against the risks that the Settlement Class might recover less than the Settlement Amount (or nothing) if the Litigation continued. For example, Plaintiffs faced risks to establishing JPM's liability. In ruling on Defendant's motion to dismiss the Complaint, the Court sustained Plaintiffs' breach of contract claims while acknowledging open questions to be resolved at summary judgment or trial—in particular, whether the spreads that Plaintiffs alleged JPM impermissibly extracted from the FX rates given to class members were permissible expenses, charges, or fees under the terms of the Deposit Agreements at issue—and noting that "just because Plaintiffs say the spread was a fee does not make it so." ECF No. 35 at 19. In further support of its position, JPM, along with its fact witnesses, maintained that the spread retained was an acceptable (and commercially reasonable) means of compensating it for conducting Conversions. Plaintiffs also faced risks to establishing damages. Particularly in this case, where Plaintiffs sought to establish class-wide damages using a damages methodology that measured the spread taken by JPM in the conversion of FX, JPM conversely argued that Plaintiffs' analysis failed to account for the actual expenses incurred by JPM in converting currencies, and moreover, that such expenses varied between currency pairs such that a class-wide damages methodology was not applicable. Ultimately, the measure of damages in this case was highly contested and assuming that Plaintiffs prevailed on establishing a class-wide damages methodology at class certification, the issue of damages would have come down to an unpredictable battle of the experts.

In addition to the challenge of establishing a class-wide damages methodology, Plaintiffs faced additional risks to obtaining certification of the full class. At the motion to dismiss stage, the

Court determined that Plaintiffs lacked class standing to represent claims of ADR holders other than those who had purchased the same securities as Plaintiffs and, it was possible that the Court could have limited Plaintiffs' class standing even further to just those ADR holders who received the same Cash Distributions as Plaintiffs. Such a decision would have considerably reduced the class of ADR holders, and would have severely reduced the efficiency and cost-effectiveness of the class action vehicle to prosecute Plaintiffs' claims. The Settlement eliminates these risks, and others, while recovering a significant percentage of the Settlement Class's losses.

In the face of these risks—as well as the fully contingent nature of the case—Lead Counsel devoted substantial resources to prosecuting this Litigation against highly skilled opposing counsel in order to achieve an excellent result for the Settlement Class. Among other work detailed in the Nirmul Declaration, Lead Counsel: (i) conducted a comprehensive pre-complaint investigation into the Conversions at issue in the Litigation; (ii) drafted three complaints including the detailed Amended Complaint; (iii) opposed a change of jurisdictional venue; (iv) opposed two motions to dismiss; (v) moved for reconsideration of the Court's order on JPM's motion to dismiss the Complaint; (vi) engaged in extensive discovery, including reviewing and analyzing over 250,000 pages of documents, participating in numerous meet and confers, and deposing six fact and 30(b)(6) witnesses; (vii) consulted with an expert to develop a class-wide damages methodology; (viii) performed work in anticipation of Plaintiffs' motion for class certification; and (ix) participated in several months of arm's-length negotiations with Defendant's Counsel in an attempt to resolve the Litigation. ¶¶ 15-107, 121-123.[2] *See also* § II.C.1 below.

---

[2]     The Nirmul Declaration is an integral part of this submission and, for the sake of brevity, the Court is respectfully referred to it for a detailed description of: the procedural history of the Litigation (¶¶ 15-107); the nature of the claims asserted (¶¶ 12-14); the negotiations leading to the Settlement (¶¶ 121-124); the risks of continued litigation (¶¶ 110-120); and Lead Counsel's efforts on behalf of the Settlement Class (¶ 108).

Through June 14, 2019, Lead Counsel has devoted over 6,600 hours with a resulting lodestar of $3,191,242.50, to the investigation, prosecution, and resolution of the Litigation. Here, unlike most cases in which counsel seek a fee which exceeds their lodestar, *see, e.g.*, *Fleisher v. Phoenix Life Ins. Co.*, 2015 WL 10847814, at *18 (S.D.N.Y. Sept. 9, 2015) ("Courts regularly award lodestar multipliers from 2 to 6 times lodestar in this Circuit . . ."), Lead Counsel's fee request is *less than* the total lodestar value of the time that Lead Counsel dedicated to the Litigation.[3] It is against this backdrop that Lead Counsel respectfully submits its request for attorneys' fees. In short, the requested fee is supported by the time and effort Lead Counsel devoted to the Litigation, as well as the risks undertaken in prosecuting Plaintiffs' claims and, in light of such risks, the results obtained for the Settlement Class.

Lead Counsel also respectfully submits that the expenses for which it seeks reimbursement were reasonable and necessary for the successful prosecution and resolution of the Litigation and that the request for Service Awards to Plaintiffs for the efforts they dedicated to the Litigation on behalf of the Settlement Class is likewise reasonable and appropriate.

Accordingly, Lead Counsel respectfully submits that its motion for attorneys' fees and expenses should be granted in full.

---

[3]    *See In re Flag Telecom Holdings Ltd. Sec. Litig.*, 2010 WL 4537550, at *25-26 (S.D.N.Y. Nov. 8, 2010) ("a positive multiplier is typically applied to the lodestar in recognition of the risk of litigation, the complexity of the issues, the contingent nature of the engagements, the skill of the attorneys, and other factors"); *In re Comverse Tech., Inc. Sec. Litig.*, 2010 WL 2653354, at *5 (E.D.N.Y. June 24, 2010) ("Where, as here, counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar").

II.     **LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES IS REASONABLE AND SHOULD BE APPROVED**

A.      **Counsel Is Entitled to a Reasonable Fee Award from the Common Fund**

The propriety of awarding attorneys' fees from a common fund is well established. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000) ("the attorneys whose efforts created the [common] fund are entitled to a reasonable fee – set by the court – to be taken from the fund"). This Circuit has noted that "[t]he rationale for the [common fund] doctrine is an equitable one: it prevents unjust enrichment of those benefitting from a lawsuit without contributing to its cost." *Id.*, 209 F.3d at 47. Further, courts recognize that awards of fair attorneys' fees from a common fund "serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons," and therefore "to discourage future misconduct of a similar nature." *City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *11 (S.D.N.Y. May 9, 2014), *aff'd, Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015).

In the Second Circuit, courts "may award attorneys' fees in common fund cases under either the lodestar method or the percentage of the fund method." *McDaniel v. Cty. of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010); *see also Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("*Visa*"). Ultimately, the determination of a reasonable fee award from a common fund rests in the sound discretion of the Court, acting as a fiduciary for the class. *Goldberger*, 209 F.3d at 47, 52.

5

### B.     The Requested Fee is Reasonable Under Either the Percentage of the Fund or Lodestar Method

Here, whether assessed under the percentage of the fund or lodestar method, Lead Counsel's 33⅓% fee request—which, if approved, would yield a slightly negative lodestar "multiplier" on Lead Counsel's lodestar—is fair and reasonable and warrants approval by the Court.

### 1.     The Fee Request is Reasonable Under the Percentage Method

Lead Counsel respectfully submits that the Court should award a fee based on a percentage of the common fund obtained. As noted above, the Second Circuit has approved the percentage method for awarding fees, recognizing that the "trend in this Circuit is toward the percentage method" and that this method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Visa*, 396 F.3d at 121; *see also Goldberger*, 209 F.3d at 48-50 (holding either percentage of fund method or lodestar method may be used to determine fees, but "lodestar method proved vexing" and results in "inevitable waste of judicial resources"); *Fleisher*, 2015 WL 10847814, at *14 ("[T]he percentage method continues to be the trend of district courts in this Circuit and has been adopted in the vast majority of circuits.") (alteration in the original).[4]

---

[4]     Other circuits have also endorsed the percentage method. *See, e.g.*, *In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 305 (1st Cir. 1995); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821-22 (3d Cir. 1995); *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 975 (7th Cir. 1991); *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir. 1996); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454-56 (10th Cir. 1988). The Eleventh and District of Columbia Circuits require the use of the percentage method in common fund cases. *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 773-74 (11th Cir. 1991); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1269-71 (D.C. Cir. 1993). In *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984), the Supreme Court recognized that under the "common fund doctrine" a reasonable fee may be "based on a percentage of the fund bestowed to the class . . . ."

Lead Counsel's present request for attorneys' fees is fair and reasonable under the percentage method. Indeed, "[d]istrict courts in the Second Circuit routinely award attorneys' fees that are 30 percent or greater." *Velez v. Novartis*, 2010 WL 4877852, at *21 (S.D.N.Y. Nov. 30, 2010); *see also In re Marsh ERISA Litig.*, 265 F.R.D. 128, 149 (S.D.N.Y. 2010) (noting trend of awarding 20–50 percent of recovery and finding fee of one-third to be "fair and reasonable in relation to the recovery and compares favorably to fee awards in other risky common fund cases in this Circuit and elsewhere"); *Stefaniak v. HSBC Bank USA, N.A.*, 2008 WL 7630102, at *3 (W.D.N.Y. June 28, 2008) (awarding 33% of fund, finding it "typical in class action settlements in the Second Circuit"). Moreover, ample precedent exists in this Circuit for granting fees in class actions and other complex litigation that are equal to the fee requested here and where the recovery obtained for the class is of comparable size. *See, e.g.*, Ex. 4, Order, *Levin v. Resource Capital Corp. et al.*, No. 1:15-cv-07081-LLS (S.D.N.Y. Aug. 3, 2018), ECF No. 95 (awarding 33% of $9.5 million fund); *In re China Media Express Holdings, Inc. S'holder Litig.*, 2015 WL 13639423, at *1 (S.D.N.Y. Sept. 18, 2015) (S.D.N.Y. Sept. 18, 2015) (awarding 33.3% of $12 million fund); *City of Providence*, 2014 WL 1883494, at *20 (awarding 33% of $15 million fund); *Id.* at *12 (citing *In re Apac Teleservs., Inc. Sec. Litig.*, No. 97-cv-9145 (S.D.N.Y. June 29, 2001) (awarding 33⅓% of $21 million fund); *Newman v. Caribiner Int'l Inc.*, No. 99-cv-2271 (S.D.N.Y. Oct. 25, 2001) (awarding 33⅓% of $15 million fund)); Ex. 5, Order, *Gould, et al v. Winstar, Inc., et al.*, Master File No. 1:01-cv-03014-GBD (S.D.N.Y. Nov. 13, 2013), ECF No. 363 at 2 (awarding 33.3% of $10 million fund); *In re IMAX Sec. Litig.*, 2012 WL 3133476, at *11 (S.D.N.Y. Aug. 1, 2012) (awarding 33% of $12 million fund); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 165 (S.D.N.Y. 2011) (awarding 33% of $13 million fund); *Khait v. Whirlpool Corp.*, 2010 WL 2025106, at *8 (E.D.N.Y. Jan. 20, 2010) (awarding 33% of $9.25 million fund); *Maley*

*v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 368 (S.D.N.Y. 2002) (awarding 33⅓% of $11.5 million fund).

### 2.    The Fee Request is Reasonable Under the Lodestar Method

Courts employing the percentage method often utilize a less rigorous lodestar "crosscheck" on the reasonableness of the requested fee. *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 406 (S.D.N.Y. 2019) (employing cross-check and noting "Second Circuit encourage[s] the practice of requiring documentation of hours as a cross check on the reasonableness of the requested percentage") (alteration in original); *Novartis*, 2010 WL 4877852, at *20 (employing lodestar cross-check and noting "if a percentage of fund figure compares favorably with a lodestar that uses reasonable hourly rates and a reasonable multiplier, it tends to validate the percentage of funds figure").

The work undertaken by Lead Counsel wholly supports the Court's approval of Lead Counsel's fee request. As detailed herein and in the Nirmul Declaration, Lead Counsel exerted substantial efforts in advancing this Litigation in the face of aggressive and highly-skilled defense attorneys for three years. Additionally, since reaching the Settlement, Lead Counsel has devoted significant time to ensuring that notice of the Settlement was provided to the Settlement Class in the most efficient and effective manner. Further, should the Court approve the Settlement, Lead Counsel will continue to perform legal work on behalf of the Settlement Class. Additional resources will be expended assisting Settlement Class Members with their Claim Forms and related inquires and working with the Claims Administrator, KCC, to ensure the smooth progression of claims processing and distribution of the Net Settlement Fund. No additional legal fees will be sought for this work. *See Willix v. Healthfirst, Inc.*, 2011 WL 754862, at *7 (E.D.N.Y. Feb. 18, 2011) ("The fact that Class Counsel's fee award will not only compensate them for time and effort already expended, but for time that they will be required to spend administering

the settlement going forward also supports their fee request."); *In re Facebook, Inc.*, 674 F. App'x 37 (2d Cir. 2016) (finding, in awarding a fee of 33% of a $26.5 million settlement fund, amounting to a lodestar multiplier of 1.02, that the fact that "the work in [the] matter [was] not yet concluded for [p]laintiffs' counsel who will necessarily need to oversee the claims process, respond to inquiries, and assist Class Members in submitting their Proof of Claims" supported the reasonableness of the award).

Lead Counsel has devoted over 6,600 hours of attorney and other professional support time to this Litigation through June 14, 2019. Based on these hours, Lead Counsel's lodestar is $3,191,242.50. ¶ 155; *see also* lodestar and expense submission of Sharan Nirmul, on behalf of Kessler Topaz ("Lodestar/Expense Decl.") attached to the Nirmul Declaration as Exhibit 3. Accordingly, the 33⅓% fee request represents a slightly negative "multiplier" of 0.99 on the lodestar value of the time that Lead Counsel dedicated to the Litigation. ¶ 155.

Fee awards in class actions with substantial contingency risks generally represent positive multipliers of counsel's lodestar, with lodestar multiples between 1 and 5 commonly awarded. *See, e.g.*, *Visa*, 396 F. 3d at 123 (upholding a multiplier of 3.5 as reasonable on appeal); *In re BioScrip, Inc. Sec. Litig.*, 273 F. Supp. 3d 474, 497 (S.D.N.Y. 2017) ("There is no question that Lead Counsel's lodestar multiplier of 1.39 is at the lower range of comparable awards in common fund cases."); *Pepsi*, 363 F. Supp. 3d at 411 (approving 1.94 multiplier "which closely aligns with the median multiplier in consumer cases of 1.82"). The negative multiplier here is below the parameters used throughout district courts in the Second Circuit and is additional evidence that the requested fee is reasonable. *See, e.g.*, *In re Bear Stearns Cos. Sec. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 271 (S.D.N.Y. 2012) (approving fee with a negative multiplier and noting that the negative multiplier was a "strong indication of the reasonableness of the [requested] fee");

*Marsh ERISA Litig.*, 2009 WL 5178546, at *20 (reasoning that where the multiplier is negative, the lodestar cross-check "unquestionably supports the requested percentage fee award."); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 515 (S.D.N.Y. 2009) (finding "no real danger of over-compensation" given that requested fee represented discount to counsel's lodestar).

Moreover, in conducting a lodestar analysis, the appropriate hourly rates to use are those rates that are "normally charged in the community where the counsel practices, *i.e.,* the market rate." *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *17 n.6 (S.D.N.Y. July 27, 2007); *Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir. 1997) ("[t]he lodestar figure should be in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation") (second alteration in original).[5] The accompanying Lodestar/Expense Declaration sets forth the hourly rates utilized by Lead Counsel in calculating its lodestar. Lead Counsel's hourly rates range from: (i) $820 to $920 per hour for partners; (ii) $325 to $690 per hour for other attorneys; (iii) $250 to $295 per hour for paralegals; and (iv) $300 to $450 per hour for in-house investigators. *See* Ex.3-A. Courts in this District have found similar rates to be fair and reasonable market rates for complex litigations. *See, e.g., Woburn Ret. Sys. v. Salix Pharm., Ltd.*, 2017 WL 3579892, at *5 (S.D.N.Y. Aug. 18, 2017) (approving hourly rates up to $995 for partners); *Rudman v. CHC Grp. Ltd.*, 2018 WL 3594828, at *3 (S.D.N.Y. July 24, 2018) (finding hourly rates ranging from $210 to $985 to be appropriate for

---

[5]     The Supreme Court and courts in this Circuit have approved the use of current hourly rates to calculate the base lodestar figure as a means of compensating for the delay in receiving payment, inflation, and the loss of interest. *See Missouri v. Jenkins*, 491 U.S. 274, 284 (1989); *In re Hi-Crush Partners LP Sec. Litig.*, 2014 WL 7323417, at *15 (S.D.N.Y. Dec. 19, 2014) ("the use of current rates to calculate the lodestar figure has been endorsed repeatedly by the Supreme Court, the Second Circuit and district courts within the Second Circuit as a means of accounting for the delay in payment inherent in class actions and for inflation").

class counsel); *In re Platinum & Palladium Commodities Litig.*, 2015 WL 4560206, at *3-4 (S.D.N.Y. July 7, 2015) (approving hourly rates ranging from $250 to $950).[6]

In sum, Lead Counsel's requested fee award is reasonable, justified, and within the range of what courts in this Circuit regularly award in class actions such as this one, whether calculated as a percentage of the fund or as a cross-check on counsel's lodestar. As discussed below, each of the factors considered by courts in the Second Circuit also weighs in favor of finding that the requested fee is reasonable.

### C.    The *Goldberger* Factors Confirm that the Requested Fee is Reasonable

The Second Circuit has set forth the following criteria that courts should consider when reviewing a request for attorneys' fees in a common fund case:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50. As demonstrated below, each of these factors confirms the requested fee is fair and reasonable.

---

[6]    Lead Counsel's hourly rates are also reasonable when compared against prevailing rates of defense firms specializing in complex litigation. *See In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 589 (S.D.N.Y. 2008) (explaining that "[p]erhaps the best indicator of the 'market rate' in the New York area for plaintiffs' counsel in securities class actions is to examine the rates charged by New York firms that defend class actions on a regular basis") (emphasis omitted). Indeed, JPM's counsel in this Litigation, Skadden, Arps, Slate, Meagher & Flom, LLP, reported hourly rates ranging from $220 per hour (for paraprofessionals) to $1,495 per hour (for partners) in a recent bankruptcy filing. *See In re China Fishery Grp. Ltd. (Cayman) et al. & In re CFG Peru Invs. Pte. Ltd. (Singapore)*, Case Nos. 16-11895 (JLG) & 16-11914 (JLG), ECF No. 981 (Bankr. S.D.N.Y. Feb. 8, 2018), available at http://document.epiq11.com/document/getdocumentbycode/?docID=3384935&projectCode=CHF&source=DM.

1.     **The Time and Labor Expended Support the Requested Fee**

The substantial time and effort expended by Lead Counsel in prosecuting this Litigation

and achieving the Settlement supports the requested fee. As set forth in greater detail in the Nirmul

Declaration, Lead Counsel, among other things:

- conducted a significant legal and factual investigation into Plaintiffs' claims,
  which included research regarding the pricing of Conversions by JPM, analysis
  of the underlying governing documents relating to JPM's provision of ADR
  services to Plaintiffs and review of voluminous publicly available information
  regarding JPM and its practices relating to FX currency trading (¶¶ 15-16);

- developed a theory of liability relating to JPM's Conversions and drafted three
  complaints, including the detailed operative Amended Complaint (¶¶ 17, 21,
  49-50);

- opposed a change of jurisdictional venue (¶ 19);

- opposed two motions to dismiss (¶¶ 19, 34-35);

- briefed a motion for reconsideration of the Court's ruling on JPM's motion to
  dismiss the Complaint (¶¶ 43-45);

- engaged in extensive fact discovery, including reviewing and analyzing over
  250,000 pages of documents produced by JPM, participating in numerous meet
  and confers to resolve discovery disputes, and deposing six fact and 30(b)(6)
  witnesses (¶¶ 58-96);

- consulted with a damages expert in developing a class-wide damages
  methodology, which entailed obtaining and analyzing internal JPM information
  regarding the relevant Cash Distributions for JPM-sponsored ADRs, the
  currencies involved in each FX transaction, and the FX rates applied by JPM,
  among other data (¶¶ 97-102);

- performed work in preparing an anticipated motion for class certification and
  assembling the proofs necessary to defeat an anticipated motion for summary
  judgment by Defendant (¶¶ 103-107);

- prepared for and participated in arm's-length settlement negotiations with
  Defendant's Counsel to resolve the Litigation (¶¶ 121-123);

- negotiated the specific terms of the Settlement over the course of two months
  and coordinated with JPM's transfer agent, Equiniti, to identify Registered

Holder Settlement Class Members for purposes of mailing notice and calculating claims (¶ 124);

- developed a plan for allocating the Net Settlement Fund with the assistance of Plaintiffs' damages expert (¶ 127-129); and

- consulted with a notice expert, HF Media, in modifying the initially proposed (and approved) notice plan in light of certain developments, including potentially incomplete and inaccurate responses provided by banks, brokers and other nominees ("Nominees"), in order to more effectively and efficiently target the Settlement Class, and moved for approval of such modifications to the notice plan (¶¶ 126, 134).

As noted above, Lead Counsel has expended a significant amount of time prosecuting this Litigation. This time and effort was critical in obtaining the favorable result achieved by the Settlement.

### 2. The Magnitude and Complexity of the Litigation Support Requested Fee

The complexity of the litigation is another factor examined by courts evaluating the reasonableness of attorneys' fees requested by class counsel. "[C]lass action suits in general have a well-deserved reputation as being most complex." *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999). This case was no exception.

In its initial scope, the Litigation alleged misconduct spanning over thirteen years, concerned hundreds of Conversions, and involved fifty-nine unique ADRs. *See* Complaint (ECF No. 1), at 2. Moreover, the alleged misconduct involved an opaque and technically complex corner of the financial-services world which required Lead Counsel, in developing and articulating a cogent theory of liability relating to JPM's Conversions, to become familiar with the pricing protocols, and the various systems, databases and coding conventions JPM maintained and utilized in handling FX. ¶ 100. In developing their allegations, Lead Counsel also had to review and analyze dozens of publicly-available Deposit Agreements in order to determine JPM's obligations

to ADR holders, as well as whether such Deposit Agreements were substantially similar to one another such that JPM's alleged conduct would constitute a breach of each agreement. ¶ 16. Lead Counsel also compared the rates received by ADR holders (as publicly disclosed by JPM) to the FX rates available in the market at or around the same time in order to determine the divergence, or "spread," that, as alleged by Plaintiffs, was retained by JPM as an unauthorized fee. *Id*.

The Litigation also raised a number of complex questions concerning liability and damages. As such, Plaintiffs knew that many aspects of their claims, and in particular, JPM's defenses, would be the subject of expert testimony. Specifically with respect to damages, Plaintiffs retained G. William Brown, Jr., Esq., principal of 8 Rivers Capital, to prepare a class-wide damages methodology—an analysis that had no prior roadmap and was unique to the facts of this case and tailored to the data maintained and produced by JPM. Without a doubt, the issue of damages would have come down to a battle of the experts had the Litigation continued. ¶¶ 119-120.

Accordingly, to build Plaintiffs' case, Lead Counsel had to dedicate a substantial amount of time to understanding these complex matters, conducting an extensive factual investigation, obtaining discovery, and working extensively with an expert to analyze the claims and the evidence obtained. *See City of Providence*, 2014 WL 1883494, at *16 (finding the second *Goldberger* factor to favor settlement where case involved "difficult, complex, hotly-disputed and expert-intensive issues"). The magnitude and complexity of this Litigation clearly supports the requested fee.

### 3. The Risk of the Litigation Support the Fee Request

"Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation." *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004). Moreover, "[c]ourts have repeatedly recognized that 'the risk of litigation' is a pivotal factor in assessing the appropriate attorneys' fees to award plaintiffs' counsel

14

in class actions." *Telik*, 576 F. Supp. 2d at 592. For this reason, the Second Circuit has found "[t]he level of risk associated with litigation . . . is 'perhaps the foremost factor' to be considered in assessing the propriety of the multiplier." *McDaniel*, 595 F.3d at 424; *In re MetLife Demutualization Litig.,* 689 F. Supp. 2d 297, 361 (E.D.N.Y. 2010) (recognizing that "[t]he risk of the litigation is often cited as the first, and most important, *Goldberger* factor"). While Lead Counsel believes that Plaintiffs' claims are meritorious, Lead Counsel recognized that there were a number of substantial risks in this Litigation from the outset and that Plaintiffs' ability to succeed at trial and obtain a substantial judgment was far from certain.

As discussed in detail in the Nirmul Declaration and summarized below, there were substantial challenges to succeeding in the Litigation. ¶¶ 110-120. When the Settlement was reached, Plaintiffs were just weeks away from filing a critical motion—their motion for class certification. In its MTD Order, the Court determined that Plaintiffs lacked class standing to represent the claims of ADR holders who had not purchased the same securities, finding that Plaintiffs' claims did not implicate the "same set of concerns as the claims of the absent class members." ¶ 115; ECF No. 35 at 30. It is possible that the Court, in ruling on a motion for class certification, could have further limited Plaintiffs' class standing by allowing Plaintiffs to represent only those ADR holders that received the same Cash Distributions. ¶ 115.

With respect to establishing liability, JPM—along with its fact witnesses—steadfastly maintained that the spread retained by JPM with respect to the Conversions at issue in this Litigation was an acceptable (and commercially reasonable) means of compensating it for conducting such Conversions. ¶ 117. And, although the Court sustained Plaintiffs' breach of contract claims at the pleading stage, the MTD Order left several open questions that could serve as leverage for Defendant as the Litigation continued. Specifically, the MTD Order noted that:

> Given the ambiguity in the Contract Documents, whether the spread is an expense, charge, or fee that is or is not permitted under the terms of the agreements are questions of fact to be resolved at summary judgment or trial. The Court notes, however, that just because Plaintiffs say the spread was a fee does not make it so.

¶ 117; ECF No. 35 at 18-19. If the Court (at summary judgment) or a jury (at trial) found Defendant's testimony regarding the spread to be more convincing, it is possible that Plaintiffs and the Settlement Class would have recovered nothing.

In addition, proving damages is always a risky endeavor; but here, this risk was underscored by the fact that there was no commonly accepted damages methodology on which to base an analysis. ¶ 119. While Plaintiffs and Lead Counsel believed their damages expert's methodology was grounded in sound economic theory, it was unique to this Litigation and would bring significant challenges by Defendant. Clearly, the issue of damages here would result in a battle of the experts. *See City of Providence*, 2014 WL 1883494, at *9 ("Undoubtedly, the Parties' competing expert testimony on damages would inevitably reduce the trial of these issues to a risky "battle of the experts" and the "jury's verdict with respect to damages would depend on its reaction to the complex testimony of experts, a reaction that is inherently uncertain and unpredictable."); *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 665 (S.D.N.Y. 2015) ("On the issue of damages, a trial would likely have turned heavily on a 'battle of the experts' between the parties' respective economists. It is impossible to predict which party's model of damages—if either—the jury would credit.").

In addition to the litigation risks unique to this case, courts also consider the risks associated with attorneys undertaking a case on a contingency fee basis in determining a fee award. *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001) (it is

"appropriate to take [contingent-fee] risk into account in determining the appropriate fee.").[7] Unlike counsel for defendants who are paid substantial hourly rates and reimbursed for their expenses on a regular basis, Plaintiffs' Counsel have not been compensated for any time or expenses since this case began in 2015, and would have received no compensation or expenses had this case not achieved a recovery for the Settlement Class. From the outset, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy endeavor with no guarantee of ever being compensated for the enormous investment of time and money the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient attorney and professional resources were dedicated to the prosecution of the Litigation and that funds were available to compensate staff and to pay for the costs entailed. There have been many class actions in which plaintiffs' counsel took on the risk of pursuing claims on a contingent basis, expended thousands of hours and millions of dollars in expenses and time and received nothing for their efforts.[8] This case could have been dismissed like so many others on Defendant's motions for summary judgment or resulted in a defense verdict, leading to absolutely

---

[7]     "No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974).

[8]     *See, e.g., In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050 (N.D. Cal. June 19, 2009); *aff'd*, 627 F.3d 376 (9th Cir. 2010) (granting summary judgment to defendants after eight years of litigation, and after plaintiffs' counsel had incurred over $6 million in expenses and a lodestar of approximately $48 million (based on over 100,000 hours of time)); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 504 (2d Cir. 2010) (affirming summary judgment in favor of defendants on loss causation grounds); *In re BankAtlantic Bancorp, Inc.*, 2011 WL 1585605, at *1 (S.D. Fla. Apr. 25, 2011) (granting defendants' judgment as a matter of law following plaintiff verdict); *In re JDS Uniphase Corp. Sec. Litig.*, No. 4:02-cv-01486-CW (N.D. Cal. Nov. 27, 2007), ECF No. 1883 (verdict for defendants); *Robbins v. Koger Props. Inc.*, 116 F.3d 1441 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs against an accounting firm reversed on appeal).

no recovery for the Settlement Class or Plaintiffs' Counsel. Accordingly, the risks in this case, including the contingency risk, strongly supports the requested attorneys' fee.

### 4. The Quality of Lead Counsel's Representation Supports the Fee Request

The quality of Lead Counsel's representation is another important factor that supports the reasonableness of the requested fee. This factor "is best measured by results," which "may be calculated by comparing the extent of possible recovery with the amount of actual verdict or settlement." *Goldberger*, 209 F.3d at 55. Here, the Settlement Amount—which exceeds the median recovery as a percentage of damages in recent securities class action settlements with comparable investor losses by *over three times*[9]—is a very favorable result for the Settlement Class particularly in light of the serious risks to continued litigation. *See Giant Interactive Grp.*, 279 F.R.D. 151 at 164 (finding settlement recovering "16.5% of the aggregate loss of the class [to be] higher than the typical recovery in many shareholder class actions, further justifying counsel's 33% fee request"). Indeed, it took a great deal of skill to achieve a settlement at this level in this particular case. Specifically, this Litigation required the marshalling of proofs related to complicated factual circumstances, the ability to develop compelling legal theories, and the skill to respond to a host of legal defenses. Kessler Topaz has substantial experience in complex federal civil litigation, particularly the litigation of securities and consumer class actions (*see* Ex. 3-C), and this experience translated into an immediate benefit for the Settlement Class in this Litigation.

---

[9]   *See* Stefan Boettrich & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review*, NERA Economic Consulting, Jan. 29, 2019, at 35, available at https://www.nera.com/content/dam/nera/publications/2019/PUB_Year_End_Trends_012819_Final.pdf (finding median settlement between 1996 and 2018 in securities cases with investor losses between $20 million and $49 million recovered 8.4% of investor losses).

"The quality of opposing counsel is also important in evaluating the quality of plaintiffs' counsel's work." *Seijas v. Republic of Argentina*, 2017 WL 1511352, at *13 (S.D.N.Y. Apr. 27, 2017); *see also Marsh ERISA Litig.*, 265 F.R.D. at 148 ("The high quality of defense counsel opposing Plaintiffs' efforts further proves the caliber of representation that was necessary to achieve the Settlement."). In this Litigation, JPM was represented by very skilled attorneys from the nationwide firm of Skadden, Arps, Slate, Meagher & Flom, LLP, a firm with a well-deserved reputation for vigorous advocacy in the defense of complex civil cases such as this. In the face of this formidable opposition, Lead Counsel was able to persuade JPM to settle the case at both a point in the Litigation and on terms that were highly favorable to the Settlement Class.

### 5.       The Requested Fee in Relation to the Settlement

"When determining whether a fee request is reasonable in relation to a settlement amount, the court compares the fee application to fees awarded in similar securities class-action settlements of comparable value." *Comverse*, 2010 WL 2653354, at *3; *see also In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at *7 (S.D.N.Y. Nov. 7, 2007) (noting that the fee awarded is "consistent with fees awarded in a similar class actions settlements of comparable value"). As discussed in detail in § II.B.1 above, the requested fee is in line with fee percentages awarded by courts in the Second Circuit.

### 6.       Public Policy Considerations Support the Requested Fee

The requested fee furthers the policy goal of "providing lawyers with sufficient incentive to bring common fund cases that serve the public interest." *Goldberger*, 209 F.3d at 51. The public interest is well served by this Litigation, which sought to hold JPM accountable for allegedly violating its agreements with investors and fraudulently concealing those violations. A necessary component of encouraging attorneys to undertake the risk of bringing actions (like this Litigation) however, is adequate compensation. *See Fleisher*, 2015 WL 10847814, at *22 ("Public policy

19

considerations strongly favor incentivizing skilled private attorneys to undertake this type of litigation, especially since the action is on behalf of small claimants who lack the financial incentive to obtain a recovery on their own behalf."); *Hicks v. Morgan Stanley*, 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) ("To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding.").

Accordingly, a 33⅓% fee would compensate Plaintiffs' Counsel for the benefits the Settlement has conferred on the Settlement Class, the substantial investment of time and money Lead Counsel devoted to litigating this case and securing the Settlement, as well as the risks they undertook in prosecuting the Litigation, including the contingent nature of their representation.

### 7. The Reaction of the Settlement Class

In accordance with the Court's Preliminary Approval Order (ECF No. 104) and subsequent Notice Modification Order (ECF No. 118), Postcard Notices were mailed to over 700,000 Registered Holder Settlement Class Members and a comprehensive multi-media notice campaign was conducted by an experienced notice administrator.[10]

The Postcard Notices as well as the publications and banner ads utilized in the multi-media notice campaign directed recipients to the long-form Notice for additional information, including that Lead Counsel, on behalf of Plaintiffs' Counsel, would be applying to the Court for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Amount and reimbursement of Litigation Expenses in an amount not to exceed $400,000, plus interest earned on these amounts.

---

[10]     *See* Declaration of Justin R. Hughes Regarding (A) Receipt of Registered Holder Data; (B) Mailing of the Postcard Notice; (C) Establishment of the Telephone Hotline; (D) Establishment of the Settlement Website; and (E) Report on Requests for Exclusion Received to Date ("Hughes Declaration" or "Hughes Decl.") attached to the Nirmul Declaration as Exhibit 1, at ¶ 4 and Declaration of Jeanne C. Finegan, APR Concerning Implementation of Notice to Settlement Class Members Through Multi-Media Notice Program ("Finegan Declaration" or "Finegan Decl.") attached to the Nirmul Declaration as Exhibit 2, at ¶¶ 14,17-44.

Ex.1-C. The fees and expenses sought by Lead Counsel do not exceed the amounts set forth in the Notice. While the deadline set by the Court for Settlement Class Members to object has not yet passed, to date, no objections to the amounts of attorneys' fees and expenses set forth in the Notice have been received. ¶ 145.[11] Additionally, Plaintiffs have approved the fees and expenses requested herein.

## III.   LEAD COUNSEL'S EXPENSES WERE REASONABLY INCURRED AND NECESSARY TO THE PROSECUTION OF THE LITIGATION AND SHOULD BE APPROVED

Lead Counsel also request reimbursement of the expenses that it reasonably incurred in prosecuting and resolving the Litigation in the total amount of $264,680.05. "Courts routinely note that counsel is entitled to reimbursement from the common fund for reasonable litigation expenses." *See Fleisher*, 2015 WL 10847814, at *23. The expenses for which Lead Counsel seek reimbursement are set forth by category in the Lodestar/Expense Declaration, *see* Ex. 3-B, and are of the type typically approved by courts. *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 468 (S.D.N.Y. 2004) ("The expenses incurred – which include investigative and expert witnesses, filing fees, service of process, travel, legal research and document production and review – are the type for which 'the paying, arms' length market' reimburses attorneys . . . [and] [f]or this reason, they are properly chargeable to the Settlement fund."); *In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *6 (S.D.N.Y. May 13, 2011) (in a class action, attorneys should be compensated "for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were 'incidental and necessary to the representation'"). Because the

---

[11]    The deadline for the submission of objecting is July 3, 2019. Should any objections be received, Lead Counsel will address them in its reply papers to be filed with the Court on or before August 1, 2019.

expenses here were incurred with no guarantee of recovery, Lead Counsel had a strong incentive to closely monitor and keep expenses at a reasonable level, and did so.

The largest component of Lead Counsel's expenses was the cost of experts, primarily Plaintiffs' damages expert, Professor Brown of 8 Rivers Capital, in the amount of $174,960.60, or approximately 66% of total expenses. ¶ 161. The next largest component of Lead Counsel's expenses (*i.e.*, $32,673.94) was for document hosting—specifically for the maintenance of an electronic database enabling Lead Counsel to effectively (and efficiently) analyze and review the more than 250,000 pages of documents produced in the Litigation. *Id*.

In addition, Lead Counsel incurred $16,129.78 in research charges. This amount represents charges for computerized research services such as Lexis Advance, Westlaw, and PACER. It is standard practice for attorneys to use online services to assist them in researching legal and factual issues, and indeed, courts recognize that these tools create efficiencies in litigation and ultimately save money for clients and the class. *Id*. Travel was also required to prosecute this Litigation and Lead Counsel incurred a total of $16,536.21 for travel expenses such as airline and train tickets, lodging and meals. ¶ 162. The other expenses for which Lead Counsel seek reimbursement include, among others, court fees, court reporters and transcripts, document-reproduction costs, and delivery expenses. ¶ 160, *see also* Ex. 3-B. Accordingly, reimbursement of the requested expenses is reasonable and appropriate.

Here, the amount of expenses requested for reimbursement to Lead Counsel, a total of $264,680.05, combined with the $5,000.00 being requested for Plaintiffs discussed below, is well below the $400,000 maximum amount stated in the Notice. Ex. 1-B. As set forth above, to date, there have been no objections to the maximum expense amount set forth in the Notice. ¶ 158.

## IV.    SERVICE AWARDS TO PLAINTIFFS ARE WARRANTED

Courts within this Circuit "have, with some frequency, held that a successful Class action plaintiff, may, in addition to his or her allocable share of the ultimate recovery, apply for and, in the discretion of the Court, receive an additional award, termed an incentive award." *Bellifemine v. Sanofi-Aventis U.S. LLC*, 2010 WL 3119374, at *7 (S.D.N.Y. Aug. 6, 2010). Incentive awards are completely within the discretion of the Court, and have been approved as an important means of "reimbursing class representatives who take on a variety of risks and tasks when they commence representative actions, such as complying with discovery requests and often must appear as witnesses in the action." *Marsh ERISA Litig.*, 265 F.R.D. at 150. Accordingly, Lead Counsel request Service Awards of $2,500.00 each for the Merryman Plaintiffs and Chester County.

Lead Counsel respectfully submits that the requested Service Awards are justified in light of Plaintiffs' efforts in representing the Settlement Class. As detailed in the Nirmul Declaration, Plaintiffs responded to discovery requests and produced over 10,000 pages of documents to JPM. Additionally, Plaintiffs reviewed significant filings and communicated regularly with Lead Counsel regarding the status of the Litigation, and all Plaintiffs approved the Settlement. ¶¶ 108-109.

Further, the Notice informed Settlement Class Members that Lead Counsel might seek Service Awards of up to $50,000 in the aggregate from the Settlement Fund, and no objection to this request has been received. The $5,000.00 total award to Plaintiffs is well below the maximum amount set forth in the Notice and is well-justified. *See, e.g.,* Ex. 6, Order, *In Re: The Bank of New York Mellon ADR Litig.*, No. 16-CV-00212-JPO-JLC (S.D.N.Y. June 17, 2019), ECF No. 161 at 4 (awarding Service Awards ranging from $2,500 to $10,000 to Lead Plaintiffs); *Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 2012 WL 2064907, at *3 (S.D.N.Y. June 7, 2012) (approving $50,000 service award to each of the named plaintiffs, who "diligently

performed the tasks expected of them and reasonably incurred costs and expenses in responding to document requests and interrogatories, producing responsive documents, reviewing filings, attending depositions, and communicating regularly with plaintiffs' counsel").

## V.      CONCLUSION

Lead Counsel respectfully requests that the Court award attorneys' fees in the amount of 33⅓% of the Settlement Fund and approve reimbursement of Lead Counsel's expenses in the amount of $264,680.05, as well as the proposed Service Awards to Plaintiffs in the aggregate amount of $5,000.00.

Dated:  June 20, 2019                            Respectfully Submitted,


**KESSLER TOPAZ MELTZER & CHECK, LLP**

*s/Sharan Nirmul*
Joseph H. Meltzer
Sharan Nirmul
Ethan J. Barlieb
Jonathan F. Neumann
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile:  (610) 667-7056
jmeltzer@ktmc.com
snirmul@ktmc.com
ebarlieb@ktmc.com
jneumann@ktmc.com

*Counsel for Plaintiffs and the Settlement Class*